

**DANIEL B. BESIKOF**
Partner

345 Park Avenue
New York, NY 10154

**Direct**   212.407.4129
**Main**    212.407.4000
**Fax**     646.417.6335
dbesikof@loeb.com

Via ECF

January 31, 2020

Hon. Alan S. Trust
U.S. Bankruptcy Judge
U.S. Bankruptcy Court
Eastern District of New York
Alfonse M. D'Amato Federal Courthouse
290 Federal Plaza
Central Islip, New York 11722

Re:   *In re: Absolut Facilities Management, LLC, et al.*, No. 19-76260-ast

Dear Judge Trust:

We represent Absolut Facilities Management, LLC and its affiliated debtor entities (collectively, the "**Debtors**"), as debtors-in-possession in the above-referenced chapter 11 cases.

Pursuant to the Court's instructions at yesterday's hearing, please find attached:

- The proposed form of sale order (attached as **Exhibit A**);

- The Chapter 11 Plan Term Sheet (attached as **Exhibit B**);

- A draft Asset Purchase Agreement (attached as **Exhibit C**); and

- A draft Administrative Services and Consulting Agreement (attached as **Exhibit D**).

Any objections to the above-referenced document must be filed and served upon counsel for the Debtors so as to be **actually received by February 4 at 10:00 a.m. (Eastern Time)**.  If an objection is filed, a hearing to consider the objection and approval of the proposed sale will be held on **February 5, 2020 at 1:30 p.m.** at 271-C Cadman Plaza East, Courtroom 2554, Brooklyn, NY 11201.

We thank the Court for its attention to this matter.

Sincerely,

/s/ *Daniel B. Besikof*
Daniel B. Besikof
Partner

Los Angeles   New York   Chicago   Nashville   Washington, DC   San Francisco   Beijing   Hong Kong   www.loeb.com

For the United States offices, a limited liability partnership including professional corporations. For Hong Kong office, a limited liability partnership.

18681308

# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re:<br><br>Absolut Facilities Management, LLC, *et al.*<br><br>Debtors.[1] | ) Chapter 11<br>)<br>) Case No. 19-76260-ast<br>) Case No. 19-76263-ast<br>) Case No. 19-76267-ast<br>) Case No. 19-76268-ast<br>) Case No. 19-76269-ast<br>) Case No. 19-76270-ast<br>) Case No. 19-76271-ast<br>) Case No. 19-76272-ast<br>)<br>) (Jointly Administered) |

### ORDER AUTHORIZING (I) SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO RCA HEALTHCARE MANAGEMENT, LLC, FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS (EXCEPT FOR ASSUMED LIABILITIES) AND (II) ASSUMPTION AND ASSIGNMENT OF CONTRACTS

Upon the motion, dated November 22, 2019 [Dkt No. 269] (the "**Motion**") of the above-captioned debtors and debtors in possession (the "**Debtors**" or "**Seller**"), seeking, among other things, entry of an order pursuant to sections 105, 363 and 365 of Title 11 of the United States Code (the "**Bankruptcy Code**"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), authorizing the Debtors to sell the Acquired Assets pursuant to the terms of an Asset Purchase Agreement, dated as of January 30, 2020 (the "**Agreement**"),[2] by and among the Debtors, as Seller, and RCA Healthcare Management, LLC, as buyer (together with its designees, successors and permitted assigns, the "**Buyer**"); and the Court

---

[1] The Debtors in these chapter 11 cases (as captioned above, these "**Chapter 11 Cases**"), along with the last four digits of each Debtors' federal tax identification number, are: Absolut Facilities Management, LLC (1412); Absolut Center for Nursing and Rehabilitation at Allegany, LLC (7875); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (8266); Absolut Center for Nursing and Rehabilitation at Gasport, LLC (8080); Absolut at Orchard Brooke, LLC (1641); Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC (8300); Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC (8133); and Absolut Center for Nursing and Rehabilitation at Westfield, LLC (7924).

[2] Any capitalized term used but not otherwise defined herein shall have the meaning ascribed to such term in the Agreement or the Motion.

having entered an *Order (I) Approving Bidding Procedures for the Sale of Substantially all of the Debtors' Assets, (II) Authorizing the Selection of a Stalking Horse Bidder, (III) Approving Bid Protections, (IV) Scheduling Auctions and Hearings to Consider Such Sale of Assets, (V) Approving Assumption and Assignment Procedures Related to Such Sale and (VI) Approving the Form and Manner of Related Notice,* dated December 18, 2019 [Dkt No. 323] (the "**Sale Procedures Order**"), based upon the record made at the hearing held on Dec

"**Sale Procedures Hearing**"); the Auction having been cancelled due to the Debtors' determination, in consultation with the official committee of unsecured creditors (the "**Committee**"), that the Buyer was the only qualified bidder per the Sale Procedures Order and the Agreement constitutes the highest and otherwise best offer for the Acquired Assets; and the Court having conducted a hearing to consider the Motion and the Debtors' request to enter into and consummate the transactions contemplated by the Agreement on January 30, 2020 (the "**Sale Hearing**"); and all parties in interest having been heard, or having had the opportunity to be heard, regarding the Agreement, whereby Seller has agreed to sell and Buyer has agreed to acquire, the Acquired Assets (the "**Sale**") and Seller has agreed to transfer and Buyer has agreed to assume certain of the Debtors' liabilities (collectively and as specifically set forth and defined in the Agreement, the "**Assumed Liabilities**") (collectively and including all actions taken or required to be taken in connection with the implementation and consummation of the Agreement, the "**Transactions**"); and the Court having reviewed and considered the Agreement, the Motion and all evidence and arguments in support thereof, the Sale Procedures Order, the Agreement, the Plan Term Sheet (as defined below) and any objections and responses to the Motion and the Transactions; and the Court having considered the arguments of counsel made and the evidence adduced at the Sale Procedures Hearing and the Sale Hearing; and upon the record of the Sale

2

Procedures Hearing, the Sale Hearing and these Chapter 11 Cases; and it appearing that due notice of the Motion, the Sale Procedures Order and the Sale has been provided; and it appearing that the relief requested in the Motion with respect to the Transactions is in the best interests of the Debtors, their estates, their stakeholders and all other parties in interest; and it appearing that the Court has jurisdiction over this matter; and it further appearing that the legal and factual bases set forth in the Motion, at the Sale Procedures Hearing and at the Sale Hearing establi

relief granted herein; and after due deliberation thereon and good and sufficient cause appearing therefor, it is hereby,

FOUND AND DETERMINED THAT:

A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.     The Court has jurisdiction over the Motion and the Transactions contemplated by the Agreement pursuant to 28 U.S.C. §§ 157 and 1334 and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d) and to any extent necessary under Bankruptcy Rules 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

D.     The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014 and Rule 6004-1

of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Eastern District of New York (the "**Local Rules**").

E.      As evidenced by the affidavits of service and publication previously filed with the Court and based on the representations of counsel at the Sale Hearing, (i) due, proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Procedures Hearing, the Sale and the assumption and assignment of the Assumed Contracts ha

accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014, the applicable Local Rules, including Local Rule 9006-1 and in compliance with the Sale Procedures Order to each party entitled thereto, (ii) such notice was good and sufficient and appropriate under the particular circumstances and (iii) no other or further notice of the Motion, the Sale Hearing and the Sale is or shall be required.

F.      Pursuant to the Sale Procedures Order, the Debtors filed a schedule of cure obligations on December 26, 2019  [Dkt No. 348] (the "**Executory Contract List**") and served the Executory Contract List on each of the non-debtor parties listed on the Executory Contract List electronically and by first class mail on such date, notifying contract counterparties: (a) that Seller may seek to assume and assign certain Contracts on the Closing Date of the Sale or thereafter as provided in the Sale Procedures Order and (b) of the proposed Cure Amounts. The service of the Executory Contract List was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of the assumption, assignment and establishing a cure amount for those Contracts listed on the Executory Contract List that have been designated by the Buyer for assumption and assignment at any time prior to the Closing and that are ultimately assumed in connection with this Order (the "**Assumed Contracts**").  Each of the counterparties to

the Assumed Contracts has had an opportunity to object to the assumption, assignment and the Cure Amounts and has consented to the assumption and assignment pursuant to this Order.

G.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and the Sale Procedures Hearing and (ii) the representations of counsel made on the record at the Sale Hearing and the Sale Procedures Hearing, the Debtors (x) have adequately marketed the Acquired Assets since one year prior to the Petition Date in t

exercised sound business judgment in determining not to proceed with the Auction and (z) have duly and properly agreed, in accordance with their business judgment, that the Transactions contemplated by the Agreement are in the best interest of the estates and creditors.

H.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, under the circumstances, the consideration provided by Buyer under the Agreement, and this Order, constitutes or provides the highest or otherwise best offer obtained, and provides fair and reasonable consideration to the Debtors for the sale of all Acquired Assets and the assumption of all Assumed Liabilities, and the performance of the other covenants set forth in the Agreement, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative resulting from the Debtor's sale process. The Debtors' determination that the Agreement and the Transactions contemplated thereby constitutes the highest and best offer for the Acquired Assets is a valid and sound exercise of the Debtors' business judgment. Approval of the Agreement and consummation of the Sale and the other Transactions at this time are in the best interests of the Debtors, their creditors, their estates and other parties in interest.

I.      Notice and a reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all parties in interest in these Chapter 11

Cases, including: (a) the U.S. Trustee; (b) counsel to the Committee; (c) counsel to the Buyer; (d) all parties which, to the best of the Debtors' knowledge, information and belief, have asserted a lien or security interest against any of the Acquired Assets; (e) all of the Debtors' landlords (the "Landlords"); (f) all applicable federal, state and local taxing and regulatory authorities which have a reasonably known interest in the relief requested in the Motion, including the Internal Revenue Service; (g) all parties who have filed a notice of appearance and r

papers pursuant to Bankruptcy Rule 2002; and (h) all other known creditors of the Debtors, including any contract counterparties.

J. The Agreement was negotiated, proposed and entered into by Seller and the Buyer without collusion, in good faith and from arm's-length bargaining positions. Neither the Debtors, nor the Buyer, nor any Affiliate of the Buyer, has engaged in any conduct that would cause or permit the Agreement to be avoided under section 363(n) of the Bankruptcy Code. Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate consideration provided by the Buyer for the Acquired Assets was not controlled by any agreement among any bidders.

K. The Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby. Specifically, (i) the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Debtors agreed that the sale to the Buyer constitutes or provides the highest or otherwise best offer obtained and provides fair and reasonable consideration to the Debtors for the sale of all Acquired Assets and the assumption of all Assumed Liabilities; (iii) the Buyer in no way induced or caused the chapter 11 filings by the Debtors; and (iv) the negotiation and execution of the Agreement was at arms' length and in good faith.

L.     The consideration provided by Buyer for the Acquired Assets pursuant to the Agreement (i) is fair and reasonable, (ii) is the highest or otherwise best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession and the District of Columbia.

M.     There has been no showing that Seller or Buyer (i) have entered into the Agreement or propose to consummate the Transactions for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors or (ii) are entering into the Agreement or proposing to consummate the Transactions fraudulently, for the purpose of statutory or common law fraudulent conveyance and fraudulent transfer claims, whether under the Bankruptcy Code or any other applicable law.

N.     The Sale must be approved and consummated promptly in order to preserve the value of the Debtors' assets, as there is substantial risk of deterioration of the value of the Acquired Assets if the Transactions are not consummated quickly.

O.     The Seller and Buyer have authorized the execution and delivery of the Agreement, the sale of all Acquired Assets to Buyer and the assumption of all Assumed Liabilities by Buyer. The Seller and the Buyer (i) have full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, as applicable, (ii) have all of the power and authority necessary to consummate the Transactions and (iii) have taken all action necessary to authorize and approve the Agreement and to consummate the Transactions, and no further consents or approvals are required for the Seller or the Buyer to consummate the Transactions contemplated by the Agreement, except as otherwise set forth in the Agreement.

P.     Effective upon the Closing, the transfer and assignment of the Acquired Assets to the Buyer will be a legal, valid, enforceable and effective transfer and assignment of the Acquired Assets, and will vest the Buyer with all right, title and interest of the Debtors in the Acquired Assets free and clear of all Liens, Claims and Interests (as defined below) except for the Assumed Liabilities, or as otherwise provided in this Order.  A sale of the Acquired Assets other than one free and clear of all Liens, Claims and Interests, except for the Assumed Liabil

provided in this Order, would adversely impact the Debtors' estates and would yield substantially less value for the Debtors' estates, with less certainty than the Sale.  Therefore, the Sale contemplated by the Agreement is in the best interests of the Debtors, their estates and creditors and all other parties in interest.

Q.     The consummation of the Sale and Transactions is legal, valid, properly authorized and complies with all applicable state and federal law.

R.     The Acquired Assets constitute property of the Debtors' estates and title thereto is presently vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

S.     Neither the Buyer nor any of its Affiliates, successors, or assignees is a successor to the Debtors or their bankruptcy estates by reason of any theory of law or equity and neither the Buyer nor any of its Affiliates, successors, or assignees shall assume or in any way be responsible for any liability or obligation of the Debtors and/or their bankruptcy estates, except as otherwise expressly provided in the Agreement or this Order.

T.     The Buyer would not have entered into the Agreement and will not consummate the Transactions if the sale of the Acquired Assets is not free and clear of all Liens, Claims and Interests, except for the Assumed Liabilities, or as otherwise provided in this Order.

U.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assumed Contracts to the Buyer in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts, is in the best interests of the Debtors, their estates and their creditors.  The assumption and assignment of the Assumed Contracts pursuant to the terms of this Order is integral to the Agreement, in the best interests of the Debtors and their respective estates, creditors and other pa

represent the reasonable exercise of sound and prudent business judgment by the Debtors. Accordingly, such assumption and assignment of Assumed Contracts and Assumed Liabilities are reasonable and enhance the value of the Debtors' estates.

V.    For all counterparties to Assumed Contracts other than the Landlords, the "cure" amounts set forth on the Executory Contract List (the "**Cure Amount**") are approved and shall be paid by the Buyer to each counterparty.

W.    The Debtors, the Landlords, the Committee, and ABS DIP, LLC have entered into the Plan Term Sheet, attached hereto as Exhibit A (the "**Plan Term Sheet**"), the terms of which are incorporated herein by reference.  Pursuant to the Plan Term Sheet, the Landlords' Cure Amount will remain the obligation of the Debtors' estates and the Landlords have agreed to certain compromises as to the priority, treatment, and amount of their Cure Amounts solely with respect to this Sale, as set forth in the Plan Term Sheet.

X.    The Debtors have met all requirements of section 365(b) of the Bankruptcy Code for each of the Assumed Contracts.  Except as set forth in the immediately preceding paragraph, effective upon the Closing and in accordance with the Agreement, the Buyer will have agreed to (i) cure, or provide adequate assurance of cure, of any default existing prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the

Bankruptcy Code and (ii) provide compensation or adequate assurance of compensation to any appropriate party for any actual pecuniary loss incurred by such party resulting from a default prior to the date hereof under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code. Further, the Buyer has provided adequate assurance of future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code. Each of the Assumed Contracts is assigned and rem effect for the benefit of, the Buyer notwithstanding any provision in the contracts or other restrictions prohibiting their assignment or transfer free and clear of Liens, Claims and Interests, except for the Assumed Liabilities, against the Buyer.

Y.      No default exists in the Debtors' performance under the Assumed Contracts as of the date of this Order other than the failure to pay Cure Amounts (if any), or defaults that are not required to be cured as contemplated in section 365(b)(1)(A) of the Bankruptcy Code.

Z.      Time is of the essence. To maximize the value of the Debtors' assets, it is critical that the Transactions close within the time constraints set forth in the Agreement, and the Debtors and Buyer intend to close the Transactions as soon as practicable.  Accordingly, there is good cause to waive the stay contemplated by Bankruptcy Rules 4001, 6004 and 6006.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED and DECREED THAT:**

1.      The Motion is granted, to the extent, and as further described herein. The Sale and the Transactions contemplated by the Agreement, the ASA and the other Transaction Documents (defined below) are approved.

2.      All objections to the Motion and the Transactions or the relief requested therein that have not been withdrawn, waived, or settled and all reservations of rights included therein, are

hereby overruled on the merits with prejudice. All persons and entities given notice of the Motion that failed to timely object thereto are deemed to consent to the relief sought therein, including all non-Debtor parties to the Assumed Contracts.

3. Findings of fact and conclusions of law in the Sale Procedures Order, including the record of the Sale Procedures Hearing, are incorporated herein by reference.

## Approval of the Transaction Documents

4. The Agreement, the Administrative Services and Consulting Agreement ("**ASA**") and the other Transaction Documents, and all of the terms and conditions thereof and all Transactions contemplated therein are hereby approved.

5. Pursuant to sections 363(b) and 365 of the Bankruptcy Code, the Debtors are authorized to (a) perform their obligations under and comply with the terms of the Agreement, the ASA and the other Transaction Documents, and consummate, implement and fully close the Transactions, pursuant to and in accordance with the terms and conditions of the Agreement, the ASA, the other Transaction Documents and this Order, and (b) assume and assign any and all Assumed Contract(s) as and when provided in the Agreement, or this Order.

6. This Order, the Agreement, the ASA and the other Transaction Documents shall be binding in all respects upon all creditors (whether known or unknown) of the Debtors, all non-Debtor parties to the Assumed Contracts, successors and assigns of the Buyer, the Debtors and their affiliates and subsidiaries and any subsequent trustees appointed in the Debtors' chapter 11 cases or appointed upon a conversion to chapter 7 under the Bankruptcy Code. Nothing contained in any chapter 11 plan confirmed in this bankruptcy case (the "**Plan**"), the order confirming any such Plan (the "**Confirmation Order**") or any order dismissing or converting to chapter 7 of the Bankruptcy Code any of the Debtors' bankruptcy cases (the "**Other Orders**"), shall conflict with,

supersede, abrogate, nullify or restrict the terms of the Agreement, the ASA, the other Transaction Documents, the Sale Procedures Order, or this Order, or in any way prevent or interfere with the consummation or performance of the Transactions contemplated by the Agreement, the ASA or the other Transaction Documents, including, without limitation, any transaction contemplated or approved pursuant to this Order or the Sale Procedures Order.

7. The Agreement, the ASA and the other Transaction Documen amended, or supplemented by the parties thereto in a writing signed by both parties and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on the Debtors' estates.

**Transfer of Assets**

8. Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, upon the Closing Date, the Acquired Assets shall be transferred to the Buyer in accordance with the Agreement and such transfer shall constitute a legal, valid, binding and effective transfer of such Acquired Assets, and shall, except with respect to the Assumed Liabilities, or as otherwise provided in this Order, vest the Buyer with title to the Acquired Assets, free and clear of all liens, claims and interests and all mortgages, pledges, options, security interests, charges, rights of first refusal, hypothecations, encumbrances on real or personal property, easements, encroachments, rights of way, restrictive covenants on real or personal property, real or personal property licenses, leases, or conditional sale arrangements, debts, liabilities, obligations, judgments, mechanics liens, artisans liens, charging liens, suppliers' liens, design professionals' liens, laborers' liens, construction liens, constitutional, statutory and other liens and claims (as that term is defined in section 101(5) of the Bankruptcy Code), including rights or claims based upon successor or

transferee liability, Environmental Laws, liability under the Federal and State WARN Acts or similar law, whether accrued or fixed, direct or indirect, liquidated or unliquidated, absolute or contingent, matured or unmatured, known or unknown, determined or undeterminable, including those arising under any law or action and those arising under any contract or otherwise, including any tax liability and including any rights, claims, or causes of action based on any theories of transferee or successor liability (collectively, the "**Liens, Claims and Intere**

and Interests shall also include but are not limited to: (a) those that purport to give to any party a right terminate the Debtors' or the Buyer's interest in the Acquired Assets, or any similar rights; (b) those relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Acquired Assets prior to the Closing; and (c) all debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or any of the Debtors' predecessors or affiliates, claims (as that term is defined in the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases and whether imposed by agreement, understanding, law, equity, or otherwise, including but not limited to claims otherwise arising under doctrines of successor liability.

9. All Liens, Claims and Interests released, terminated and discharged as to the Acquired Assets shall attach to the proceeds of the Sale (the "**Proceeds**"), with the same validity, force and effect that they now have as against the Debtors, the estates, or the Acquired Assets, subject with respect to the Proceeds to any claims and defenses the Debtors may possess with respect thereto. For the avoidance of doubt, except with respect to the Assumed Liabilities, or as otherwise provided in this Order, upon the Closing Date the sole and exclusive right and remedy

with respect to the Acquired Assets available to purported creditors, equity holder(s), including, without limitation, the equity holder(s) of the Debtors and the holders of any other Liens, Claims and Interests and parties in interest, shall be a right to assert Liens, Claims and Interests against the Proceeds and the Debtors' estates.

10. As of the Closing, the Buyer shall have any and all rights, claims, defenses and offsets held by Debtors and their estates with respect to all Assumed Liabiliti

11. The Buyer shall not be deemed, as a result of any action taken in connection with the Agreement, the consummation of the Transactions, or the transfer, operation or use of the Acquired Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors; (b) have, *de facto* or otherwise, merged with or into the Debtors; or (c) be an alter ego or a mere continuation or substantial continuation of the Debtors, including within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation (including filing requirements under any such laws, rules or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine.

12. Except as expressly provided in the Agreement with respect to the Assumed Liabilities, or as otherwise provided in this Order, Buyer shall have no liability whatsoever with respect to the Debtors' (or their predecessors or affiliates) respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations (as described below, "**Successor or Transferee Liability**") based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor or transferee liability, *de facto* merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing

14

or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Acquired Assets or the Business prior to the Closing.  Except to the extent expressly included in the Assumed Liabilities or otherwise provided for in the Agreement or this Order, Buyer shall have no liability or obligation under the WARN Act (29 U.S.C. §§ 2101 et seq.) and its state law equivalents

Environmental Response Compensation and Liability Act (42 U.S.C. §§ 9601 et. seq.); the Employment Retirement Income Security Act of 1974, as amended (29 U.S.C. §§ 2101 et seq.) ("**ERISA**") or any foreign, federal, state or local labor, employment or environmental law whether of similar import or otherwise by virtue of Buyer's purchase of the Acquired Assets or assumption of the Assumed Liabilities by Buyer.  Except as otherwise provided herein, the Buyer and its Affiliates shall have no liability or obligation with respect to any environmental conditions related to the Acquired Assets.

13.     Except as otherwise provided in this Order, effective upon the Closing, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its Affiliates or their assets (including the Acquired Assets), with respect to any (a) Liens, Claims and Interests, except for any Assumed Liabilities, or (b) Successor or Transferee Liability, including the following actions with respect to clauses (a) and (b): (i) commencing or continuing any action or other proceeding pending or threatened; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Liens, Claims and Interests, except with respect to any Assumed Liabilities; (iv) asserting any setoff, right of subrogation or recoupment of any

kind; (v) commencing or continuing any action, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect hereof; or (vi) revoking, terminating or failing or refusing to renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with such assets.

**Assumption and Assignment of Contracts**

14.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing Date, the Debtors' assumption and assignment to the Buyer and the Buyer's assumption on the terms set forth in the Agreement of the Assumed Contracts are hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

15.     The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon and subject to the occurrence of the Closing and the Closing Date, the Assumed Contracts free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, except for Assumed Liabilities, or as otherwise provided in this Order, which Assumed Contracts by operation of this Order, shall be deemed assumed and assigned effective as of the Closing Date and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts and Assumed Liabilities to the Buyer.

16.     The Assumed Contracts shall be transferred and assigned to, and following the Closing Date, remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms (as may be modified by agreement between the Buyer and the applicable counterparty), notwithstanding any provision in any such Assumed Contract (including those of

16

the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Assumed Contracts after such transfer and assignment to the Buyer. The Buyer may assume the Assumed Contracts in accordance with section 365 of the Bankruptcy Code. The Debtors may assign each Assumed Contract in accordance with sections 363 and 365 of the Bankruptcy Code, a

any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the non-debtor party to such Assumed Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Contract, shall constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption and assignment by the Debtors to the Buyer of each Assumed Contract have been satisfied. Upon the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Contract. For the avoidance of doubt, the Buyer shall be able to designate contracts from the Executory Contract List (or any supplement or modification to the Executory Contract List) for assumption through the Closing.

17. All defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code as to which no objections were interposed), are deemed satisfied by the Cure Amounts with respect to each Assumed Contract in those amounts agreed to by the Buyer and non-debtor counterparties to the Assumed Contracts and which were satisfied, or shall be satisfied as soon as practicable

following Closing, by the Buyer; provided, however, that pursuant to the Plan Term Sheet and notwithstanding anything in this Order or the Sale Procedures Order to the contrary, the Landlords' Cure Amount will remain the obligation of the Debtors' estates, as modified by the terms and conditions contained in the Plan Term Sheet.

18. Except as otherwise provided in this Order and the Plan Term Sheet with respect to the Landlords, each non-debtor party to an Assumed Contract hereby is fore and permanently enjoined from asserting against the Debtors, the Buyer, or the property of any of them, any default existing as of the Closing Date; or, against Buyer, any counterclaim, defense, setoff, or any other claim asserted or assertable against the Debtors. Except as provided in the Agreement, the Plan Term Sheet, or this Order, after the Closing Date, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, their property, or their assets or estates. There shall be no rent accelerations, assignment fees, increases, or any other fees charged to the Buyer or the Debtors as a result of the assumption, assignment and/or transfer of any Assumed Contract. The Buyer's agreement pursuant to the terms of the Agreement to pay the Cure Amounts and to perform the obligations under the Assumed Contracts after the Closing Date shall constitute adequate assurance of its future performance under the Assumed Contracts being assigned to it within the meanings of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

**The Sale Does Not Require the Appointment of a Consumer Privacy Ombudsman**

19. The Debtors did not have any privacy policy in effect on the Petition Date and the Debtors are not selling or leasing any personally identifiable information (as that term is defined

in 11 U.S.C. § 101(41A)) of any individual.  Accordingly, no consumer privacy ombudsman is required in connection with the sale under section 363(b)(1) of the Bankruptcy Code.

**<u>Additional Provisions</u>**

20.     The Debtors are parties to Medicare provider agreements (the "**Medicare Provider Agreements**") with the Secretary of the United States Department of Health and Human Services, acting through its designated component, the Centers for Medicare & Medicai

to receive payment for services provided to Medicare beneficiaries pursuant to the provisions of and regulations promulgated under, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll.  Notwithstanding anything in this Order, the Motion, the Agreement, the Plan Term Sheet, the ASA, or any other Transaction Documents:

(a)     the Medicare Provider Agreements shall be governed exclusively and solely by the Medicare statutes, regulations, rules, policies and procedures, including, but not limited to, transfer of the Medicare Provider Agreements with successor liability through a valid "change of ownership".  Pursuant to 42 C.F.R. § 489.18(c), the Provider Agreements shall be automatically assigned to the Buyer or any subsequent operator of the Facilities (globally defined herein as defined in the ASA) (collectively, the "**New Operators,**" and each a "**New Operator**") upon a change in ownership, subject to the terms and conditions under which the Medicare Provider Agreements were originally issued, including, but not limited to, the recoupment of all pre-assignment Medicare overpayments and all other monetary liabilities, regardless of whether they have not yet been determined by CMS;

(b)     the New Operators shall be subject to compliance with applicable health and safety standards pursuant to all Medicare statutes, regulations, rules, policies and procedures;

(c)     nothing shall affect or impair the United States' defenses, claims, rights, or ability to recoup, setoff, or otherwise recover Medicare overpayments and any other monetary liabilities from the Debtors and/or any New Operator under the Medicare Provider Agreements in accordance with the Medicare statutes, regulations, rules, policies and procedures;

(d)     nothing shall relieve or be construed to relieve the Debtors or any New Operator from complying with all Medicare statutes, regulations, rules, policies and pr

but not limited to, the requirement that the Debtors and any New Operator apply for and obtain CMS approval of a change of ownership by the filing of Form CMS-855A; and

(e)     The Debtors and New Operators shall comply with the anti-assignment provisions of the Medicare Act and regulations at, respectively, 42 USC 1395g(c) and 42 CFR 424.73(a). Specifically, any payments billed for services under the Debtors' provider numbers prior to the change of ownership will be deposited into the Debtors' respective accounts.  Further, pursuant to 42 C.F.R. § 424.550 and 42 C.F.R. § 424.535(a)(7), the New Operators are prohibited from using the Debtors' Medicare Provider Numbers to bill for services except pursuant to a valid change of ownership.  Any ASA Servicer (globally defined herein as defined in the ASA) will not have a Power of Attorney with respect to Medicare payments due to the Debtors prior to the change of ownership.

21.     The financial accounts of the Facilities (as defined in the ASA) during the Interim Period (as defined in the ASA) shall be maintained for federal, state and local taxation purposes as if the ASA Servicers (globally as defined in the ASA) are the actual owners of the operation of the Facility from and after the ASA Effective Date (as defined in the ASA), and ASA Servicers shall file tax returns and pay any other applicable governmental assessments, including the Cash Assessment for the Interim Period, indicating that all expenses for such period were incurred by

ASA Servicers, all revenue for such period was earned by ASA Servicers and the gain or loss from the operation of the Facility during such period is the sole responsibility of ASA Servicers.

22. Notwithstanding anything in this Order, the Motion, the ASA, the Agreement, the Plan Term Sheet, or the Transaction Documents (as defined below), all rights of the Debtors and the U.S. Trustee relating to quarterly fees under 28 U.S.C. § 1930 are reserved and not impaired in any way.

23. Debtors are also parties to Medicaid provider agreements (the "**Medicaid Provider Agreements**") with New York State Department of Health. Notwithstanding anything in this Order, the Motion, the ASA, the Agreement, the Plan Term Sheet, or the Transaction Documents (as defined below):

(a) The Medicaid Provider Agreements shall be governed exclusively and solely by applicable Medicaid statutes, regulations, rules, policies and procedures, including, but not limited to, the adjustment of any payments to the New Operators, including but not limited to the recoupment of all pre-assignment Medicaid overpayments and all other monetary liabilities, regardless of whether they have been determined;

(b) The New Operators and the Medicaid Provider Agreements shall be subject to compliance with applicable health and safety standards pursuant to all Medicaid and other pertinent statutes, regulations, rules, policies and procedures relating to the operation of the Facilities;

(c) Nothing shall affect or impair New York State's defenses, claims, rights, or ability to recoup, setoff, or otherwise recover Medicaid overpayments and any other monetary liabilities from the Debtors and/or any New Operator under the Medicaid Provider Agreements in accordance with all applicable Medicaid statutes, regulations, rules, policies and procedures;

(d)     Nothing shall relieve or be construed to relieve the Debtors or any New Operator from complying with all applicable Medicaid statutes, regulations, rules, policies and procedures; and

(e)     The Debtors and/or New Operators shall retain their respective right to an administrative appeal of any overpayment determination in accordance with the applicable statutes, regulations, rules, policies and procedures.

24.     Notwithstanding anything to the contrary in this Order, the Motion, the Agreement, the ACSA, the Sale Procedures Order or any other Transaction Documents, the New York State Department of Health ("DOH") expressly reserves all rights regarding the jurisdiction and authority of the DOH and the New York Public Health and Planning Council under all applicable laws, statutes, rules, policies, procedures and regulations in connection with all approvals, consents, licenses, permits and other regulatory matters related to the sale of the Debtors' assets and continued operation of the Debtors' healthcare facilities.

25.     Nothing contained herein shall transfer Cass Development Company's interest in personal property located at the Debtor's Westfield New York facility.

26.     Notwithstanding anything in this Order, the Motion, the Plan Term Sheet, the Agreement, the ASA, or any other of the Transaction Documents (as defined below), the Debtors, the New Operators and the Landlords shall abide by all U.S. Department of Housing and Urban Development ("**HUD**") statutes, regulations, and policies, including but not limited to all current requirements in HUD handbooks, guides, notices or mortgagee letters, procedures, rules and regulatory agreements with respect to changes in the operator of the Facilities, including that as condition precedent to Closing, any New Operator will be subject to HUD's Transfer of Physical Assets review and will have received all required consents and approvals from HUD and from

Capital Funding, LLC, Capital Funding Group, Inc., and any of their predecessors, successors and/or assigns (collectively, "**Capital Funding**") and Midland Loan Services, Inc., acting by and through its authorized sub-servicer Berkadia Commercial Mortgage LLC (collectively, the "**HUD Insured Lenders**"). The Debtors, the New Operators and the Landlords shall otherwise abide by all HUD statutes, regulations, policies, including but not limited to all current requirements in HUD handbooks, guides, notices or mortgagee letters, procedures, ru agreements. Notwithstanding anything in this Order, the Motion, the Plan Term Sheet, the Agreement, or any other Transaction Documents (as defined below), nothing shall impair or affect HUD's authority under any statutes, regulations, policies, procedures, rules, or regulatory agreements, including, but not limited to, enforcement and administrative actions and proceedings related to the project(s) financed by the HUD Insured Lenders.

27. Notwithstanding anything contained in this Order, the Motion, the Plan Term Sheet, the Agreement, the ASA, the Memorandum of Understanding with the Buyer (the "**Buyer MOU**"), the Memorandum of Understanding with the Landlords and Sublandlord (the "**Landlord MOU**"), or any other agreements, documents or instructions in connection with the sale or assignment of the Acquired Assets and/or the operation of the Facilities (collectively, the "**Transaction Documents**"), the Acquired Assets shall be subject to the liens, claims, interests and encumbrances of Capital Funding, Capital Finance, LLC ("**Capital Finance**"), ABS DIP LLC, and HUD.

28. Notwithstanding anything contained in this Order, the Motion, the Plan Term Sheet, the Agreement, the ASA, the Buyer MOU, the Landlord MOU, the Transaction Documents or otherwise, it is a condition precedent to the closing of the Sale to the Buyer and the Transactions and to the effectiveness of the ASA that (a) the Buyer, its designee and/or its successors and/or assigns, executes and performs under that certain Loan Sale and Assignment Agreement dated as

of January 30, 2020 (the "**Loan Sale Agreement**") by and among the Buyer and Capital Finance; and (b) in connection therewith, the Buyer pays to Capital Finance indefeasibly and in immediately available funds, an amount equal to all of the obligations outstanding to Capital Finance, including as required under (i) that certain Credit and Security Agreement dated as of May 22, 2009 by and among Capital Finance and Debtors Absolut Facilities Management, LLC and Absolut Center for Nursing and Rehabilitation at Westfield, LLC and all documents and agree

(collectively, the "**Capital Finance Non-HUD Loan Documents**"); (ii) that certain Credit and Security Agreement dated as of May 22, 2009 by and among Capital Finance and Debtors Absolut Center for Nursing and Rehabilitation at Allegany, LLC, Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC, Absolut Center for Nursing and Rehabilitation at Gasport, LLC, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC, and Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC and all documents and agreements related thereto (collectively, the "**Capital Finance HUD Loan Documents**" and together with the Capital Finance Non-HUD Loan Documents, the "**Capital Finance Loan Documents**"); and (iii) the Final DIP Financing Order (as defined below). Upon completion of the conditions precedent set forth in the foregoing sentence, the Debtors shall be immediately and automatically deemed to have no claim, demand, defense, right of setoff or counterclaim of any kind or nature whatsoever against Capital Finance or any of its officers, employees or agents, nor shall the Debtors be permitted to bring any such claim, demand, defense, right of setoff or counterclaim of any kind or nature whatsoever, whether known or unknown, matured or unmatured, anticipated or unanticipated, suspected or unsuspected, vested, fixed, contingent or conditional, at law or in equity, against Capital Finance or any of its officers, employees or agents, with respect to the Loan Sale Agreement, the Capital Finance Loan Documents, the Final DIP Financing Order (as defined

24

below) or the obligations thereunder or in connection therewith, with respect to any action previously taken or not taken, or taken or not taken in the future by Capital Finance or any of Capital Finance's officers, employees or agents, relating thereto, or with respect to any lien, collateral or third party collateral securing any liabilities, obligations or indebtedness under the Capital Finance Loan Documents or the Final DIP Financing Order. The deadline to object to the findings with respect to the validity of Capital Finance's claims against the the Debtors' property has expired and all findings and releases set forth in the Final DIP Financing Order (as defined below) related thereto are final and binding.

29. Notwithstanding anything contained in this Order, the Motion, the Plan Term Sheet, the Agreement, the ASA, the Buyer MOU, the Landlord MOU, the Transaction Documents or otherwise, the Acquired Assets and the Assumed Contracts shall be subject to the Lessee Security Agreements (collectively, the "**Capital Funding Security Agreements**" and each, a "**Capital Funding Security Agreement**") executed by Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC; Absolut at Orchard Brooke, LLC; and Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC, as well as any related documents, that granted to Capital Funding and to HUD, security interests in and liens upon the Collateral (as defined in the Capital Funding Security Agreements), and to the liens, claims, interests, or encumbrances granted to Capital Funding and to HUD, under the Capital Funding Security Agreements and any related documents.

30. The Buyer shall execute and deliver to (i) Capital Funding and HUD, a Lessee Security Agreement(s) (the "**New Capital Funding Security Agreements**" and each, a "**New**

**Capital Funding Security Agreement**"), in the form and substance acceptable to Capital Funding and to HUD, that grants to Capital Funding and to HUD, a first priority security interest in, and lien upon all of the Acquired Assets and Assumed Contracts (except with respect to the Acquired Assets of Absolut Center for Nursing and Rehabilitation at Westfield, LLC and Absolut Facilities Management, LLC), and/or any other assets otherwise constituting the Collateral; (ii) Capital Funding, an intercreditor agreement, a deposit account control agreement(s)

further documents required by Capital Funding and HUD, in the form and substance satisfactory to Capital Funding and HUD (collectively, the "**Additional Security Documents**"); and (iii) HUD, a Healthcare Regulatory Agreement(s) – Operator, as well as such other documents as may be required by HUD, to operate each of the Facilities.

31.     Notwithstanding anything contained in this Order, the Motion, the Plan Term Sheet, the Agreement, the ASA, the Buyer MOU, the Landlord MOU or any of the other Transaction Documents, any loans provided by the Buyer, any New Operator, or by any other person or entity, and any claims, obligations, liens or encumbrances arising under such loans, shall be subject to and subordinated to the rights, remedies, claims, obligations, liens or encumbrances granted to Capital Funding and to HUD under the Capital Funding Security Agreements, the *Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364* [Dkt No. 264] (the "**Final DIP Financing Order**"), the New Capital Funding Security Agreements and/or the Additional Security Documents.

32.     Nothing in this Order shall effect the rights or liens granted to ABS DIP LLC under the Final DIP Financing Order or the DIP Loan Agreement.

33. Notwithstanding anything contained in this Order, the Motion, the Plan Term Sheet, the Agreement, the ASA or any other Transaction Documents, any claims, obligations, liens or encumbrances arising under the Transaction Documents shall be subject to and subordinated to the rights, remedies, claims, liens or encumbrances granted to Capital Funding and to HUD under the Capital Funding Security Agreements, the Final DIP Financing Order, the New Capital Funding Security Agreements and the Additional Security Documents.

34. Notwithstanding anything contained in this Order, the Motion, the Plan Term Sheet, the Agreement, the ASA or any other Transaction Documents, nothing contained therein shall modify, affect, impair or alter any rights, remedies, claims, liens, encumbrances, interests or defenses of the HUD Insured Lenders or HUD under any agreements, documents, statutes, rules, regulations, regulatory agreements, policies, loan agreements and documents, security agreements, leases, lease addenda, deeds of trust, orders, or applicable law.

35. Seller has agreed to transfer and Buyer has agreed to assume the liabilities of Signature Financial LLC's ("**Signature**") rights and remedies as a purchase money secured interest pursuant to the April 10, 2017 Promissory Note, Master Security Agreement and Schedule of the equipment given, and entered into by Absolute Center for Nursing and Rehabilitation at Aurora Park, LLC.  Buyer agrees that all of Signatures rights, remedies claims or defenses shall not be affected or alter any rights, remedies, claims or defenses and Signature shall retain its liens of its equipment and collateral.  All of Signature's rights and remedies as a purchase money secured interest creditor pursuant to the April 10, 2017 Promissory Note, Master Security Agreement, and Schedule of Equipment ("**the Original Debt Documents**") given, executed, and entered into by Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC (the "**AP Debtor**") and Signature in the amount of $1,036,000.00 are preserved, and any sale or assignment

shall not affect or alter any rights, remedies, claims or defenses of Signature, who shall retain its liens on the equipment and collateral set forth in the Original Debt Documents. At no time shall there be a sale or other disposition of the AP Debtor's equipment by AP Debtor, Purchaser, or any other person or party without Signature's written consent.

36. In accordance with UCC §9-103(f), it is hereby expressly identified that the Original Debt Documents shall maintain and continue the effectiveness of Purchase Money Security Interest ("**PMSI**"). Notwithstanding the foregoing, prior to Closing, the Purchaser shall be required to execute and deliver to Signature a security agreement with attached equipment schedule as well as an amended UCC filing statement evidencing Signature's continued priority interest ("**the New Documents**"). The New Documents to be executed by Debtor's Purchaser shall constitute an assignment and restructuring not intended to be a discharge, novation, cancellation, or extinguishment of the original debt, obligation, and priority of the PMSI.

37. The Debtors are in possession of a bank account in the amount of $425,000, which was created on November 27, 2018 pursuant to the Consent Decree entered in *Equal Employment Opportunity Commission v. Absolut Facilities Management, LLC, et al.*, 1:18-cv-01020 (W.D.N.Y.). This Order, the ASA, the Agreement, or the Plan Term Sheet, do not include any legal or equitable title to such funds and nothing in this Order, the ASA, the Agreement, or the Plan Term Sheet changes, affects or alters any rights, remedies or legal obligations of the Debtors or the U.S. Equal Employment Opportunity Commission under the Consent Decree.

38. Except as otherwise set forth in this Order, on the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Liens, Claims and Interests in the Acquired Assets, if any, except

with respect to the Assumed Liabilities, as such Liens, Claims and Interests may have been recorded or may otherwise exist.

39. Except as otherwise set forth in this Order, this Order (a) shall be effective as a determination that, upon the Closing Date, all Liens, Claims and Interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date, except with respect to the Assumed Liabilities, have been unconditionally released, discharged and ter

conveyances described herein and the Agreement have been effected and (b) shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

40. Except with respect to the Assumed Liabilities, or as otherwise provided in this Order, the Debtors are hereby authorized to execute and file such statements, instruments, releases of mortgages, releases and such other documents of any kind on behalf of the person or entity with respect to such Acquired Assets and (b) the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims and Interests in such Acquired Assets of any kind or nature whatsoever. This Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

41. All non-debtor entities that are presently, or on the Closing may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date.

42. The Acquired Assets are to be sold free and clear of the Cash Receipts Assessments made pursuant to Public Health Law § 2807-d [10] [a]) that were made or accrued for receipts for services rendered by the Debtor prior to or on the ASA Effective Date althoug

be received after the ASA Effective Date.

43. The Personal Property transferred to Buyer shall not be subject to New York City or State sales tax liability.

44. Notwithstanding anything in this Order, the Plan Term Sheet, the Agreement, the ASA, or any other Transaction Document, nothing releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit arising from or related to the enforcement of any applicable police or regulatory law or regulation to which any entity would be subject to as the owner, operator or licensee of property from and after the date of the closing of the Sale. Nothing in this Order authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police and regulatory law.

45. Notwithstanding anything in this Order, the Plan Term Sheet, the Agreement, the ASA, or any other Transaction Document, (1) the Debtors and New Operators shall abide by all Social Security Administration ("**SSA**") statutes, regulations, rules, policies, and procedures, including, but not limited to, (a) the transfer of any account holding Social Security benefits, or (b) any New Operators' actions as any beneficiary's representative payee; (2) nothing shall impair

or affect SSA's authority, rights, claims or defenses under SSA statutes, regulations, rules, policies, and procedures; and (3) to the extent the Debtors may need to disclose information they possess solely by virtue of being organizational representative payees, the Debtors shall seek a protective order or request the information be sealed.

46. Pursuant to section 4 of the Plan Term Sheet, the Debtors and Committee will share exclusivity under section 1121 of the Bankruptcy Code until the Confirmatic date is defined in and may be extended in accordance with the Plan Term Sheet), after which, if the Confirmation Date (as defined in the Plan Term Sheet) has not occurred, or if any other breach of the Plan Term Sheet by any party thereto other than the Landlords occurs: (i) the Landlord Cure Claim and the OP Claim (as defined in the Plan Term Sheet) will be allowed and paid as follows: (a) $1 million will be an allowed administrative expense claim that will be paid after the Debtors' payroll taxes are paid in full but before payment of all other priority claims, and (b) the balance of the amounts asserted in the Landlord's proofs of claim against the Debtors and AFM in respect of the Landlord Cure Claim (as defined in the Plan Term Sheet) and the OP Claim (as defined in the Plan Term Sheet) will be allowed general unsecured claims; and (ii) the Landlords otherwise reserve all rights with respect to these Chapter 11 Cases, including without limitation the right to seek termination of exclusivity as to the Landlords.

47. This Court retains jurisdiction to enforce and implement the terms and provisions of this Order, the Plan Term Sheet, and the Agreement, all amendments thereto, any waivers and consents thereunder and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to: (a) compel delivery of the Acquired Assets to the Buyer, (b) compel delivery of the Purchase Price or performance of other obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Agreement, except as

31

otherwise provided therein, (d) interpret, implement and enforce the provisions of this Order, and (e) protect the Buyer against any of the Excluded Liabilities, successor liability or any Liens, Claims and Interests in the Debtors or the Acquired Assets, of any kind or nature whatsoever.

48. Notwithstanding the possible applicability of Bankruptcy Rules 4001(a)(3), 6004(h) and 6006(d), this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing. In the absence of any entity obtaining a

before Closing, the Debtors and the Buyer are free to close under the Agreement at any time.

49. In accordance with the Plan Term Sheet and the settlement agreement dated November 22, 2019 (the "Settlement Agreement") approved by the *Order Approving Settlement Agreement Between the Debtors, the Landlord Group and Israel Sherman* [Docket No. 322], there will be no TSA Fee (as defined in the Settlement Agreement) payable by the Landlords to Israel Sherman in connection with the Sale or the transition of the Facilities to the New Operators.

50. The Buyer shall not acquire the 2019 Chevrolet Traverse, vehicle identification number 1GNERFKW9KJ218832, and such vehicle shall be designated as an Excluded Asset (as defined in the Agreement).

51. The provisions of this Order are non-severable and mutually dependent without the written consent of the Buyer and the Debtors.

52. To the extent of any conflict between the Agreement, the ACSA, or the Sale Procedures Order, on the one hand, and this Order on the other hand, the terms and provisions of this Order shall govern.

# Exhibit B

# CHAPTER 11 PLAN TERM SHEET

This term sheet (the "Term Sheet") dated as of January 30, 2020, by and among (A) the Arba Group and the following landlord entities: 292 Main Street, LLC; 6060 Armor Road, LLC; 2178 N. Fifth Street, LLC; 101 Creekside Drive, LLC; 4540 Lincoln Drive, LLC; and 26 Cass Street, LLC (collectively, the "Landlord Group"), (B) Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC ("Orchard Park"); Absolut Facilities Management, LLC ("AFM"); Absolut Center for Nursing and Rehabilitation at Allegany, LLC ("Allegany"); Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC ("Aurora Park"); Absolut Center for Nursing and Rehabilitation at Gasport, LLC ("Gasport"); Absolut at Or ("Orchard Brooke"); Absolut Center for Nursing and Rehabilitation at Three Rivers"); and Absolut Center for Nursing and Rehabilitation at Westfield, (Allegany, Aurora Park, Orchard Brooke, Gasport, Three Rivers, and Westfield collectively referred to herein as the "Operating Debtors"; and the Operating Debtors with AFM, Orchard Park referred to as the "Debtors"), (C) the official committee of unsecured creditors (the "Committee") in the Chapter 11 Cases (as defined below); and (D) ABS DIP, LLC ("DIP Lender" and together with the Landlord Group, the Debtors, and the Committee, the "Parties"), contains the terms of the Parties' agreement regarding (a) the sale of the Operating Debtors' skilled nursing facilities and (b) a chapter 11 plan for the Debtors in their voluntary cases pending in the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), Case No. 19-76260 (AST) (jointly administered) (the "Chapter 11 Cases"). **For the avoidance of doubt, nothing contained in this Term Sheet will be construed to prejudice or impair the rights of any party-in-interest to the Chapter 11 Cases that is not a Party hereto with respect to the Debtors or the Chapter 11 Cases and all such rights are preserved, including without limitation the right to object to the Plan and Disclosure Statement (each as defined below).**

NOTHING IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY BY ANY PARTY HERETO. THIS TERM SHEET IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN PURSUANT TO THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE.

1. This Term Sheet is subject to and conditioned upon: (i) the Debtors' selection of the bid submitted by RCA Healthcare Management, LLC (together with any affiliate, "RCA") to purchase the facilities of all of the Operating Debtors as the successful bidder in the Debtors' sale and marketing process, (ii) Israel Sherman's waiver of the $592,000 fee from the Landlord Group in connection with the transition services agreement (the "TSA Fee") contemplated in the settlement agreement dated November 22, 2019 (the "Settlement Agreement"); (iii) the Debtors' cancellation of the auction for the Operating Debtors' operating assets previously scheduled for January 9, 2020 and cancellation of the sale and marketing process for the Debtors' accounts receivable and the auction currently scheduled for February 18, 2020, and (iv) entry of an order by the Bankruptcy Court approving the sale of all of the Operating Debtors' facilities to RCA and related documentation on or before February 5, 2020 (or submission of such an order to the Bankruptcy Court for signature by such date). This Term Sheet shall be attached to and incorporated by reference into the order approving the sale to RCA.

2. Except for the specific agreements of the DIP Lender herein concerning the treatment to be afforded to the Prepetition Loan Claim and the DIP Loan Claim, post-confirmation

governance of the reorganized debtors, and use of the DIP Lender's collateral to fund a Wind Down Budget (defined below) approved by the DIP Lender until the DIP Lender is paid in full, nothing in this Term Sheet shall constitute or be deemed to constitute a waiver or novation of all rights and remedies held by or granted to the DIP Lender under the Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 [Docket No. 264] (the "Final DIP Financing Order"), and the DIP Loan Agreement defined therein (the "DIP Loan Agreement"). This reservation is incorporated into each provision of this Term Sheet. To the extent that it is referred to in any particular provision is for emp limit this reservation in any way.

3.      Counsel to the Committee, Amini LLC ("Amini"), will draft and file a joint chapter 11 plan ("Plan") and disclosure statement ("Disclosure Statement") for all of the Debtors that is reasonably acceptable to the Debtors and Landlord Group consistent with the terms provided herein.  Amini shall seek conditional approval of the Disclosure Statement and a consolidated hearing on the Plan and Disclosure Statement.  In the event a consolidated hearing is denied, Amini will act as expeditiously as reasonably possible to seek approval of a disclosure statement and plan on a non-combined basis.  The fees and expenses incurred by Amini in drafting and seeking confirmation of the Plan will be capped at $50,000.  In addition to the reservations of paragraph 2, the DIP Lender reserves its right to object to the Plan or Disclosure Statement on any ground other than the specific matters to which it has agreed herein.

4.      The Plan and Disclosure Statement will be filed within 30 days following the effective date of the administrative services agreement (or equivalent) in connection with the RCA sale transaction (the "ASA Effective Date"), and the Committee shall endeavor to obtain entry of an order confirming the Plan (the date on which such order is entered, the "Confirmation Date") by no later than 75 days after the ASA Effective Date (the "Confirmation Deadline"), which date shall be subject to a single automatic extension of 45 days in the event confirmation is denied or re-solicitation of votes is required and which otherwise will not be extended without the Landlord Group's reasonable consent.  The Debtors and Committee will share exclusivity under section 1121 of the Bankruptcy Code until the Confirmation Deadline (as such date may be extended with the Landlord Group's reasonable consent) after which, if the Confirmation Date has not occurred, or if any other breach of this Term Sheet by any Party other than the Landlord Group occurs: (i) the Landlord Cure Claim and the OP Claim (as defined below) will be allowed and paid as follows: (a) $1 million will be an allowed administrative expense claim that will be paid after the Debtors' payroll taxes are paid in full but before payment of all other priority claims, and (b) the balance of the amounts asserted in the Landlord Group's proofs of claim against the Debtors and AFM in respect of the Landlord Cure Claim and the OP Claim will be allowed general unsecured claims; and (ii) the Landlord Group otherwise reserves all rights with respect to the Chapter 11 Cases, including without limitation the right to seek termination of exclusivity as to the Landlord Group.

5.      The claim of Debtors' counsel, Loeb & Loeb LLP, for professional fees and expenses incurred through the Plan Effective Date (defined below) shall be capped at $2.7 million. The claim of the Debtors' CRO Michael Wyse for fees and expenses incurred through the Plan Effective Date shall be capped at $574,900.  None of the Landlord Group, its affiliates, nor the Plan Administrator (defined below) will object to Loeb & Loeb's or Michael Wyse's final fee applications provided they do not exceed the foregoing caps.

6. The CRO will provide access to the Debtors' books and records to the Responsible Officer (defined below) and Plan Administrator commencing February 28, 2020. The Debtors will propose a wind down budget reasonably acceptable to the Landlord Group, the DIP Lender, and the Committee ("Wind Down Budget"), in the form annexed hereto as Schedule 1 and which will be funded as provided herein and extended through the full administration of the Plan and may be modified from time to time with the reasonable agreement of the Landlord Group, the DIP Lender (to the extent not repaid in full), the Responsible Officer, and the Committee.

7. Between the ASA Effective Date and the appointment of Ronald Winters of Gibbins Advisors, LLC ("Gibbins") as Plan Administrator on the Plan Ef Administrator"), Gibbins will remain employed as financial advisor to the Lan Responsible Officer will permit Gibbins to monitor the Debtors' colle Receivables (defined below) and reconciliation of secured, administrative, and priority claims. Gibbins' fees and expenses in such capacity (and, for the avoidance of doubt, not in his capacity as financial advisor to the Landlord Group) shall be provided for, allowed, and paid under the Wind Down Budget as an administrative expense claim.

8. The Responsible Officer and Plan Administrator will provide regular, detailed reporting to one another regarding the fulfillment of their respective duties and financial condition and respond to inquiries on a regular basis. The Responsible Officer and Plan Administrator will work together in good faith, including to allocate work among them that may not be clearly allocated hereunder to maximize efficiency and value for stakeholders.

9. The Plan shall provide for terms and conditions as set forth in the following table:

| Treatment of Claims and Equity Interests | |
|---|---|
| **General Administrative Expense Claims** | Subject to the Priority of Distributions set forth below and the reservation of paragraph 2, payment in full of allowed administrative expense claims on the later of the Plan Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter, unless otherwise agreed by the holder of such claim; provided, however, absent an order to the contrary, no administrative expense claim (other than the DIP Loan) may be paid prior to the Plan Effective Date that is not contained in the Wind Down Budget and has not been paid prior to the ASA Effective Date. The Plan shall establish an administrative expense claims bar date for administrative expense claims arising prior to the ASA Effective Date that is 30 days after the ASA Effective Date and another administrative expense claim bar date for claims arising after the ASA Effective Date and before the Plan Effective Date that is 45 days after the Plan Effective Date. |
| **Priority Tax Claims** | Subject to the Priority of Distributions set forth below, and the reservation of paragraph 2, at the option of the Plan Administrator, (1) cash in the allowed amount of such claim on the later of the Plan Effective Date and the date on which such claim becomes allowed, or as soon as reasonably practicable thereafter, or (2) installment payments in accordance with Bankruptcy Code section 1129(a)(9)(C). |

| | |
|---|---|
| **Prepetition Loan Claim (Class 1)** | To the extent not paid in full prior to the Plan Effective Date, payment in full of the prepetition loan claim against the Debtors, and for its allowance in the following amount: (1) outstanding principal obligations under the applicable Credit Agreement as of the Plan Effective Date, (2) plus accrued but unpaid interest on said principal obligations at the non-default rate through the Plan Effective Date, (3) plus interest accrued on said principal obligations at the non-default rate after the Plan Effective Date. |
| **DIP Loan Claim (Class 2)** | To the extent not paid in full prior to the Plan Effective Date, payment in full of all amounts due and paya Lender under the Final DIP Financing Order and Agreement until all such amounts are paid in full Claim") minus $50,000. |
| **Other Secured Claims (Class 3)** | At the option of the Plan Administrator, payment in full, delivery of the collateral securing such claim plus any interest required by Bankruptcy Code section 506(b), or such other treatment needed to satisfy the requirements of section 1129. Each holder of an allowed other secured claim shall retain liens in existence of the Plan Effective Date until full and final satisfaction of such claim. |
| **Landlord Cure Claim (Class 4)** | Pro rata share of 85% of net available cash. The Landlord Group shall have an allowed cure claim against the Consolidated Debtors (as defined below) in the amount of $2,385,000 ("<u>Landlord Cure Claim</u>"), which shall not be subject to further reduction or challenge. |
| **General Unsecured Claims (Class 5)** | Pro rata share of 15% of net available cash until the Landlord Cure Claim has been paid in full and 100% thereafter. 6060 Armor Road LLC's claims under sections 365, 502(b)(6) and 503(b) of the Bankruptcy Code (the "<u>OP Claims</u>") shall be treated as general unsecured claims against the Consolidated Debtors; <u>provided, however,</u> that in the event the Landlord Group's personal property that is missing from Orchard Park is returned to the Landlord Group's reasonable satisfaction, the Landlord Group will waive the OP Claims. |
| **Equity Interests (Class 6)** | The Plan shall provide for Israel Sherman, Samuel Sherman, and AFM to retain their respective equity interests in each of the Debtors on the Plan Effective Date, but for such equity interests to be extinguished upon the closing of the RCA transaction ("<u>Sale Effective Date</u>"). They will not receive a distribution on account of such interests. |
| **Priority of Distributions** | Cash available for distribution shall, subject to the Wind Down Budget being funded from cash proceeds of Debtors' healthcare receivables for services rendered prior to the ASA Effective Date ("<u>Healthcare Receivables</u>"), be paid to holders of allowed claims or allocated to reserves in the following order: <u>first</u>, to the holder of the Prepetition Loan Claims on account thereof; <u>second</u>, to the DIP Lender on account of its allowed claim; <u>third</u>, to holders of allowed administrative expense claims, including professional fee claims; <u>fourth</u>, to holders of allowed priority non-tax claims; <u>fifth</u>, to holders |

| | |
|---|---|
| | of allowed priority tax claims; <u>sixth</u>, to reserves (including the disputed claims reserve); and <u>seventh</u>, to the Landlord Group on account of the Landlord Cure Claim and to holders of allowed general unsecured claims. |
| **Limited Consolidation** | On the Plan Effective Date, all assets and liabilities of the Debtors will be deemed merged into AFM (as such, "<u>Consolidated Debtors</u>") solely for purposes of the Plan and distributions to be made thereunder, the obligations of each of the Debtors will be deemed to be the obligation of the Consolidated Debtors solely for purposes of the Plan and distributions to be made thereunder, a on account of any such obligations will be deeme Consolidated Debtors and any and all claims file one Debtor for the same liability shall be deemed one claim against any of the Consolidated Debtors; <u>provided</u>, <u>however</u>, the foregoing limited consolidation shall not affect each of the Debtors' obligation to file quarterly operating reports and pay U.S. Trustee Fees, which shall continue until a final decree has been entered, and shall not affect, expand, or limit the collateral pledged to the holders of valid, perfected liens on each Debtor's assets. |
| **Means for Implementation** | |
| **Source of Distributions** | The source of cash needed for distributions to creditors shall include all assets of the Debtors, including but not limited to Healthcare Receivables, cash on hand as of the ASA Effective Date, sale proceeds payable in connection with the RCA transaction, and avoidance actions and other preserved causes of action as specified in a plan supplement to be filed in advance of the voting deadline. |
| **Continued Corporate Existence** | From and after the Plan Effective Date, each of the Debtors shall be reorganized and shall conduct the business of ensuring the RCA transaction is consummated. The Plan Administrator, in consultation with the Responsible Officer, shall cause the Debtors to be dissolved at such time as the Plan Administrator, in consultation with the Responsible Officer, deems appropriate and in the estates' best interests, after the Sale Effective Date and after entry of a final decree. |
| **Plan Administrator** | The Plan Administrator shall be appointed as such on the Plan Effective Date. The Plan Administrator's duties shall be as set forth in a Plan Administrator Agreement to be included in a plan supplement, and shall include: monetizing or abandoning the Debtors' assets, objecting to and resolving disputed claims other than tort claims (and consulting with the Responsible Officer regarding priority tax claims), making distributions to all creditors pursuant to the Plan, preparing post-confirmation quarterly reports and paying U.S. Trustee fees, preparing and filing tax returns for the Debtors, and closing the Chapter 11 Cases and dissolving the Debtors at the appropriate time. The Responsible Officer shall have consultation rights in respect of the foregoing. The Plan Administrator shall have the right to employ, in consultation with the Oversight Committee, attorneys and other professionals to assist the Plan Administrator in fulfilling his duties. The Plan Administrator shall have exclusive |

| | |
|---|---|
| | authority to object to and resolve disputed claims filed against the Debtors other than tort claims. |
| **Officers** | Following the Plan Effective Date, Israel Sherman shall remain an officer of each of the Debtors, and William Lenhart shall remain an officer of each of the Debtors ("<u>Responsible Officer</u>," and together, the "<u>Officers</u>"), in both cases through the dissolution of the Debtors. The Officers shall have ultimate decision-making authority for the Debtors for all matters not expressly delegated to the Plan Administrator pursuant to the Plan or Plan Administrator Agreement, including for the avoidance of doubt objecting to claims against the Debtors, except that decisio with respect to matters regarding the provision of shall be reserved for Israel Sherman, unless such matter involves a related-party transaction in which case the Responsible Officer shall have authority. Notwithstanding the foregoing, Israel Sherman's responsibilities as officer shall include fulfilling all duties required of him by the Settlement Agreement, including without limitation in connection with the transfer of the facilities and the CHOW process. The Responsible Officer's employment shall be governed by a Responsible Officer Agreement to be included in a plan supplement. In the event the terms of such an Responsible Officer Agreement cannot be agreed upon, Mr. Lenhart shall be excused from any role as Responsible Officer and shall be replaced by a party selected by the Landlord Group from a list of 3 or more candidates provided by the Debtors. The Responsible Officer shall have exclusive authority to object to and resolve tort claims filed against the Debtors. |
| **Compensation of Plan Administrator and Officers** | The Plan Administrator and Responsible Officer shall be entitled to compensation at hourly rates and reimbursement of expenses as set forth in their respective agreements, subject to the line item set aside for their professional fees in the Wind Down Budget. Israel Sherman shall serve as officer of each of the Debtors without compensation. The Debtors will continue to maintain D&O insurance with policy limits and coverage not less than the D&O insurance maintained by the Debtors previously, and the Debtors shall also provide indemnities acceptable to the Officers with related obligations constituting allowed general administrative expense claims. |
| **Oversight Committee** | The Plan Administrator and Responsible Officer shall report to an oversight committee comprised of a representative of the Landlord Group until its claims have been fully satisfied, the Responsible Officer and a designee of the Committee ("<u>Oversight Committee</u>"). The following matters shall be subject to Oversight Committee review and approval: compensation of the Plan Administrator and Responsible Officer and payment of fees and expenses of any professional employed by the Plan Administrator to the extent in excess of the Wind Down Budget (with disputes to be resolved by the Court), modifications of the Wind Down Budget proposed by the Plan Administrator or Responsible Officer, and collection or monetization of the |

| | |
|---|---|
| | Healthcare Receivables other than by Billit employees. Except for reimbursement of reasonable, actual costs and expenses incurred in serving as an Oversight Committee member, which amounts shall not be paid until the DIP Lender has been paid in full, such members shall serve without compensation.  Under no circumstances will attorneys' fees incurred by the Oversight Committee or any individual members thereof be reimbursable.  Notwithstanding the foregoing, until the DIP Lender has been paid in full, none of the Plan Administrator, Responsible Person, or the Oversight Committee shall have any authority to increase th under the Wind Down Budget, to compromise the Receivables, or to pay any amounts not reflected i Budget without the DIP Lender's prior written approval. |
| **Collection of Healthcare Receivables** | Prior to the Plan Effective Date, the Responsible Officer will oversee the collection of the Healthcare Receivables and will employ employees of Billit Accounting & Information Technology LLC ("Billit") for such purposes, subject to the Wind Down Budget.  From and after the Plan Effective Date, the Plan Administrator shall be responsible for overseeing collections of the Healthcare Receivables, and the Plan Administrator shall have absolute discretion to reduce Billit staffing as he deems appropriate.  After payment of the DIP Loan, the Plan Administrator, in consultation with the Responsible Officer, shall have discretion to at any time elect to cease collection activities, engage a third party (including RCA or its affiliates) to collect the Healthcare Receivables, or sell or assign the remaining Healthcare Receivables at such time and on such terms as he determines is in the best interests of creditors, in each case subject to Oversight Committee approval.   To the extent RCA collects any Healthcare Receivables, RCA will be caused to remit proceeds thereof and copies of all information or reporting related to RCA's collection of said receivables to the Plan Administrator.  For the avoidance of doubt, any authority granted to the Debtors or Plan Administrator in respect of the collection of Healthcare Receivables shall include the right to oversee any disputes with RCA regarding the allocation or true-up of any collections of Healthcare Receivables. Nothing contained herein or in the Plan shall limit the right of the Debtors or Plan Administrator to enforce the Debtors' rights as against RCA, all of which rights are expressly preserved. |
| **Other** | |
| **Releases** | The Plan shall contain full releases from liability to the fullest extent permitted by applicable law in favor of the Landlord Group and each of their current and former officers, directors, principals, members, professionals, advisors, accountants, attorneys, investment bankers, consultants, employees, agents, and other representatives (the "Landlord Release Parties") by the Debtors and each of their current and former officers, directors, principals, members, professionals, advisors, accountants, attorneys, investment bankers, consultants, |

|  |  |
|---|---|
|  | employees, agents, and other representatives ("<u>Debtor Release Parties</u>") and the Committee and the Committee's members and advisors (the "<u>Committee Parties</u>") from and any and all claims or causes of action. The Landlord Group will provide mutual releases to each of the Debtor Release Parties and the Committee Parties; <u>provided</u>, <u>however</u>, that the Landlord Group's release of claims against Israel Sherman and Samuel Sherman provided in the Settlement Agreement shall not occur prior to the date provided in the Settlement Agreement. The Debtor Release Parties, which for the avoidance of doubt include Israel Sherman and Sa DIP Lender and the Committee Parties shall exculpation provisions and shall receive full rele Administrator, Responsible Officer, the Debtors and the Debtors' estates. |
| **Automatic Stay** | The automatic stay shall remain in place post-Plan Effective Date pursuant to Bankruptcy Code section 362(c). |
| **Plan Effective Date** | Unless otherwise agreed by the Debtors, the Landlord Group and the Committee, the Plan will be structured to become effective as soon as reasonably practicable after the Confirmation Date. |

IN WITNESS WHEREOF, the Parties have executed this Term Sheet as of the date first written above.

**DEBTORS**:

**ABSOLUT FACILITIES MANAGEMENT, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATIO PARK, LLC**

**ABSOLUT AT ORCHARD BROOKE, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ORCHARD PARK, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT ALLEGANY, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT THREE RIVERS, LLC**

**ABSOLUT CENTER FOR NURSING AND REHABILITATION AT GASPORT, LLC**

**ABSOLUT NURSING AND REHABILITATION CENTER OF WESTFIELD, LLC**

By*/s/ Michael Wyse*_____
Name: Michael Wyse_____
Title: Chief Restructuring Officer_____

**ABS DIP, LLC**

By:_____

Name:_____

Title:_____

**LANDLORDS:**

**292 MAIN STREET, LL**

**6060 ARMOR ROAD, LLC**

**2178 N. FIFTH STREET, LLC**

**101 CREEKSIDE DRIVE, LLC**

**4540 LINCOLN DRIVE, LLC**

**26 CASS STREET, LLC**

By:_____

Name:_____

Title:_____

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS:**

By:_____

Name:_____

Title:_____

**ABS DIP, LLC**

By:_____
Name:_____
Title:_____


**LANDLORDS:**

**292 MAIN STREET, LLC**

**6060 ARMOR ROAD, LLC**

**2178 N. FIFTH STREET, LLC**

**101 CREEKSIDE DRIVE, LLC**

**4540 LINCOLN DRIVE, LLC**

**26 CASS STREET, LLC**

By:_____
Name:___IRA, SMEDRA___
Title:___MANAGER___


**OFFICIAL COMMITTEE OF
UNSECURED CREDITORS:**

By:_____
Name:_____
Title:_____

9

**ABS DIP, LLC**

By:_____
Name:_____
Title:_____


**LANDLORDS:**

**292 MAIN STREET, L]**

**6060 ARMOR ROAD, LLC**

**2178 N. FIFTH STREET, LLC**

**101 CREEKSIDE DRIVE, LLC**

**4540 LINCOLN DRIVE, LLC**

**26 CASS STREET, LLC**

By:_____
Name:_____
Title:_____


**OFFICIAL COMMITTEE OF
UNSECURED CREDITORS:**

By:_____
Isaac Newman, Chief Operating Officer of
DentServ Dental Services, P.C.
Chairperson of the Committee

1

# SCHEDULE 1

**AFM**
Transition Budget

| | March | April | May | June | July | August | TOTAL |
|---|---|---|---|---|---|---|---|
| Operations | | | | | | | |
| Wages | $ 97,567 | $ 92,260 | $ 56,038 | $ 70,047 | $ 56,038 | $ 56,038 | $ 427,987 |
| Benefits | 19,513 | 18,452 | 11,208 | 14,009 | 11,208 | 11,208 | 85,597 |
| Contracted Service (CFO) | 27,200 | 34,000 | 27,200 | - | - | - | 88,400 |
| Postage and Freight | 442 | 442 | 442 | 442 | 442 | 442 | 2,652 |
| Supplies | 842 | 842 | 842 | 842 | 842 | 842 | 5,052 |
| Purchased Services | 493 | 493 | 493 | 493 | 493 | 493 | 2,958 |
| Audit Fee | - | - | 7,200 | - | - | - | 7,200 |
| Phone | 987 | 987 | 987 | 987 | 987 | 987 | 5,922 |
| Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 45,000 |
| Office Lease | 10,730 | 21,460 | - | - | - | - | 32,190 |
| Other Direct | 127 | 127 | 127 | 127 | 127 | 127 | 762 |
| | | | | | | | |
| Profesional / Plan Related | | | | | | | |
| WKL | 25,000 | 25,000 | 25,000 | 10,000 | 10,000 | 10,000 | 105,000 |
| WALLC | 15,000 | 15,000 | 15,000 | - | - | - | 45,000 |
| Plan Administrator | 20,000 | 25,000 | 20,000 | 32,500 | 30,000 | 30,000 | 157,500 |
| Administrator Trust | 250,000 | - | - | - | - | - | 250,000 |
| Prime Clerk | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 90,000 |
| Amini | 25,000 | 25,000 | 25,000 | - | - | - | 75,000 |
| UST Fees | - | 200,000 | - | - | - | - | 200,000 |
| Contingency | - | - | 60,000 | - | - | - | 60,000 |
| | $ 515,402 | $ 481,563 | $ 272,036 | $ 151,947 | $ 132,636 | $ 132,636 | $ 1,686,221 |

Exhibit C

**ADMINISTRATIVE SERVICES AND CONSULTING AGREEMENT**

*THIS ADMINISTRATIVE SERVICES AND CONSULTING AGREEMENT* (this "Agreement") is entered into as of January 30, 2020, by and between Absolut Facilities Management, LLC (the "Manager"), Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Absolut Center for Nursing and Three Rivers, LLC; Absolut of Orchard Brooke, LLC; and Absolut Center fo Rehabilitation at Westfield, LLC (with the exception of the Manager, each an Operator" and collectively the "Established Operators"), all New York limited liability companies, and affiliates of RCA Healthcare Management, LLC, each New York limited liability companies with an address at 10 E. Merrick Road, Suite 305, Valley Stream, NY 11580 (each an "ASA Servicer" and collective, the "ASA Servicers"). The ASA Servicers, the Manager and the Established Operators shall individually be referred to as a "Party" and collectively shall be referred to as the "Parties".

**WHEREAS**, the Manager and the Established Operators (collectively, the "Debtors") filed for protection under Chapter 11 of the Bankruptcy Code with each case being jointly administered under Case No. 19-76260; and

**WHEREAS**, each Established Operator remains in possession of its assets as a "debtor in possession" according to sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS,** the Manager is an established member-manager of each Established Operator, each of which is separately licensed under Article 28 of the New York Public Health Law to operate a skilled nursing facility;

**WHEREAS**, the ASA Servicers or their affiliates (collectively, the "Buyer") were collectively the successful bidder at a bankruptcy sale of the Acquired Assets of the Established Operators and have entered into that certain Asset Purchase Agreement dated as of January 30, 2020 between the Buyer and the Debtors (the "APA");

**WHEREAS,** as a condition of the sale, the Established Operators and the ASA Servicer are obligated to enter into this Agreement to consult in the operation of the Facilities (as hereinafter defined) until the ASA Servicers are established by the New York State Department of Health Public Health and Health Planning Council as Operators under Article 28 of the Public Health law of each of the Facilities; and

**WHEREAS,** Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC owns and operates a 320-bed skilled nursing facility known as "Absolut Care of Aurora Park" (the "Aurora Park Facility") located at 292 Main Street, East Aurora, NY 14052, which provides residential skilled nursing services; and

**WHEREAS,** Absolut Center for Nursing and Rehabilitation at Allegany, LLC owns and operates a 37-bed skilled nursing facility known as "Absolut Care at Allegany" (the "Allegany

18656215.6
233620-10001

Facility") located at 2178 N. Fifth Street, Allegany, NY 14706, which provides residential skilled nursing services; and

**WHEREAS,** Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC owns and operates a 120-bed skilled nursing facility known as "Absolut Care of Three Rivers" (the "Three Rivers Facility") located at 101 Creekside Drive, Painted Post, NY 14870, which provides residential skilled nursing services; and

**WHEREAS**, Absolut Center for Nursing and Rehabilitation at Gas operates an 83-bed skilled nursing facility known as "Absolut Cente Rehabilitation at Gasport" (the "Gasport Facility") located at 4540 Lincoln 14067, which provides residential skilled nursing services; and

**WHEREAS**, Absolut Center for Nursing and Rehabilitation at Westfield , LLC owns and operates a 120-bed skilled nursing facility known as "Absolut Center for Nursing and Rehabilitation at Westfield" (the "Westfield Facility") located at 26 Cass Street, Westfield, NY 14787 which provides residential skilled nursing services; and

**WHEREAS,** Absolut at Orchard Brooke, LLC owns and operates an 80 Assisted Living Facility known as "Absolut Care of Orchard Brooke" (the "Orchard Brooke Facility" and collectively with the Aurora Park Facility, the Allegany Facility, the Three Rivers Facility, the Gasport Facility and the Westfield Facility, the "Facilities" and each, a "Facility") located at 6060 Armor Duels Rd, Orchard Park, NY 14127, which provides residential assisted living services; and

**WHEREAS,** the ASA Servicers, either directly or through their affiliates, provide consulting and administrative services to skilled nursing facilities and assisted living facilities, and have developed proprietary systems and techniques to enhance the operation of skilled nursing facilities and assisted living facilities; and

**WHEREAS,** each Established Operator desires to retain the ASA Servicers to provide certain consulting and administrative services for the Facilities, and the ASA Servicers desire to provide such services to and for each Facility upon the terms and conditions set forth herein.

**NOW, THEREFORE,** in-consideration of the mutual representations, warranties, covenants and undertakings of the Parties, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, do hereby agree as follows:

## ARTICLE 1   RELATIONSHIP OF THE PARTIES

**Section 1.01** *Appointment of the ASA Servicers.* Each Established Operator appoints the applicable ASA Servicer as such Established Operator's consultant with respect to those nonprofessional functions and services of each Facility that are described in Article II (the "Services"), and such ASA Servicer accepts such appointment, pursuant to the terms and conditions contained herein.

18656215.6
233620-10001

**(a)** *Retention of Ownership and Control.* Each Established Operator shall hold all necessary licenses and permits to operate each Facility. Each Established Operator will provide to the applicable ASA Servicer immediate notice of any termination or suspension of any necessary license or permit. In providing services under this Agreement, each ASA Servicer is to have the use of all operating assets of the Established Operators (other than the cash on hand of the Established Operators, the Pre-ASA Effective Date Receivables (as defined below) and the proceeds thereof or any other Excluded Assets (as defined in the APA)), to the extent permitted by applicable law. Notwithstanding any other provision in this Agreement, each Established Operator shall remain responsible for compliance with respect to all appl
federal, state, and local laws, rules, regulations and ordinances, and standa
Each Established Operator retains the ultimate authority over the overall p
assets of each Facility. The Established Operators shall not delegate to the ASA Servicers, and the ASA Servicers will not be responsible for, any powers and responsibilities not specifically allocated to the ASA Servicers in this Agreement. Specifically, notwithstanding anything in this Agreement to the contrary, each Established Operator retains and shall not delegate authority and responsibility over the following:

(i) Each Established Operator must retain direct, independent authority over the appointment and/or dismissal, in its sole discretion, of the Facility's management level employees (including but not limited to the Facility/Service Administrator/Director, the Medical Director, the Director of Nursing, the Chief Executive Officer, the Chief Financial Officer and the Chief Operating Officer) and all licensed or certified health care staff.

(ii) Each Established Operator must retain the right to adopt and approve, in its sole discretion, the Facility's operating and capital budgets.

(iii) Each Established Operator must retain independent control over and physical possession of the Facility's books and records.

(iv) Each Established Operator must retain independent control over and physical possession of the Facility's operating policies and procedures.

(v) Each Established Operator must retain full authority and responsibility for, and control over, the operations and management of the Facility.

(vi) Each Established Operator must retain the right and authority to independently adopt, approve and enforce, in its sole discretion, policies affecting the Facility's delivery of health care services.

(vii) Each Established Operator must retain the right to independently adopt, approve and enforce at its sole discretion, the disposition of assets and authority to incur debts.

(viii) Each Established Operator must retain the right to approve, in its sole discretion, certificate of need applications filed by or on behalf of such Established Operator.

18656215.6
233620-10001

(ix)    Each Established Operator must retain the right to approve, in its sole discretion, contracts for management and/or clinical services.

(x)     Each Established Operator must retain the right to approve, in its sole discretion, any facility debt.

(xi)    Each Established Operator must retain the right to approve, in its sole discretion, settlements of administrative proceedings or litigation to which such Established Operator may delegate to an ASA Se

(xii)   No powers specifically reserved to an Established delegated to the Consultant.

(xiii)  Each Established Operator must retain the right to approve all matters set forth in 10 NYCRR Section 415.26.

**Section 1.02**    Each Established Operator shall consider and respond to all recommendations of the applicable ASA Servicer regarding operations, policies and procedures relating to its Facility, to the extent relevant to the obligations of such ASA Servicer hereunder and permissible under applicable law. Each ASA Servicer agrees not to take any actions that will interfere with the authority and responsibility of an Established Operator that is not expressly delegated to such ASA Servicer hereunder.

**Section 1.03**    *Status of Parties.*    To the extent that the provisions of this Agreement and that of the APA are in conflict, any such conflict shall be interpreted or determined by referring solely to the terms and provisions of this Agreement.  To the extent the provisions of this Agreement and APA are in conflict with the terms of the Sale Order (as defined in the APA), any such conflict shall be interpreted or determined by referring solely to the terms and provisions of the Sale Order.

**Section 1.04**    *Professional Health Care Services.*    The Parties acknowledge and agree that the ASA Servicers are not authorized or qualified to engage in any activity that may constitute the practice of any health care profession.  Nothing in this Agreement is intended nor is to be construed to allow the ASA Servicers to exercise control or direction over the manner or method by which physicians on the medical staff or other health care professionals at each Facility perform medical services or other professional health care services.  To the extent that any act or service herein required of the ASA Servicers should be construed by a court of competent jurisdiction, each Facility's Operator's legal counsel or any regulatory or administrative body having oversight responsibilities regarding such professional activities to constitute the practice of any health care profession, the requirement to perform that act or service by the ASA Servicers shall be deemed waived and unenforceable.

**Section 1.05**    *Appointment of Medical Director.*    Each Established Operator shall appoint a Medical Director to direct the medical activities of each Facility and to perform such duties as may be assigned from time to time by the Established Operator.  The ASA Servicers shall not assume any of the Established Operators' liabilities or obligations with respect to the Established

18656215.6
233620-10001

Operators' compliance or non-compliance with applicable federal and state laws in the securing of medical director services for each Facility.

## ARTICLE 2   *CONSULTING SERVICES*

**Section 2.01**   *Scope of Services.*   The ASA Servicers shall provide certain consulting and non-professional services described in this Article II.   The ASA Servicers shall provide the Services described herein without discrimination as to race, creed, color, religion, national origin, sex, or disability within the Established Operators' treatment capacity, sexual orie
payment for patients.

**Section 2.02**   *Facility and Equipment.*   The ASA Servicers shall dire
equipment and supplies and the maintenance of the equipment of each Facility in accordance with the Established Operators' maintenance policies.   The ASA Servicers shall manage any ongoing construction project and the continued maintenance of the Facilities.   The ASA Servicers shall negotiate the vendor contracts and the evaluation of alternate proposals and bids submitted by various companies relating to each Facility.   The ASA Servicers shall direct the Facilities' employees in maintaining records of inventory and in arranging for purchases of necessary and appropriate supplies and equipment for each Facility, including management information system items or systems for each Facility.   The ASA Servicers shall review invoices to confirm correct payment.   Each Established Operator shall be solely responsible for approving and executing all contracts  (including any contracts that would replace an existing contract) and purchases for the Facilities, including equipment and supplies, after consultation with the applicable ASA Servicer.   To facilitate such purchasing, at the request of any Established Operator, the applicable ASA Servicers may provide consolidated purchasing of equipment and supplies through the ASA Servicers contacts or affiliated companies, subject to such Established Operator's approval.   The ASA Servicers shall have no independent power or authority to incur any debt or liability of any kind or nature on behalf of any Established Operator without the consent of such Established Operator.

**Section 2.03**   *Billing and Collection.*   The ASA Servicers shall prepare all bills for items and services provided by each Facility for Post-ASA Effective Date receivables.   The Established Operators shall continue to use their existing billing mechanism for all Pre-ASA Effective Date Receivables (as defined below).   The ASA Servicers shall administer controls and systems for the recording and collection of the revenues of each Facility post ASA Effective Date, as follows:

**(a)**   The ASA Servicers shall recommend when appropriate changes to any policies and procedures to verify patient eligibility, enrollment, and termination with respect to Medicare, Medicaid and other third-party payor programs, and shall assist with all billing inquiries from patients, payors, Medicare, Medicaid and other governmental authorities with jurisdiction over each Facility.

**(b)**   The ASA Servicers shall work with the Established Operators to make changes to the policies and procedures presently in place concerning methods by which the Facilities' patients are charged for services rendered at the Facilities.

18656215.6
233620-10001

**(c)**     The ASA Servicers shall administer and where necessary with the consent of each applicable Established Operator modify such Established Operator's collection policies for each Facility to assure that they are reasonable, appropriate and consistent with all applicable laws, regulations, and as agreed to with third party payors, as applicable, it being understood that the ASA Servicers has no control over the adoption of policies by the Established Operators.

**(d)**     Nothing in this Article grants the ASA Servicers authorization in any way to acquire or dispose of or to contract to acquire or dispose of any or all of the Established Operators' assets. Each Established Operator shall promptly forward to the A
of all documents relating to claims for items and services provided by each F

**(e)**     Except as provided in Section 8.13 of the APA, the ASA Servicers shall prepare, at its sole cost, in the name of each Facility and for each Established Operator's review and signature, all cost reports, exception requests, and other reports and data necessary for obtaining appropriate reimbursement for the items and services provided by each Facility under the Medicare and Medicaid programs and any other third-party payor programs in which each Facility participates (the "Reimbursement Record").

**(f)**     Each Established Operator shall cooperate in providing to the ASA Servicers the (i) names and addresses of all third-party payors, and (ii) provider numbers used by such Established Operator with respect to Medicare, Medicaid and all other third-party payors.

To the extent the capital leases of any Facility affect such Facility's reimbursement records pursuant to an applicable Reimbursement Record, the applicable ASA Servicer shall bear all costs and expenses relating to such capital leases.

**Section 2.04** *Accounting and Financial Services.*     The ASA Servicers shall provide accounting and financial consulting to the Established Operator for each Facility as follows:

**(a)**     The ASA Servicers shall develop an annual budget (the "Budget") for each Facility with an estimate of the operating revenues and expenses and capital expenditures for each Facility for the upcoming fiscal year.  The proposed Budget will contain an explanation of plans and projections regarding the operations of each Facility, utilization, services, staffing and other factors that may affect the Budget, and will include an amount equal to the ASA Servicers' direct and fixed overhead costs allocated to each Facility for the ensuing year.  At least thirty (30) days prior to the end of each fiscal year of the ASA Servicer, commencing with the first full fiscal year after the Commencement Date (as defined below), the ASA Servicers shall submit to the Established Operator the proposed Budget for each Facility.  Each Established Operator will adopt a Budget within thirty (30) days from the date on which it receives the proposed Budget from the applicable ASA Servicer.  Each Established Operator will have the sole right to reject, revise or adopt the Budget proposed by such ASA Servicer.  It will also have the right to independently adopt a Budget that is completely different from the Budget proposed by such ASA Servicer.  Upon adoption of the Budget by any Established Operator, and subject to the obligations of the ASA Servicers hereunder, such Established Operator shall use its best efforts to operate each Facility so that actual expenses and revenues are consistent with the Budget. Each ASA Servicer and each applicable Established Operator will develop for the next fiscal

year a budget within 90 days of commencement of this Agreement. Attached hereto as Exhibit 2.04 are the initial proposed Budgets for each Facility which by this Agreement are hereby deemed adopted by the Facilities.

(b)     Within thirty (30) days after the last day of each calendar month, the ASA Servicers shall prepare and submit to the Established Operators internal unaudited financial reports which will be prepared consistent with generally accepted accounting principles for each Facility and which shall contain as an exhibit actual and budgeted revenues (based on the Budget) and expenses of each Facility for the preceding month and year to date, an an
all accounts receivable activity, and reasonable explanations of any variances

(c)     The ASA Servicers shall develop financial and accounting systems for adoption by each Facility and shall use such accounting policies and procedures adopted by the Established Operators for the operations of each Facility and the performance of the ASA Servicers' duties hereunder, and with the aid, advice and cooperation of the ASA Servicer the Established Operator(s) shall conduct monthly accounts receivable collection meetings, at which the Parties will update one another regarding the collection and allocation of Pre-ASA Effective Date Receivables and Post-ASA Effective Date Receivables.

(d)     The Parties agree that the books and business records of each Facility will remain under the ownership and control of the Established Operators at all times, and that the ASA Servicers will function in a consulting capacity in performing its obligations hereunder. Notwithstanding the foregoing, after the Closing (as defined in the APA), the financial, purchasing, payroll and other records of the ASA Servicer maintained during the Interim Period shall be the property of the ASA Servicers.

(e)     During the period commencing upon the ASA Effective Date and concluding on the earlier of the date of the Closing (as defined in the APA) or the termination of this Agreement (the "Interim Period"), except as otherwise provided for in this Agreement, each Established Operator shall, with the aid, cooperation and advice of the applicable ASA Servicer (except as otherwise consented to by ASA Servicers, which consent shall not be unreasonably withheld, conditioned or delayed):

(i)     Operate the Facilities in the ordinary course in substantially the same manner as it has heretofore been conducted and shall operate the Facilities in compliance with applicable laws in all material respects;

(ii)    not enter into any leases for new or existing equipment in connection with the Facilities, which equipment has a value in excess of one hundred thousand dollars ($100,000) in the aggregate, without the consent of the ASA Servicer, other than with respect to entering into any lease for new or existing equipment for the replacement of equipment presently leased for which the leasing contract terminates by the passage of time provided Buyer has agreed to assume that lease;

18656215.6
233620-10001

(iii) not amend in any material respect or terminate any Assumed Contract (as defined in the ASA);

(iv) within five (5) business days of receipt or filing, as the case may be, provide Buyer with copies of all DOH survey reports and government notices that are received by the Established Operator(s) relevant to the Facilities subsequent to the date hereof along with copies of the Established Operator(s)'s responsive correspondence therefor;

(v) timely file plans of correction, subject to any extension course, if necessary, and shall provide the ASA Servic of the same within five (5) business days of filing;

(vi) maintain and keep the Acquired Assets in substantially the same condition and working order as exists on the date hereof in all material respects, including making necessary repairs and replacements, ordinary wear and tear, depreciation and casualty excepted;

(vii) maintain adequate staffing of the Facilities and use commercially reasonable efforts to maintain the Facilities' relationship with physicians, suppliers, customers and others having business relationships with the business;

(viii) promptly furnish ASA Servicers with such information and accountings with respect to the operation and maintenance of the Facilities and copies of all financial documents relating to the Facilities, as ASA Servicers may reasonably request from time to time;

(ix) within five (5) business days of preparation, provide ASA Servicers and any other party at ASA Servicer's reasonable request, with quarterly unaudited financial statements, annual audited financial statements, if there are any annual reporting periods prior to Closing and such financial statements shall be prepared in accordance with GAAP applied on a consistent basis (other than the absence of notes and except in the case of any unaudited financial statements, subject to normal year-end adjustments) and present fairly, in all material respects, the information set forth therein. The Established Operator(s) will reflect in such financial statements any liabilities incurred by the business during such period required in accordance with GAAP to be disclosed. The Established Operator(s) shall afford ASA Servicer and its agents, reasonable access to the business during normal business hours upon request;

(x) maintain all of the books and records of the Facilities in accordance with past practice in all material respects, subject to changes with respect to any generally applicable standards relevant to such books and records;

(xi)     shall keep in full force and effect all material permits currently in effect unless such   licenses are no longer necessary for the operation of the Facilities;

(xii)    pay when due in accordance with Section 3.03 of this Agreement (or withhold and pay over, if required), all taxes, assessments and charges or levies imposed upon the Established Operator(s) in relation to the Facilities and shall timely file all cost reports covering any periods prior to the Closing subject to any extension filed in the ordina
provide ASA Servicers with copies of all cost rep
business days after their filing; (m) promptly advis
writing if the Established Operator(s) becomes aware of any threatened or actual action, suit or proceeding, arbitration or investigation against the Facilities or claims for which the Established Operator(s)'s insurance carrier has been put on notice;

(xiii)   not change from an accrual basis of accounting; and

(xiv)    not enter into any agreement, other than the APA or this Agreement, for the sale of the Acquired Assets or submit or allow any application to be submitted to DOH regarding the acquisition of the Acquired Assets in connection other than pursuant to this Agreement.

**Section 2.05   [ASA Servicer Insurance Policies.**

**(a)**     The ASA Servicers shall not be responsible for maintaining general liability or professional liability insurance policies covering any claims or causes of action arising out of an incident or occurrence or otherwise from the provision of care or the operation of the Facilities prior to the ASA Effective Date.  On and after the ASA Effective Date, the ASA Servicers and/or Buyers shall maintain general liability and professional liability insurance policies covering any claims or causes of action arising out of an incident or occurrence or otherwise from the provision of care or the operation of the Facilities on or after the ASA Effective Date ("Post ASA Claims") with limits at least equal to, and deductibles and/or self-insured retentions no greater than, the existing policies of the Established Operators ("ASA Servicer Liability Policies").  To the extent the ASA Servicer Policies are in the name of the ASA Servicers, such ASA Servicer Liability Policies shall designate each of the Established Operators as an additional insured.  The ASA Servicer Liability Policies shall have a retroactive effective date with respect to the Established Operators of September 10, 2020 (the "Petition Date").

**(b)**     The ASA Servicers and/or Buyers shall not be responsible for maintaining workers compensation policies covering any claims arising prior to the ASA Effective Date.  On and after the ASA Effective Date, the ASA Servicers and/or Buyers shall maintain workers compensation policies covering any claims arising on or after the ASA Effective Date with limits at least equal to the existing policies of the Established Operators ("ASA Servicer WC Policies").  To the extent the extent the ASA Servicer WC Policies are in the name of the ASA Servicers, such ASA Servicer Policies shall designate each of the Established Operators as an additional insured.

18656215.6
233620-10001

**(c)** For the avoidance of doubt, any deductibles or self-insured retention obligations under the ASA Servicer Liability Policies and the ASA Servicer WC Policies for Post ASA Causes of Action shall be the sole responsibility of the ASA Servicer and/or Buyers as applicable. For the avoidance of doubt, any deductibles or self-insured retention obligations under the ASA Servicer Liability Policies for claims or causes of action arising out of an incident or occurrence or otherwise from the provision of care or the operation of the Facilities between the Petition Date and the ASA Effective Date shall be the sole responsibility of the Established Operators.]

**Section 2.06** *Policies and Procedures.* The ASA Servicers shall prepar procedure manuals to the extent it deems necessary for each Facility, to Established Operators. During the Term (as defined below), the ASA Servi Established Operators with copies of the ASA Servicers' standard operational and technical policy and procedure manuals for each Facility. The Established Operators reserve the right to change each Facility's policies, procedures and forms at any time, in its reasonable discretion, subject to compliance with applicable law. Upon the termination or expiration of this Agreement, the Established Operators shall be entitled to retain and continue to use all policies, procedures, and forms prepared by the ASA Servicers for use by each Facility. The ASA Servicers shall further assist the Established Operators in the following:

**(a)** Establishing and implementing written policies and procedures governing the admission process that ensures compliance with State and Federal anti-discrimination laws that apply to each Facility. Such laws include, but need not be limited to, the applicable provisions of this Part; Public Health Law, Section 2801-a (9); the New York State Civil Rights Law, Sections 40 and 40-c; Article 15 (Human Rights Law) of the State Executive Law, Sections 291, 292 and 296 and Title 42 of the United States Code, Sections 1981, 2000a, 2000a-2, 2000d, 3602, 3604 and 3607, and 10NYCRR 415.26.

**(b)** Establishing and implementing written policies and procedures governing the receipt, review and investigation of allegations of misappropriation of resident property by individuals in the employ of and/or whose services are utilized by each Facility. Such policies and procedures shall be coordinated with the process governing the handling of complaints as set forth in 10 NYCRR Section 415.3.

**(c)** Establishing and administering a Nursing Aid Training Program and assuming the responsibility for providing a Program Coordinator who shall have the day to day responsibility for implementing each Facility's training program in accordance with each Facility's policies and procedures and State and Federal requirements. The instructor shall be a registered professional nurse with at least one year of experience in a nursing home who has demonstrated ability to teach adult learners.

**(d)** Establishing and supervising the nurses' aide competency evaluation and a clinical skills evaluation given by a certified Nurse Aide Evaluator.

**Section 2.07** *Service Contracts.* The ASA Servicers shall direct the negotiating and maintenance of contracts and arrangements with individuals or entities providing goods or services for each Facility, including, but not limited to, ancillary medical items and services (e.g.,

18656215.6
233620-10001

laboratory, blood, EKG, bone densitometry, pharmacy, etc.), third party payor contracts, transplant agreements, affiliation agreements and related agreements for and in the name of each Established Operator, and other contracts or arrangements appropriate for each Facility.

**Section 2.08** *Quality and Utilization Controls.* The ASA Servicers shall advise and assist each Established Operator in performing such medical record audits and in conducting utilization review and quality assurance/control review for each Facility and other related activities as are necessary and appropriate for the operation of each Facility and as permitted under applicable law.

**Section 2.09** *Code of Conduct; Compliance: Screening.* The ASA Servi
each Established Operator, for such Established Operator's use with respec
proposed code of business and ethical conduct, as well as a proposed annual compliance training plan. The ASA Servicers shall also assist each Established Operator in screening for individuals and entities who (i) are currently excluded, suspended, debarred or otherwise ineligible to participate in federal health care programs, or (ii) have been convicted of a criminal offense related to the provision of health care items or services and have not been reinstated in the federal health care programs after a period of exclusion, suspension, debarment or ineligibility.

**Section 2.10** *Accreditation.* The ASA Servicers shall assist each Established Operator in maintaining applicable accreditation and Medicare certification for each Facility, including assisting each Established Operator in preparing documentation required by applicable accreditation agencies.

**Section 2.11** *Patient/Resident Evaluation.* At the request of any Established Operator, the applicable ASA Servicers shall provide consultation and support (including personnel as necessary) to evaluate and document specific needs and required services of all patients and residents.

**Section 2.12** *Admission and Discharge.* The ASA Servicers shall provide consultation and support with regard to admission and discharge of patients and residents.


**ARTICLE 3  Interim Period Financial Accounting.**

**Section 3.01** *Compliance with Medicare and Medicaid Statutes and Regulations*: The Existing Operators are parties to Medicare provider agreements (the "Provider Agreements") with the Secretary of the United States Department of Health and Human Services ("HHS"), acting through its designated component, the Centers for Medicare & Medicaid Services ("CMS"), to receive payment for services provided to Medicare beneficiaries pursuant to the provisions of, and regulations promulgated under, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395lll. Notwithstanding anything in the APA:

(a) the Provider Agreements shall be governed exclusively and solely by the Medicare statutes, regulations, rules, policies, and procedures, including, but not limited to, transfer of the Provider Agreements with successor liability through a valid "change of ownership". Pursuant to 42 C.F.R. § 489.18(c), the Provider Agreements shall be automatically

18656215.6
233620-10001

assigned to the ASA Servicers upon a change in ownership, subject to the terms and conditions under which the Provider Agreements were originally issued, including, but not limited to, the recoupment of all pre-assignment Medicare overpayments and all other monetary liabilities, regardless of whether they have not yet been determined by CMS;

**(b)** the ASA Servicers shall be subject to compliance with applicable health and safety standards pursuant to all Medicare statutes, regulations, rules, policies, and procedures;

**(c)** nothing except the applicable statutes of limitation shall affect United States' defenses, claims, rights, or ability to recoup, setoff, or otherwi overpayments and any other monetary liabilities from the facilities and/or AS the Provider Agreements in accordance with the Medicare statutes, regulations, rules, policies, and procedures; and

**(d)** nothing shall relieve or be construed to relieve the ASA Servicers from complying with all Medicare statutes, regulations, rules, policies, and procedures, including, but not limited to, the requirement that the Debtors and any New Operator apply for and obtain CMS approval of a change of ownership by the filing of Form CMS-855A.

**Section 3.02** The Established Operators and ASA Servicers shall comply with the anti-assignment provisions of the Medicare Act and regulations at, respectively, 42 USC 1395g(c) and 42 CFR 424.73(a). Specifically, any payments billed for services under the Established Operators' provider numbers prior to the change of ownership will be deposited into the Established Operators' respective accounts. Further, pursuant to 42 C.F.R. § 424.550 and 42 C.F.R. § 424.535(a)(7), the ASA Servicers are prohibited from using the Debtors' Medicare Provider Numbers to bill for services except pursuant to a valid change of ownership.

**Section 3.03**

**(a)** During the Interim Period, ASA Servicers shall not participate in the total gross income or net revenue of the Facility during the Interim Period;

**(b)** no transfer of any of the Purchased Assets by Established Operator to the ASA Servicers shall occur prior to the receipt of approval of the DOH and the Closing;

**(c)** Except as provided in Section 3.02, ASA Servicers shall bill under Established Operators' names and provider numbers to the extent permitted under applicable law.

**Section 3.04** On or before the ASA Effective Date, the Established Operator(s) shall establish a new operating bank account (the "New Operating Account") and a new payroll bank account (the "New Payroll Account"), both of which shall be under the control of the Established Operator(s) (the "New Accounts") and over which two parties designated by the ASA Servicers and Israel Sherman or Bill Lenhart (or his successor) on behalf of the Established Operator(s) shall have signature authorization.

18656215.6
233620-10001

(a)     During the Interim Period, all payments received on account of the Post-ASA Effective Date Receivables shall be transferred from the Established Operator(s)'s existing Governmental and Non-Governmental Deposit Accounts and/or, except as provided in Section 3.02, deposited into the New Operating Account on Friday of each week, net of an amount sufficient to pay the full amount of the New York State Department of Health cash receipts assessment (the "Cash Assessment") associated with the Post-ASA Effective Date Receivables collected (the "Weekly Seller Assessment Reserve").

(b)     During the Interim Period, all payments received on account o Effective Date Receivables shall be transferred from the Established Operato Governmental and Non-Governmental Deposit Accounts and/or deposited int Operator's existing operating account(s) on Friday of each week, net of an amount sufficient to pay the full amount of the Cash Assessment associated with the Pre-ASA Effective Date Receivables collected (the "Weekly ASA Servicer Assessment Reserve" and together with the Weekly Seller Assessment Reserve, the "Assessment Reserves").

(c)     The ASA Servicer timely shall file each month all required returns or other submissions relating to the Cash Assessment, including Form DOH-4274, and shall pay the Cash Assessment due from the Weekly Seller Assessment Reserve and the Weekly ASA Servicer Assessment Reserve.

(d)     The proceeds of the Post-ASA Effective Date Receivables shall be used to pay the Post-ASA Effective Date operating expenses of the business. Any single draw on the New Operating Account in excess of fifty thousand dollars ($50,000.00), excluding transfers from the New Operating Account to the New Payroll Account and payment of payroll tax liabilities, shall require both the signatures of Israel Sherman and a representative of the ASA Servicer.

(e)     The Debtors shall retain all proceeds of the Pre-ASA Effective Date Receivables in their existing accounts for the benefit of the Debtors' estates, and no portion of the proceeds of the Pre-ASA Effective Date Receivables shall be deposited into the New Operating Account.

(f)     During the Interim Period, representatives of Buyer and the Established Operator(s) shall meet on a weekly basis to review draws on the New Operating Account and the allocation of collections as between the Pre-ASA Effective Date Receivables and the Post-ASA Effective Date Receivables.  The  Established Operator(s) and Buyer shall take all reasonable action necessary to effectuate the foregoing. This provision shall survive the Closing. Notwithstanding the provisions of this section, the Established Operator(s) shall be permitted to transfer or dispose of any Excluded Assets at any time and in any manner, it desires in its sole discretion.

(g)     On the occurrence of the Closing or the termination of this Agreement, all of the funds remaining in the New Operating Account that are proceeds of the Post-ASA Effective Date Receivables or that are the proceeds of the WC Loan (as defined below) or that otherwise were deposited into the such account by or on behalf of the ASA Servicer shall be immediately transferred to or become the property of the Buyers; *provided* that, for the avoidance of doubt, all

18656215.6
233620-10001

proceeds of the collections of Pre-ASA Effective Date Receivables shall remain the property of the Established Operators and shall not be transferred to or become the property of the Buyers.

**Section 3.05** *Purchase of Capital Finance, LLC's Loans to the Manager and Established Operators.* On or prior to the Commencement Date, the ASA Servicer or the Buyer shall (a) purchase all obligations and liabilities of Capital Finance, LLC ("Capital Finance") under (i) that certain Credit and Security Agreement dated as of May 22, 2009 by and among Capital Finance and the Manager and Absolut Center for Nursing and Rehabilitation at Westfield, LLC and all documents and agreements related thereto (collectively, the "Capital Finan~~

Documents") and (ii) that certain Credit and Security Agreement dated as
and among Capital Finance and Absolut Center for Nursing and Rehabilita
LLC, Absolut Center for Nursing and Rehabilitation at Gasport, LLC, Absolut Center for Nursing and Rehabilitation at Orchard Park, LLC, and Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC, and all documents and agreements related thereto (collectively, the "Capital Finance HUD Loan Documents" and, together with the Capital Finance Non-HUD Loan Documents, the "Capital Finance Loan Documents; and (b) execute and perform under that certain Loan Sale and Assignment Agreement dated as of January 29, 2020 (the "Loan Sale Agreement") by and among the Buyer or the ASA Servicer and Capital Finance. The Manager and the Established Operators agree to attorn to and be bound by the Capital Finance Loan Documents, as assigned to the ASA Servicer. The Manager and the Established Operators shall agree to sign or use commercially reasonable efforts to cause to be signed any documents reasonably required by the ASA Servicers or the Buyer to ensure that the ASA Servicer shall have a continuing first lien on all of the collateral presently securing the loans made by Capital Finance under the Capital Finance Loan Documents, and that all personal guarantees of such loans are reaffirmed. Subject to the ability to make payments pursuant to a wind-down budget reasonably agreeable to the Buyer, the Manager and the Established Operators shall not make any payments to any party or pay any administrative fee or other obligation until the loans from Capital Finance have been repaid in full. Additionally, the Established Operators shall deliver an estoppel certificate to the ASA Servicers acknowledging the amounts due under the Capital Finance Loan Documents and shall agree to attorn to and be bound by the Capital Finance Loan Documents.

**Section 3.06** *Working Capital.* In the event ASA Servicers shall determine at any time during the Interim Period that any Facility's revenue shall not be sufficient to pay its ongoing expenses accrued during the Interim Period, including, without limitation, rent and additional rent, Established Operator after notice of such deficits from the ASA Servicers shall provide ASA Servicers with written notice of the amount of working capital needed for the Facility to meet its ongoing expenses (based upon financial statements or projections reasonably demonstrating the need for such amount) (the "WC Amount") and, within ten (10) days after ASA Servicers' receipt of such notice, ASA Servicers shall loan the Established Operator the WC Amount (the "WC Loan(s)"). For the avoidance of doubt, ASA Servicers shall only be obligated to make WC Loans with respect to WC Amounts accrued during the Interim Period. The WC Loan(s) shall be without any recourse to the Debtors and shall be secured solely by and recoverable solely from, a security interest granted to the ASA Servicers on all of the Post ASA Effective Date Receivables, which security interest shall be subordinate to any and all existing liens on the Post-ASA Effective Date Receivables of Capital Funding, LLC, Capital Funding Group, Inc., and any of

18656215.6
233620-10001

their predecessors, successors and/or assigns (collectively, "Capital Funding"), and the U.S. Department of Housing and Urban Development ("HUD"), under those certain Lessee Security Agreements executed by the Established Opeators (other than Absolut Center for Nursing and Rehabilitation at Westfield, LLC), as well as any related documents (collectively, the "Capital Funding Security Agreements"), and the "*Final Order (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, AND 364*" [Dkt No. 264] (the "Final DIP Financing Order"), ABS DIP, LLC., with respect t
financing, and Capital Finance, with respect to the loans made by Capita
Capital Finance Loan Documents, if any. Subsequent WC Loans, as applic
to the schedule annexed to the WC Note, subject to the same repayment and security terms. At the Closing, the WC Note shall be adjusted and ASA Servicers or an Affiliate of ASA Servicers shall assume any outstanding WC Loans, and Established Operator shall receive a release from such obligations. Notwithstanding anything contained herein to the contrary, the granting of any security interests with respect to any WC Loans shall be subject to Capital Funding's and HUD's approval under any applicable agreements, statutes, regulations, policies, procedures, rules and regulatory agreements (the "Capital Funding/HUD Approval").

**Section 3.07** *Pledging of Post-ASA Effective Date Receivables.* During the Interim Period, the ASA Servicers shall be permitted, subject to the Capital Funding/HUD Approval, to pledge as collateral the Post-ASA Effective Date Receivables and the proceeds thereof as security for any loan to be used by the ASA Servicers to make the WC Loan or otherwise to fund its obligations under this Agreement (a "Third Party Loan"); provided that any Third Party Loan shall be without recourse to the Established Operators except to the extent of the Post-ASA Effective Date Receivables and the proceeds thereof. The Established Operators shall agree to sign or use commercially reasonable efforts to cause to be signed any documents reasonably required by the ASA Servicers to effectuate the foregoing. Any security provided pursuant to this Section 3.07 shall be subordinate to any and all existing liens on the Post-ASA Effective Date Receivables of Capital Funding and HUD under the Capital Funding Security Agreements and the Final DIP Financing Order, ABS DIP, LLC, with respect to the Debtors' DIP financing, and Capital Finance, with respect to the loans made by Capital Finance under the Capital Finance Loan Documents, if any.

### ARTICLE 4   PRE ASA-EFFECTIVE DATE ACCOUNTS RECEIVABLE AND PAYABLE

**Section 4.01**   No later than ten (10) days after the Commencement date of this Agreement (the "ASA Effective Date"), each Established Operator shall provide the applicable ASA Servicer with a schedule setting forth an accounts receivable report relating to accounts receivable of the Established Operators for services rendered through the ASA Effective Date setting forth, by patient, its outstanding accounts receivable as of the date hereof. All Receivables that arise from services rendered prior to the ASA Effective Date shall be defined as the "Pre ASA Effective Date Receivables" Notwithstanding the foregoing, during the "Interim Period" the Post-ASA Effective Date receivables shall continue to be billed in the name of the Established Operators by the ASA Servicers for the benefit of the Established Operators. Any Receivables that arise from

services rendered subsequent to the ASA Effective Date shall be defined as the "Post ASA Effective Date Receivables"

**Section 4.02**   Either Party, or its agents, shall, upon reasonable notice and during normal business hours, have the right to inspect all of the books and records of the ASA Servicers relating to accounts receivable collected by any Party in order to confirm that such receivables were properly booked as Pre-ASA Effective Date Receivables or Post-ASA Effective Date Receivables.  Notwithstanding the foregoing, if such information can be transmitted through electronic mail, then the ASA Servicers and the Established Operato
obligations under this subsection in that manner.

**Section 4.03   Claims Requiring Legal Action**.   ASA Servicers shall have the right to commence legal proceedings to collect any Post-ASA Effective Date Accounts Receivable, and any recovery with respect to such Post-ASA Effective Date Accounts Receivable shall be solely for the account of ASA Servicers, including in satisfaction of any WC Loans.

**Section 4.04**   All receipts collected during the Interim Period shall be handled as follows:

**(a)**   The Debtors will be responsible for collection of all Pre-ASA Effective Date Receivables and the payment of any Cash Assessments and other collection costs associated with the collection of the Pre-ASA Effective Date Receivables.

**(b)**   ASA Servicers shall be responsible for the collection of all Post-ASA Effective Date Receivables and the payment of any Cash Receipts Assessments on that income or other collection costs, whether legal, or just billing staff relating to the collection of Post-ASA Effective Date Receivables.

**(c)**   Except as provided in Section 3.02 of this Agreement, all payments received by ASA Servicer on account of Post-ASA Effective Date receivables shall not be subject to the existing deposit account control agreement between the Debtors and Capital Finance (or its affiliates).  Rather such payments shall be subject to any new deposit account control agreement between the Buyer/ASA Servicer, Capital Finance (or its affiliates), Capital Funding (or its affiliates) and/or Buyers' working capital lender (whomever that may be) and shall be allowed to be used by Buyer as collateral for any working capital loan obtained by Buyer or otherwise may be retained by the ASA Servicer or the Buyer for its own account.

**(d)**   If any payment of accounts receivable collected by the Debtors either specifically indicates on the accompanying remittance advice, or if the Parties agree, that it is fully or partially on account of a Post-ASA Effective Date Receivable, such payment (or such portion of a payment as applicable) will be credited to the ASA Servicer and shall be turned over to the ASA Servicers as soon as reasonably practicable, but no later than five business days, after the determination has been made that such amounts are to be credited to the ASA Servicers.

**(e)**   If any payment of accounts receivable collected by the ASA Servicers either specifically indicates on the accompanying remittance advice, or if the Parties agree, that it is

18656215.6
233620-10001

fully or partially on account of a Pre-ASA Effective Date Receivable, such payment will be credited to the Established Operators and shall be turned over to the Established Operators as soon as reasonably practicable, but no later than five business days, after the determination has been made that such amounts are to be credited to the Established Operators.

**(f)** In the event either of the Parties collects a payments and the accompanying remittance advice does not indicate the period to which a payment relates, or if there is no accompanying remittance advice, then the ASA Servicers and the Established Operators shall investigate, in good faith consultation with one another, how such payment
applied; provided that in the event the parties cannot agree as to the appr
such collection, payment shall be applied and pro rata based on the amounts
payor in respect of Pre-ASA Effective Date Receivables and Post-ASA Effective Date Receivables. After the analysis conducted in this subsection (e), the Party holding amounts that are to be credited to the other Party shall turn over such amounts to the other Party as soon as reasonably practicable, but no later than five business days after the determination has been made regarding the allocation of such funds.

**(g)** Any payments (regardless of date of remittance advice) received by ASA Servicers or Established Operators from or on behalf of private pay patients will be trued up twelve months following the ASA Effective Date, and then be applied pro rata to (a) reduce the patient's pre-ASA Effective Date Receivables, which shall be credited to the Established Operators and (b) to reduce the patient's post-ASA Effective Date Receivables, which shall be credited to the ASA Servicers; provided that, for the purposes of this proration, (i) Pre-ASA Effective Date Receivables older than twelve months at the time of the ASA Effective Date shall not be taken into account and (ii) any costs associated with collection of these amounts shall be taken into account. Upon payment of the amounts due to the Established Operators and ASA Servicers in full as provided in the immediately preceding sentence, all further collections shall be paid on account of Pre-ASA Effective Date Receivables balances due from more than 12 months prior rot eh ASA Effective Date. Notwithstanding the foregoing, in the event the private pay patient no longer resides in any of the Facilities upon the ASA Effective Date, this provision (f) shall not apply, and any collections on account of such patient shall be handled in accordance with subsection (a) and (d) above. After the allocation contemplated by this subsection (f) has been completed, the Party holding amounts that are to be credited to the other Party shall turn over such amounts to the other Party as soon as reasonably practicable, but no later than five business days after the determination has been made regarding the allocation of such funds.

**Section 4.05** All AR collections, including the amount of the Cash Assessment Reserves, shall be trued up on a monthly basis. Until all Pre-ASA Effective Date Receivables have been collected or otherwise administered, representatives of ASA Servicers and, after the Closing, the Buyer, and the Established Operator(s) shall conduct a monthly formal reconciliation of the allocation of collections as between the Pre-ASA Effective Date Receivables and the Post-ASA Effective Date Receivables, as well as the amount of the Cash Assessment Reserves. This provision shall survive the Closing

**Section 4.06** **Power of Attorney**. In connection with the collection of such cash receipts, ASA Servicers are hereby authorized to endorse and deposit checks, money orders, or other negotiable

18656215.6
233620-10001

instruments, made payable to the Established Operators but received by ASA Servicers, and each Established Operator does hereby constitute and appoint the applicable ASA Servicer as its agent and attorney-in-fact for such purposes only.

**Section 4.07** On and after the Closing, the Established Operators and their representative(s) shall have access upon reasonable prior notice during normal business hours to inspect ASA Servicers' relevant books and records relating to income and receivables to ascertain ASA Servicers' compliance with this section

**Section 4.08 Audit of Books and Records.** The Established Operators m and expense, and upon reasonable prior notice to the ASA Servicers, audit th maintained by the ASA Servicers to verify the costs and expenses incurred by the ASA Servicers in connection with this Agreement.

## ARTICLE 5 TERM AND TERMINATION

**Section 5.01 *Term.*** The term of this Agreement will begin on March 1, 2020 (the "Commencement Date") and will continue until the Closing or unless sooner terminated as provided in the APA (the "Term"); provided, however, that the Commencement Date shall not occur until the requirements of the Buyer and the ASA Servicer under Section 3.05 hereof are completed in full.

## ARTICLE 6 INDEMNIFICATION

**Section 6.01 *ASA Servicers Indemnification.*** The ASA Servicers shall indemnify, defend and hold harmless the Established Operator and its officers, directors, partners, and employees, including, for the avoidance of doubt, William Lenhart, in whatever capacity he serves, from and against any and all liability, suits, claims, losses, damages and expenses (including reasonable attorneys' fees) (collectively, the "Losses") to the extent they arise from any act or omission of the ASA Servicers, its officers, agents, representatives, contractors or employees in connection with the performance of or related to any of their activities under this Agreement. The foregoing indemnification is not limited to third party claims.

**Section 6.02 *Established Operator Indemnification.*** Each Established Operator shall indemnify, defend and hold harmless the applicable ASA Servicer and its officers, directors, partners and employees, from and against any and all Losses to the extent they arise from any negligent act or omission of such Established Operator, its officers, agents and employees related to each Facility which occurs after the ASA Effective Date. The foregoing indemnification is not limited to third party claims.

## ARTICLE 7 *Notice of Claims.*

**Section 7.01** In the event that any Party receives a notice of any claim or proceeding against said Party (the "Indemnitee") that gives rise to rights of indemnification hereunder, the Indemnitee shall give the other Party (the "Indemnitor") prompt written notice thereof (by prepaid registered or certified mail, return receipt requested) together with a copy of any letter, pleading

18656215.6
233620-10001

or other writing received by Indemnitee asserting such claim, and the Indemnitor shall have the right to defend, contest, settle and compromise any action brought, or claim asserted, against the Indemnitee at the Indemnitor's own expense; provided, however, that if the Indemnitor fails to notify the Indemnitee of the assumption of the defense of any such action within twenty (20) days after the giving of such notice by the Indemnitee, then the Indemnitee will have the right to take any such action it deems appropriate to defend, contest, settle, or compromise any such action or assessment and claim indemnification as provided herein. If the Indemnitor does defend any action for which indemnification is claimed, the Indemnitee will be entitled to participate, at its own expense, in the-defense of such action, which defens
conducted and managed by the Indemnitor. Failure of the Indemnitee to noti
any claim for which it is entitled to indemnification hereunder within the t
above will not impair, limit, or affect the indemnification provided herein so long as the ability of the Indemnitor to contest, defend, or dispute such claim has not been materially and adversely affected or the Indemnitor has not otherwise been prejudiced by such failure.

(a) The Indemnitee shall cooperate fully with the Indemnitor in connection with the litigation, arbitration, contest, compromise and settlement of all Claims and shall make available to the Indemnitor and its agents all books, records and other information necessary to defend, settle and investigate such claim.

(b) Notwithstanding anything to the contrary contained herein, no Indemnitor shall, without the Indemnitee's written consent (which consent the Indemnitee may withhold in the exercise of its sole discretion), settle any claim in any manner that either (i) would impose on or subject the Indemnitee to any criminal penalty or limitation or other non-monetary remedy, or (ii) does not include as an unconditional term of such settlement the giving by the claimant or the plaintiff to the Indemnitee of a release from all liability in respect of such claim.

(c) Each Party hereby waives any right that it might now have or may in the future acquire to assert any claim against the other for consequential, punitive, special or incidental damages, for lost profits, or for lost opportunity costs in connection with any breach by the other Party of its obligations under this Agreement.

**Section 7.02** *Payment and Offset.* The Indemnitor shall pay, in cash, to the Indemnitee who presents a claim for Losses subject to indemnification hereunder, the full amount of such claim, subject to the other provisions of this Article VII, within thirty (30) days of the making of such claim if the Indemnitor does not dispute and actually defend such claim within such thirty-day period. Notwithstanding the foregoing, with respect to a third-party claim that is the subject of any action, the Indemnitor shall pay the full amount of any judgment or arbitration award when such judgment or arbitration award becomes final, in accordance with the terms of such judgment or award. Each Established Operator may satisfy any undisputed claim by such Established Operator against an ASA Servicer for indemnity hereunder or any claim for indemnification by any Established Operator against any ASA Servicer in respect of a final judgment obtained by a third party against such Established Operator by offsetting such claim against any payment due to the applicable ASA Servicer from such Established Operator hereunder.

18656215.6
233620-10001

**Section 7.03** *Obligations Survive.* The obligations of each Party in this Article 7 shall survive the termination or expiration of this Agreement.

## ARTICLE 8  *COVENANTS*

**Section 8.01**  *Nondisclosure of Proprietary Information.*

    **(a)**    **Confidentiality and Disclosure**:  To the extent not required of the Bankruptcy Court, the ASA Servicers and Established Operators sha confidentiality of all confidential and non-public information supplied by the the Debtors shall be permitted to share information regarding the contents of this Agreement and any proposals related thereto with their representatives. If this Transaction is not consummated, each Party shall return all documents obtained to the other. ASA Servicers acknowledge that Established Operators will be unable to furnish any patient health information unless such disclosure complies specifically and completely with all terms, conditions, regulations and guidelines in HIPAA.

    **(b)**    For purposes of this the term "Confidential Information" shall mean the non-public information of a Party, or any entity with which a Party contracts to provide any of the Services, including, but not limited to, formulae, patterns, compilations, programs, devices, methods, systems, techniques; processes, financial information, business strategies, costing data, patient lists, payor lists, manuals, policies and procedures, forms, and contractual arrangements. Confidential Information shall not include information which: (w) is known to the receiving Party prior to receiving it from the other Party; (x) is generally known to the public; (y) is disclosed to one Party at any time by a third party who had the legal right to disclose it; or (z) is independently developed by the other Party incompliance with law.  The provisions of this Section 8.01 shall survive the termination or assignment of this Agreement.

**Section 8.02**  *Reasonableness of Restrictions.*  The Parties acknowledge that the restrictions in Section 8.01 are reasonable and necessary to protect the legitimate interests of the parties and that any violation would result in irreparable injury to the non-disclosing Party.  The parties further acknowledge that, in the event of a violation of any such restrictions, the non-disclosing Party shall be entitled to preliminary and permanent injunctive relief without having to prove actual damages or immediate or irreparable harm or to post a bond.  The non-disclosing Party shall also be entitled to an equitable accounting of all earnings, profits and other benefits arising from such violation, which rights shall be cumulative and in addition to any other rights or remedies to which the non-disclosing Party may be entitled to at law or in equity. Notwithstanding the foregoing, if the restrictions specified in Article 8.01 are adjudged unreasonable in any court proceeding, the Parties hereby agree to the reformation of such restriction by the court to such limits as it finds reasonable, and neither Party will assert that such restrictions should be eliminated in their entirety by such court.

**Section 8.03**  *Compliance with HIPAA.*  If and to the extent, and for so long as, required by the provisions of 42 U.S.C.§ 1171 et seq., enacted by the Health Insurance Portability and

18656215.6
233620-10001

Accountability Act of 1996 and the regulations promulgated thereunder, all as amended from time to time (collectively, "HIPAA"), the ASA Servicers will appropriately safeguard all Protected Health Information (as such term is defined in HIPAA) ("PHI") received from the Established Operators, or created or received by the ASA Servicers on behalf of the Established Operators. This Section 8.03 constitutes a contract between the Established Operators and the ASA Servicers establishing the permitted and required uses and disclosures of such PHI by the ASA Servicers. ASA Servicers shall sign one or more business associate agreements with the Established Operators. Without limiting the foregoing, each ASA Servicer agrees that it shall:

(a)     Not use or further disclose PHI other than as permitted Agreement or as required by law;

(b)     Use appropriate safeguards to prevent the use or disclosure of such PHI other than as provided for by this Agreement;

(c)     Report to the appropriate Established Operator any use or disclosure of such PHI not provided for by this Agreement of which such ASA Servicer becomes aware;

(d)     Ensure that any agents, including a subcontractor, to whom any ASA Servicer provides PHI, agree in writing to the same restrictions and conditions that apply to any ASA Servicer with respect to such information;

(e)     Make such PHI available for inspection and copying by the individual subjects thereof in accordance with HIPAA;

(f)     Make such PHI available for amendment by the individual subject thereof and incorporate any amendments to PHI to the extent required and in accordance with, HIPAA;

(g)     Make available the information required to provide an individual subject with an accounting of disclosures of the subject's PHI, to the extent required by and in accordance with HIPAA;

(h)     Make the ASA Servicers' internal practices, books and records relating to the use and disclosure of PHI available to the Secretary of HHS for purposes of determining the applicable Established Operator's compliance with HIPAA;

(i)     At termination of this Agreement, if feasible, return or destroy all PHI that the ASA Servicers still maintains in any form and retain no copies of PHI, or if such return or destruction is not feasible, extend the protection of this Agreement to the PHI and limit further uses and disclosures to those purposes that make the return or destruction of the PHI infeasible; and incorporate any amendments or corrections to such PHI when notified by any Established Operator thereof.

## ARTICLE 9   *MISCELLANEOUS*

18656215.6
233620-10001

**Section 9.01** *Exhibits Incorporated by Reference.* If there are any Exhibits to this Agreement, they are a part of this Agreement as if set forth at length verbatim where reference is made to them in this Agreement.

**Section 9.02** *Change in Law.* If there is a change in Medicare, Medicaid or other federal or state statutes or regulations or in the interpretation thereof, which renders any of the material terms of this Agreement unlawful or unenforceable, this Agreement shall be amended by the Parties hereto as a result of good faith negotiations to the least extent necessary in order to carry out the original intention of the parties in compliance with such law or regu
such law or regulation is subsequently amended or interpreted in such a
provision of this Agreement that was formerly invalid valid, such provision
valid from the effective date of such interpretation or amendment.

**Section 9.03** The Established Operators and the ASA Servicers further agree that the benefits to the Established Operators hereunder do not require, are not payment for, and are not in any way contingent upon, the referral (as that term is defined in 42 U.S.C. §1395m or 42 U.S.C. §1320a-7(b)), admission, or any other arrangement for the provision of any item or service offered by the ASA Servicers to patients of the Established Operators in each Facility or any other health care operation controlled, managed, or operated by the ASA Servicers.

**Section 9.04** *Approvals.* Where the agreement, approval, acceptance or consent by either Party is required under this Agreement, such action shall not be unreasonably delayed or withheld.

**Section 9.05** *Assignment.* Neither Party may assign its interest in, subcontract, or delegate the performance of its obligations under, this Agreement without obtaining the prior written consent of the other Party which shall not be unreasonably withheld or delayed.

**Section 9.06** *Force Majeure.* If either Party is delayed or prevented from fulfilling any of its obligations under this Agreement, by force majeure, such Party shall not be liable under this Agreement for the delay or failure. "Force majeure" means any cause beyond the reasonable control of a Party, including but not limited to an act of God, act or omission of civil or military authorities of a state or nation, fire, strike, flood, riot, war, delay of transportation, or inability due to any of these causes to obtain necessary labor, materials or facilities.

**Section 9.07** *Amendment.* This Agreement may not be modified except by an agreement in writing signed by the Party against whom enforcement of such modification is sought.

**Section 9.08** *Entire Agreement.* This Agreement supersedes all agreements previously made between the Parties relating to its subject matter. There are no other understandings or agreements between the Parties with respect to the subject matter hereof.

**Section 9.09** *Confidentiality of Services Agreement.* The terms and conditions of this Agreement, as well as any documents or information (not publicly available) provided in connection with the negotiation and preparation of this Agreement, are Confidential Information; provided the terms and conditions of this Agreement may be shared with their representatives and otherwise as may be reasonable or appropriate to obtain bankruptcy court approval of this Agreement.

18656215.6
233620-10001

**Section 9.10**  *Non-Waiver.*  No delay or failure by a Party to exercise any right under this Agreement, and no partial or single exercise of that right, will constitute a waiver of that or any other right.

**Section 9.11**  *Readings.*  Headings in this Agreement are for convenience only and are not to be used to interpret or construe its provisions.

**Section 9.12**  *Governing Law.*  This Agreement is to be construed in accordance with and governed by the laws of the State of New York, without regard to such sta
principles.

**Section 9.13**  *Federal Tax Reporting.*  The financial accounts of the F
Interim Period shall be maintained for federal, state and local taxation purposes as if the ASA Servicers are the actual owners of the operation of the Facility from and after the ASA Effective Date, and ASA Servicers shall file tax returns and pay any other applicable governmental assessments, including the Cash Assessment attributable to the operation of the Facilities, if any, for the Interim Period indicating that all expenses for such period were incurred by ASA Servicers, all revenue for such period was earned by ASA Servicers and the gain or loss from the operation of the Facility during such period is the sole responsibility of ASA Servicers; provided that in the event the Established Operators or the Manager are required to pay any U.S. Trustee fees in respect of distributions resulting from the operation of the Facilities on or after the ASA Effective Date, the ASA Servicers shall indemnify the Debtors for an amount equal to one half of the payment so required.

**Section 9.14**  *Access to the ASA Servicers' Books and Records.*  To the extent that the cost or value of the Services hereunder exceed or would exceed ten thousand dollars ($10,000.00) for a twelve (12) month period, until expiration of a period of four (4) years following the last date any of the ASA Servicers furnish Services pursuant to this Agreement, the ASA Servicers shall make available, upon written request by the Secretary of HHS, the Comptroller General of the United States or any of their duly authorized representatives, all contracts, books, documents and other records of the ASA Servicers which are necessary to verify the nature and extent of the costs of the ASA Servicers' services hereunder.  The ASA Servicers shall notify the applicable Established Operator within ten (10) days of receipt of such a request.

**Section 9.15**  *Access to Subcontractor's Books and Records.*  If the ASA Servicers carry out any of their duties under this Agreement through a subcontract with a related organization involving a value or cost of ten thousand dollars ($10,000.00) or more over a twelve (12) month period, the ASA Servicers will cause the subcontract to contain a clause to the effect that, until expiration of four (4) years after the furnishing of any service pursuant to the subcontract, the related organization shall make available, upon written request by the Secretary of HHS, the Comptroller General of the United States or any of their duly authorized representatives, the subcontract and the books, documents and other records of the organization which are necessary to verify the nature and extent of the costs of the related organization's services purpose of Access Clauses.  It is understood and agreed that this Section 9.15 is designed to implement Section 1861(v) (1) (1) of the Social Security Act, as amended, and the regulations promulgated

18656215.6
233620-10001

there under.  If such statutory provision and regulations shall be deemed inapplicable hereto, then the access provisions of this Article 9 shall be deemed inoperative and without force and effect.

**Section 9.16** *Notice.*  Any notice required or desired to be given hereunder shall be in writing and delivered personally, by nationally recognized overnight delivery service, or by certified mail, return receipt requested, postage prepaid, addressed as follows:

| | |
|---|---|
| *If to the ASA Servicers, to* | RCA Healthcare Management, LLC<br>10 E. Merrick Road<br>Suite 305<br>Valley Stream, NY 11580 |
| With copies to: | Mark H Zafrin, Esq.<br>Michelman & Robinson, LLP<br>800 Third Avenue<br>New York, New York 10022 |
| *If to any Established Operator or the Manager to:* | Absolut Facilities Management, LLC<br>Attn: Mr. Israel Sherman<br>300 Gleed Avenue<br>East Aurora, NY 14052 |
| With copies to | Schuyler G. Carroll<br>Loeb & Loeb<br>345 Park Avenue<br>New York, NY 10154 |

18656215.6
233620-10001

Alternatively, at such other address and to the attention of such other person as either Party shall designate by notice. Notice shall be deemed to have been given when received if delivered personally or by overnight delivery service, or three business days after being postmarked, if sent by certified mail, and upon receipt if sent by facsimile transmission, provided that such receipt is acknowledged by the other Party or the other Party's agent.

**Section 9.17** *Representation by Counsel.* The Parties agree that each has had the benefit of representation by legal counsel in negotiating this Agreement. No Party is to
drafter of this Agreement for purposes of determining the meaning of a
Agreement, or for allocating the benefit of any future ambiguity.

**Section 9.18** *Compliance with Law.* Notwithstanding any other provision in this Agreement, each Established Operator remains responsible for ensuring that the ownership and operation of each Facility comply with all pertinent provisions of federal, state and local statutes, rules and regulations. Each ASA Servicer and each Established Operator agrees that it shall comply with all pertinent provisions of federal, state and local statutes, rules and regulations in carrying out its responsibilities hereunder.

**Section 9.19** *Choice of Forum.* The Parties hereby agree that the exclusive forum for resolving any disputes arising under this Agreement, including without limitation any proceedings to construe, interpret or enforce this Agreement, or to recover damages for a breach hereof, shall be the Eastern District Bankruptcy Court. To the extent that the provisions of this Agreement and that of the APA are in conflict, any such conflict shall be interpreted or determined by referring solely to the terms and provisions of this Agreement. To the extent the provisions of this Agreement and the APA are in conflict with the terms of the Sale Order, any such conflict shall be interpreted or determined by referring solely to the terms and provisions of the Sale Order.

**Section 9.20** *Severability.* In the event any one or more of the provisions contained in this Agreement or any application thereof shall be invalid, illegal, or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions of this Agreement or any other application thereof shall not in any way be affected or impaired thereby.

**Section 9.21** *Counterparts.* This Agreement may be executed in multiple counterparts, and all so executed will constitute one agreement, binding on both Parties hereto, even though both Parties are not signatories to the original or same counterpart. Any counterpart of this Agreement will for all purposes be deemed a fully executed instrument.

**Section 9.22** *Further Assurances.* The Parties agree to execute such other documents not inconsistent with this Agreement as may be required to comply with the laws and regulations governing the management of Absolut at Orchard Brooke LLC by the ASA Servicer.

**[Remainder of page intentionally left blank. Signature page and exhibit follow.]**

18656215.6
233620-10001

**Established Operators:**

**Absolut Facilities Management, LLC as Manager of the Established Operators**


By:

_____



**ASA Servicers:**

**[ASA SERVICERS]**


By: _____
Edward Farbenblum

18656215.6
233620-10001

Exhibit D

**ASSET PURCHASE AGREEMENT**

dated as of January 30, 2020

by and between

Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Absolut at Orchard Brooke, LLC; Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC; and Absolut Center for Nursing Rehabilitation at Westfield, LLC; and Absolut Facilities Management, LLC

(SELLERS)

and

RCA HEALTHCARE MANAGEMENT, LLC

(BUYER)

# ASSET PURCHASE AGREEMENT

**AGREEMENT** (the "Agreement") made as of January 30, 2020 (the "Contract Date") by and between Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Absolut at Orchard Brooke, LLC; Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC; Absolut Center for Nursing and Rehabilitation at Westfield, LLC, and Absolut Facilities Management, LLC, all New York limited liability companies ("Sellers"), and RCA Healthcare Management, LLC, a New York limited liability company with an address at 10 E. Merrick Road, Suite 305, Valley Stream, NY 11580 ("Buyer," and toge "Parties" and each a "Party").

**WHEREAS,** Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC owns and operates a 320-bed skilled nursing facility known as "Absolut Care of Aurora Park" (the "Aurora Park Facility") located at 292 Main Street, East Aurora, NY 14052, which provides residential skilled nursing services; and

**WHEREAS,** Absolut Center for Nursing and Rehabilitation at Allegany, LLC owns and operates a 37-bed skilled nursing facility known as "Absolut Care at Allegany" (the "Allegany Facility") located at 2178 N. Fifth Street, Allegany, NY 14706, which provides residential skilled nursing services; and

**WHEREAS,** Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC owns and operates a 120-bed skilled nursing facility known as "Absolut Care of Three Rivers" (the "Three Rivers Facility") located at 101 Creekside Drive, Painted Post, NY 14870, which provides residential skilled nursing services; and

**WHEREAS**, Absolut Center for Nursing and Rehabilitation at Gasport, LLC owns and operates an 83-bed skilled nursing facility known as "Absolut Center for Nursing and Rehabilitation at Gasport" (the "Gasport Facility") located at 4540 Lincoln Drive, Gasport, NY 14067, which provides residential skilled nursing services; and

**WHEREAS**, Absolut Center for Nursing and Rehabilitation at Westfield , LLC owns and operates a 120-bed skilled nursing facility known as "Absolut Center for Nursing and Rehabilitation at Westfield" (the "Westfield Facility") located at 26 Cass Street, Westfield, NY 14787, which provides residential skilled nursing services; and

**WHEREAS**, Absolut at Orchard Brooke, LLC owns and operates an 80-bed assisted living facility known as "Absolut Care of Orchard Brooke" (the "Orchard Brooke Facility" and collectively with the Aurora Park Facility, the Allegany Facility, the Three Rivers Facility, the Gasport Facility and the Westfield Facility, the "Facilities" and each, a "Facility") located at 6060 Armor Duels Road, Orchard Park, NY 14127, which provides residential assisted living services; and

**WHEREAS**, each of the landlords identified on schedule 1 (the "Arba Landlords") leases to each of the parties identified as tenants on Schedule 1 attached hereto under the terms and provisions of each of those certain leases identified in Schedule 1 attached hereto (as amended, the "Arba Leases"); and

**WHEREAS**, Absolut Nursing and Rehabilitation Center of Westfield, LLC ("Westfield") subleases the Westfield Facility from 26 Cass Street, LLC ("Sublandlord") pursuant to the terms and provisions of that certain Sublease Agreement, dated as of June 7, 2007 (as amended, the "Sublease" and collectively with the Arba Leases, the "Leases"), by and between Sublandlord and Westfield, and Sublandlord leases the Westfield facility from Cass Development Company (the "Westfield Prime Landlord"); and

**WHEREAS**, the Sellers filed for protection under Chapter 11 of the Bankruptcy Code, and the cases are being jointly administered under Case No. 19-76260; and

**WHEREAS**, Seller remains in possession of its assets as a "debtor in to sections 1107 and 1108 of the Bankruptcy Code; and

**WHEREAS**, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from Seller according to, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code, the Property, the Acquired Assets and to assume certain liabilities as set forth herein; and

**WHEREAS**, concurrently herewith, Buyer has entered into that certain Memorandum of Understanding with the Arba Landlords and the Sublandlord for the amendment and modifications of the Leases and Sublease; and

**WHEREAS**, pursuant to the New York State Public Health Law, Buyer shall form separate SPEs (as defined herein) for the purpose of acquiring the Acquired Assets used in the operation of each Facility; and

**WHEREAS**, each SPE shall have as its sole purpose the leasing of each Facility and each making a separate application to the New York State Department of Health pursuant to Section 2801 of the Public Health Law to become the established licensed operator of each Facility, except for Orchard Brooke which is an Assisted Living Facility, in which case the application is made under the Social Services Law; and

**WHEREAS**, the terms, and provisions of this Agreement shall be meant to apply to each separate Facility as if the Sellers have signed a separate contract with each SPE to be formed for the sale of the Acquired Assets used in each separate Facility.

**NOW, THEREFORE**, in consideration of the premises, the mutual promises contained herein and for other good and valuable consideration, receipt of which is at this moment acknowledged, the Parties agree as follows:

1.     CERTAIN DEFINED TERMS

1.1     "Acquired Assets" means all of Sellers' right, title, and interest in the following assets relating to each Facility as constituted as of midnight of the night before the Closing Date, except the Excluded Assets:

1.1.1.   the business and operation of each Facility and all inventory, supplies, and other articles of personal property, including, without limitation, (i) the CBA (as defined

in Section 8.11), (ii) the Leases, (iii) all Facilities contracts, agreements, leases, undertakings, commitments and other arrangements (collectively "Contracts") which Buyer elects to assume by written notice to Seller before the ASA Effective Date and listed on Schedule 1.1.1, which Schedule the Buyer reserves the right to amend prior to the occurrence of the Closing; and (iv) all Contracts entered into on or after the ASA Effective Date with the consent of the Seller by the ASA Servicer, but excluding any Excluded Assets (collectively the "Assumed Contracts");

1.1.2.  the trade names of Absolut Center for Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing and Rehabilitation at Absolut Center for Nursing and Rehabilitation at Gasport, LLC; Nursing and Rehabilitation at Three Rivers, LLC; Absolut at Orchar Absolut Center for Nursing and Rehabilitation at Westfield, LLC (the "Names") and any other trade names, logos, trademarks and service marks (or variations thereof) associated with the Facilities, their programs, and the Acquired Assets;

1.1.3.  all menus, policies and procedures manuals and computer software; all telephone numbers and telefax numbers used by the Facilities; copies of all books and records in the possession of Sellers or their agents relating to the Facilities (other than organizational and other corporate type records of Sellers), but not corporate minute books, corporate seals or financial statements or tax returns and records; all resident/patient records relating to the Facilities; and all employee and payroll records of Transferred Employees (the "Acquired Records"), provided that Sellers shall have access at no cost, to the Acquired Records, in order to administer the bankruptcy estates;

1.1.4.  goodwill in connection with the operation of the Facilities;

1.1.5.  all Post ASA Effective Date Receivables and proceeds and collections thereof;

1.1.6.  All profits from the operation of the Facilities derived from services performed on or after the ASA Effective Date;

1.1.7.  to the extent transferable, all licenses, permits, certificates and other authorizations and approvals of any Governmental Authorities held or owned by Sellers relating to the ownership or operation of the Facilities and the Acquired Assets;

1.1.8.  to the extent transferrable, Sellers' Medicare and Medicaid provider numbers and provider agreements; all rate increases and/or lump sum or other payments, resulting from rate appeals, audits or otherwise, with respect to third party payments, from any source, which become effective or paid on or after the ASA Effective Date for services rendered by the Facilities on or after the ASA Effective Date; all insurance claims and proceeds that Sellers have the right to receive for claims arising out of the ownership of the Acquired Assets or the Assumed Liabilities, that arise subsequent to the ASA Effective Date and those such claims which arose prior to the ASA Effective Date but would be considered reimbursement for damage or loss of any of the Acquired Assets, solely to the extent that the Seller has not repaired or replaced those assets;

1.1.9.  All proceeds from insurance for damage to equipment or the Facilities that occurred prior to the ASA Effective Date which have otherwise not been cured at the ASA Effective Date;

1.1.10. all rights of Seller or under warranties relating to the Acquired Assets or any products sold by Seller to the extent the same are transferable;

1.1.11. such other tangible or intangible assets owned by Sellers that are used in, or necessary for, the operation of the Facilities, other than Excluded Assets: and

1.1.12. All rights in impounds, escrows or other items paid to except for security deposits, and reimbursable amounts from the repl work already performed on any Facility for which a claim for reim made.

1.2     "Excluded Assets" means all of Seller's right, title and interest in the following assets as constituted as of midnight of the morning of the Closing Date or after that:

1.2.1.   all insurance policies and claims, and the proceeds thereof, relating to events occurring before the ASA Effective Date;

1.2.2.   all rights and interests of Seller under and under this Agreement and any documents executed in connection with the Closing (as from now on defined);

1.2.3.   all retroactive rate increases, resulting from rate appeals, audit or otherwise, concerning third party payments, from any source, which become effective before, on or after the Closing Date for services rendered at any Facility before the ASA Effective Date, and all accounts receivable relating to it and proceeds thereof;

1.2.4.   all claims, rights, causes of action, rights of recovery, rights of set-off and recoupment against any third parties (including, without limitation, any Governmental Authority and third-party payor programs, including, without limitation, Medicare, Medicaid, or private insurance plans and employee assistance program,) arising out of the operation of the Facilities through the end of the day immediately preceding the ASA Effective Date;

1.2.5.   Sellers' personal property as set forth on Schedule 1.2.5 hereto; all amounts due from parties related to Sellers; all financial books and records of Sellers, including, but not limited to, organizational and other corporate type records, corporate minute books, corporate seals, financial statements and tax returns and records;

1.2.6.   all Pre ASA-Effective Date Receivables, regardless of when billed or collected;

1.2.7.   all security deposits and reimbursable amounts from the replacement reserve held on deposit by any of the Arba Landlords or the Arba Landlords' lenders for work already performed on any Facility for which a claim for reimbursement has been made

1.2.8.   all chapter 5 avoidance actions of the Sellers; and

1.2.9.   any assets of Seller not used in connection with the operation of any Facility.

1.3     "Accounts Payable" means all trade and vendor accounts payable and accrued payables that have been incurred in the ordinary course of Sellers' business.

1.4     "Administrative Services Agreement" or "ASA" is dated as of January 30, 2020, by and between Absolut Facilities Management, LLC ("the "Manager"), Nursing and Rehabilitation at Allegany, LLC; Absolut Center for Nursing a Aurora Park, LLC; Absolut Center for Nursing and Rehabilitation at Gasport, for Nursing and Rehabilitation at Three Rivers, LLC; and Absolut Cent Rehabilitation at Westfield, LLC (with the exception of the Manager, each an "Established Operator" and collectively the "Established Operators"), all New York limited liability companies, and affiliates of RCA Healthcare Management, LLC, each New York limited liability companies with an address at 10 E. Merrick Road, Suite 305, Valley Stream, NY 11580 (each an "ASA Servicer" and collectively, the "ASA Servicers").

1.5     "Affiliate" means concerning a Party, any Person:  (i) which owns more than ten (10%) percent of the voting interests in the Party; or (ii) in which the Party owns more than ten (10%) percent of the voting interests; or (iii) who otherwise controls, is controlled by or is under common control with, a Party.

1.6     "Application" has the meaning outlined in Section 11.1 hereof.

1.7     "ASA Effective Date" means the date the Administrative Services Agreement becomes effective in accordance with its terms.

1.8     "Bidding Procedures Order" means the order dated December 18th, 2019, signed by Judge Alan S. Trust, among other things, approving the bidding procedures for the sale of substantially all of the Acquired Assets, (ii) authorizing the selection of a stalking horse bidder, (iii) approving bid protections, (iv) scheduling auctions and hearings to consider such sale of the Acquired Assets, (v) approving assumption and assignment procedures related to such sale, and (vi) approving the form and manner of related notice.

1.9     "Buyer's Knowledge" or any other reference to the knowledge of Buyer, (a) means and applies to the actual knowledge of Edward Farbenblum (the "Buyer's Knowledge Individual") and not to any other persons, (b) means the actual (not implied or constructive) knowledge of Buyer's Knowledge Individual, without any duty on Buyer's Knowledge Individual to conduct any investigation or inquiry of any kind, and (c) does not apply to, and shall not be construed to apply to, information or material which may be in the possession of Buyer generally or incidentally, but which is not known to a Buyer's Knowledge Individual.  Similarly, any reference to any written notice, claim, litigation, filing or other correspondence or transmittal to Buyer set forth herein shall be limited to refer to only those received by or known to Buyer's Knowledge Individual in the limited manner provided in clauses (a) through (c) above.

1.10    "CBA" means that certain Collective Bargaining Agreement, [_____].

1.11    "Closing" and "Closing Date" have the meanings set forth in Section 6 hereof.

1.12    "Contract Date" means the date of this Agreement.  Additionally, the Parties expressly understand and agree that any outstanding Schedules and Exhibits not included with this Agreement as of the Contract Date shall be negotiated by the Parties in good faith during the Interim Period and provided to Buyer not less than one (1) week before the Closing Date.

1.13    "Department of Health" or "DOH" means the New York State Department of Health and, when applicable, the Public Health and Health Planning Council of the State of New York.

1.14    "DOH Approval" has the meaning outlined in Section 6 hereo

1.15    "Governmental Authorities" means all agencies, authorities, bodies, boards, commissions, courts, instrumentalities, legislatures, and offices of any nature whatsoever of any government, quasi-governmental unit or political subdivision, whether a federal, state, county, district, municipality, city or otherwise.

1.16    "Healthcare Reimbursement Payor" means Medicare, Medicaid, any other federal health care program (as defined in 42 U.S.C. § 1320a-7b(f)), any other state sponsored reimbursement program, and any other health care reimbursement program, payment intermediary, third party payor or other private payor.

1.17    "Healthcare Reimbursement Payor Laws" means all applicable laws governing Healthcare Reimbursement Payors, including but not limited to 42 U.S.C. §§ 1320a-7, 1320a-7a, 1320a-7b and 1395nn; the False Claims Act (31 U.S.C. § 3729 *et seq.*); the False Statements Act (18 U.S.C. § 1001 *et seq.*); the Program Fraud Civil Penalties Act (31 U.S.C. § 3801 *et seq.*); the anti-fraud and abuse provisions of the Health Insurance Portability and Accountability Act of 1996 (18 U.S.C. § 1347, 18 U.S.C. § 669, 18 U.S.C. § 1035, 18 U.S.C. § 1518); and similar or the corresponding provisions, including, but not limited to, fraud and abuse, false claims and anti-self-referral laws of any other Governmental Authority.

1.18    "Interim Period" shall have the meaning set forth in the ASA.

1.19    "Liability" or "Liabilities" means any liability, obligation, commitment or undertaking (including, without limitation, all indebtedness), whether known or unknown, direct or indirect, accrued or unaccrued, liquidated or unliquidated, due or to become due, asserted or unasserted, absolute or contingent, matured or unmatured, and including all costs and expenses relating to it.

1.20    "Promissory Note" means that certain promissory note issued to Buyer by Seller for working capital.

1.21    "Nursing Home Business" means the operation of, as applicable, a skilled nursing home licensed under Article 28 of the New York State Public Health Law or the operation of an adult care facility licensed under Article 7 of the New York State Social Services Law.

1.22    "Overpayment Obligations" means the amount paid by a Medicaid agency to a provider which is in excess of the amount that is allowable for services furnished under section 1902 of the Act and which is required to be refunded under section 1903 of the Act.

1.23    "Person" means any individual, corporation, company, limited liability company, limited or general partnership, trust or estate, joint venture, association, or other legal entity.

1.24    "Plan" means any employee pension, retirement, profit-sharing, stock, bonus, incentive, deferred compensation, stock option, employee stock ownership, hospitalization, medical, dental, vacation, insurance, sick pay, disability, severance or other policy, contract or arrangement, whether arrived at through collective barg providing employee benefits, including but not limited to any "employee bene is defined in Section 3(3) of ERISA, currently maintained or previously maintained at any time in the last five (5) years by, sponsored in whole or in part by, or contributed to by Sellers for the benefit of employees, retirees, dependents, spouses, directors, independent contractors or other beneficiaries, whether or not express, implied or written.

1.25    "Pre-ASA Effective Date Healthcare Program Liabilities" means, any Liability, obligation, assessment or surcharge under any Healthcare Reimbursement Payor Laws which relate to the operation of the Nursing Home Business or the services rendered at the Facilities during any period of time before the ASA Effective Date, including (a) any obligations for repayment, settlement and/or retroactive adjustments relating to the Nursing Home Business under any Healthcare Reimbursement Payor Programs which relate to the operation of the Nursing Home Business or the services rendered at the Facilities during any period of time before the ASA Effective Date, (b) any obligations or liabilities arising by reason of any failure to comply with the rules and regulations of any Healthcare Reimbursement Payor, which relates to the operation of the Nursing Home Business or the services rendered at the Facility's during any period of time before the ASA Effective Date, (c) all obligations now existing or which may hereafter exist with respect to any payment or reimbursement owed to any Healthcare Reimbursement Payor or other payor which relates to the operation of the operation of the Nursing Home Business or the services rendered at the Facilities during any period of time before the ASA Effective Date, including, without limitation, any surcharges owed pursuant to the New York Health Care Reform Act of 1996, as may be amended from time to time, and (d) any debt, liability, obligation, assessment or surcharge to or by any Healthcare Reimbursement Payor for Overpayments and other financial obligations arising from adjustments or reductions in reimbursement attributable to events, transactions, circumstances, or conditions occurring or existing before the ASA Effective Date, but only to the extent such adjustments or reductions relate to the operation of the Nursing Home Business or the services rendered at the Facilities during any period of time before the ASA Effective Date.  Notwithstanding the foregoing, in no event shall "Pre-ASA Effective Date Healthcare Program Liabilities" include any Assumed Liabilities.

1.26    "SPE" means each single purpose limited liability company formed in the State of New York by the Buyer to act as the purchaser of each separate Facility and make a separate application to become the licensed operator of the Facility for which is has been formed to purchase, lease and operate.

1.27    "Retained Liabilities" has the meaning outlined in Section 2.4 hereof.

1.28    "Seller's Knowledge" or any other reference to the knowledge of Seller, (a) means and applies to the actual knowledge of Israel Sherman (the "Seller's Knowledge Individual") and not to any other person, (b) means the actual (not implied or constructive) knowledge of Seller's Knowledge Individual, without any duty on Seller's Knowledge Individual to conduct any investigation or inquiry of any kind, and (c) does not apply to, and shall not be construed to apply to, information or material which may be in the possession of Seller generally or incidentally, but which is not known to a Seller's Knowledge Individual and (d) is meant to include all information provided to Israel Sherman of all matters which the Facility's administrator, DON, CFO, and director of rehabilitation are required to report to him without further inquiry. Similarly, any reference to any written notice, claim, litigation, filing or other corresponde Seller set forth herein shall be limited to refer to only those received by o Knowledge Individual in the limited manner provided in clauses (a) through (

1.29    "Transferred Employees" means [___].

1.30    "PTO" means paid time off credits available to Sellers' employees for use as paid vacation, holiday, sick and personal time, fully burdened and bundled" with all related benefits and employer taxes.

1.31    "WARN" or "WARN Act" has the meaning set forth in Section 11.4.

1.32    "Pre ASA-Effective Date Receivables" shall mean all accounts receivable that arise from services rendered prior to the ASA Effective Date.

1.33    "Post ASA Effective Date Receivables" shall mean any accounts receivable arising from services rendered on or subsequent to the ASA Effective Date.

1.34    "Provider" means any individual or entity furnishing Medicaid services under a provider agreement with the Medicaid agency.

1.35    "Recoupment" means any formal action by the Government Authority or its fiscal agent to initiate recovery of an overpayment or other obligation without advance official notice by reducing future payments to a provider.

2.    TRANSFER OF ASSETS

2.1    Excluded Assets to be Retained.  Sellers shall retain the Excluded Assets, which shall not be subject to transfer, assignment, or sale by this Agreement.

2.2    Acquired Assets to be Transferred to Buyer.  Subject to other provisions of this Agreement, at the Closing, Sellers shall transfer to Buyer all of their rights, title and interest in, to or under the Acquired Assets, in their as-is condition on the Closing Date, and Buyer shall accept such transfer.  The Parties agree to comply with any applicable provisions of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

2.3    Assumed Liabilities.  Buyer shall assume at the Closing of the APA (collectively, the "Assumed Liabilities") (a) all Liabilities and obligations relating to the Facility and/or the Acquired Assets arising on or after the ASA Effective Date or otherwise relating to services

rendered by, or the operation of, the Facility on and after the ASA Effective Date, including, without limitation, (i) all of Sellers' Accounts Payable and other Liabilities accruing on or after the ASA Effective Date and (ii) all healthcare, Medicare and Medicaid overpayment and assessment Liabilities and all tort or contractual liabilities arising from the Acquired Assets arising on or after the ASA Effective Date relating to the operation of the Facility on and after the ASA Effective Date, (b) Liabilities under the Assumed Contracts accruing on or after the ASA Effective Date, (c) all COBRA and WARN obligations and Liabilities of Seller relating to the termination of employment of any employee employed by Seller, which termination is effective after (but not on or prior to) the ASA Effective Date, (d) all of Seller's Liabilities relating to the Transferred Employees for accrued and unused PTO as of the ASA Effective Date (collec
PTO"), (e) any and all obligations and liabilities of Seller arising out of, or re
to comply with any requirements of ERISA Section 4204 to the extent that
occurred on or after the ASA Effective Date, (f) the WC Loans (as defined in the ASA), (g) any liabilities under an Assumed Contract (including the CBA) that relates to any period before the ASA Effective Date, including any Cure Payments; (h) any Capital Leases the reimbursement of which are included in the Facilities Medicaid Rate; (i) the obligations described in 2.5(c), or otherwise as provided in this Agreement.

2.4 Retained Liabilities. Except as otherwise provided in this Agreement, Buyer is only assuming the Assumed Liabilities and is not assuming, directly or indirectly, any other Liability of Seller or any Affiliate of Seller of whatever nature, whether presently in existence or arising hereafter, whether fixed, contingent or otherwise (collectively, the "Retained Liabilities") including, without limitation, any of the following:

2.4.1. All Pre-ASA Effective Date Healthcare Program Liabilities, except as set forth in Sections 2.3 and 2.5(c) hereof;

2.4.2. Any tort or contractual Liability arising from the Excluded Assets; provided that for the avoidance of doubt, tort liability arising from actions or inactions occurring prior to the ASA Effective Date shall be Retained Liabilities;

2.4.3. Any Liability arising out of the use, ownership or operation of the Facilities prior the ASA Effective Date;

2.4.4. All of Seller's Liabilities relating to any employees of Seller, other than Accrued PTO and any such Liabilities relating to the employment of such employees after the ASA Effective Date, except as more fully set forth in Section 11 of this Agreement and except as required in connection with assumption of CBA;

2.4.5. Any Liability arising from claims of medical malpractice and other professional liability of Seller or any of its employees, agents or independent contractors, arising prior to the ASA Effective Date;

2.4.6. All of Seller's Accounts Payable accrued before the ASA Effective Date;

2.4.7. Any obligations to pay U.S. Trustee fees relating to period of operation prior to the ASA Effective Date;

2.4.8.   Any Liabilities under any contracts that are not Assumed Contracts; and

2.4.9.   Any loan obligations, including related and intercompany loans, payables, or other obligations, other than Liabilities concerning the loans or financings of Buyer other than any Capital Leases the reimbursement of which are included in the Facilities' Medicaid rate.

2.5    Bankruptcy Court Matters.

2.5.1.   This Agreement is subject to (1) the approval of the B final documentation of an agreement reached with the Arba Landlord revised terms and conditions of a new or amended Leases, and (3) th order approving the Transactions.

2.5.2.   The Sellers shall apply for an order that the assets shall be sold free and clear of all pre-petition and post-petition claims for the assessment imposed by Public Health Law § 2807-d on gross receipts collected by the Facilities that were made or accrued before or on the ASA Effective Date (the "Cash Receipts Assessment").

2.5.3.   The Sellers shall apply for an order providing for the Acquired Assets to be sold free and clear of all pre-petition and post-petition liens, claims, and encumbrances, but including all Cash Receipts Assessments made pursuant to Public Health Law § 2807-d[10][a]) that were made or accrued for receipts arising from Pre ASA Effective Date Receivable although the payments may be received after the ASA Effective Date; provided that the Buyer shall assume, the following liabilities: (i) claims by Medicaid and Medicare for Recoupments (ii) the final results of any OMIG audits for any recoupments; (iii) any retroactive CMI adjustments for methodology changes; and (iv) the Assumed Liabilities if any agreed to by the Buyer and the Debtor in this Agreement (the "Recoupment Obligations").  The Recoupment Obligations known to the Sellers shall be set forth on Schedule C annexed hereto.  To the extent any Recoupment Obligations exist that are not disclosed on Schedule C ("Undisclosed Recoupment Obligations"), Sellers shall indemnify the Buyer and/or the ASA Servicer, as applicable, for such Undisclosed Recoupment Obligations required to be paid by the Buyer and/or the ASA Servicer, as applicable, which indemnity obligation shall be treated as an administrative expense claim in the Sellers' bankruptcy cases and shall be permitted to offset any allowed claim for Undisclosed Recoupment Obligations against any unpaid portion of the Purchase Price.

2.6    Capital Funding Security Agreements.  Notwithstanding anything contained in this Agreement to the contrary, the sale, transfer and/or assignment of the Acquired Assets and/or any other property or assets to be sold, transferred or assigned herein, shall be subject to the Lessee Security Agreements (collectively, the "Capital Funding Security Agreements") executed by the Sellers (other than Absolute Center for Nursing and Rehabilitation at Westfield, LLC and Absolut Facilities Management, LLC), as well as any related documents that granted to Capital Funding, LLC, Capital Funding Group, Inc., and any of their predecessors, successors and/or assigns (collectively, "Capital Funding") and to the U.S. Department of Housing and Urban Development ("HUD"), security interests in and liens upon the Collateral (as defined in the Capital Funding Security Agreements), and to the liens, claims, interests, or encumbrances granted to Capital

Funding and to HUD under the Capital Funding Security Agreements and any related documents. The Buyer shall execute and deliver to (i) Capital Funding and to HUD, a Lessee Security Agreement(s), in the form and substance acceptable to Capital Funding and to HUD, that grants to Capital Funding and to HUD, a first priority security interest in, and lien upon all of the Acquired Assets and/or any other property or assets to be sold, transferred or assigned herein (except with respect to the Acquired Assets of Absolut Center for Nursing and Rehabilitation at Westfield, LLC and Absolut Facilities Management, LLC); (ii) Capital Funding, an intercreditor agreement, a deposit account control agreement(s) and such other and further documents required by Capital Funding and HUD, in the form and substance satisfactory to Capital Funding and HUD; and (iii) HUD, a Healthcare Regulatory Agreement(s) – Operator, as well as such other be required by HUD, to operate each of the Facilities.

3.    PURCHASE PRICE AND ADJUSTMENTS

3.1    Consideration for Sale.  As the consideration for the sale, assignment, conveyance, transfer, and delivery of the Acquired Assets to Buyer in accordance with the terms of this Agreement, Buyer shall (a) assume the Assumed Liabilities and (b) pay the sum of $750,000.00 to be paid as follows:  (i) $75,000.00 (the "Deposit") on the execution of this Agreement, the receipt of which is hereby acknowledged by the Sellers, which shall be credited to the Purchase Price; and (ii) $75,000 on the second anniversary of the ASA Effective Date, $250,000 on the third anniversary of the ASA Effective Date, and a final payment of $350,000.00 on the fourth anniversary of the ASA Effective Date, plus the amount of all cure costs associated with the assumption and assignment of the Assumed Contracts (other than the Leases), payable upon the Closing (the "Cure Payments"), provided that the Buyer may elect to apply all or a portion of the Deposit against the Cure Payment, in which case the payment due on the second anniversary of the Closing would be increased by the amount of the Deposit so applied. The sale shall be subject to the necessary approval of the Bankruptcy Court, the DOH, and HUD, pursuant to HUD's Transfer of Physical Assets review ("HUD Approval").  The members of each of the Buyer entities may include, in addition to Edward Farbenblum, Menachem Tauber and Michael Farbenblum, other individuals or entities including one or more of the principals of the Debtor who shall own no more than twenty-two and ½ (22.5%) percent of the equity in each of the SPEs formed to purchase the Acquired Assets and become the licensed operators of each of their respective Facilities.

3.2    The Parties shall agree to allocate the Purchase Price (Assumed Liabilities that are treated as Purchase Price for federal income tax purposes) prior to the Closing in accordance with Section 1060 of the Code (i) between each separate Facility and then (ii) the Purchase Price allocated to each separate Facility shall be further allocated among the Acquired Assets for each separate Facility.  Buyer shall prepare a preliminary Form 8594 for each Facility at least thirty (30) days prior to Closing and submit such Form 8594 to Seller for Seller's review and comment.  If Seller and Buyer cannot agree on any of the allocations, their respective accountants shall choose a third accountant who is familiar with the operation and transfer of skilled nursing facilities in the State of New York and the decision of at least two of the three accountants with respect to such unagreed items shall be final.  The Parties shall supplement and update the allocation in the event any adjustments or updates are made pursuant to Section 3.5 of this Agreement using the procedures set forth in this Section 3.2.  Once agreed upon or otherwise finally determined, the

Parties shall file all tax returns reflecting the allocations in the agreed Forms 8594 and no Party shall take a position that is inconsistent with that set forth in each Form 8594.

3.3 <u>ASA Effective Date Adjustments</u>. The following closing adjustments (the "<u>ASA Effective Date Adjustments</u>") shall be apportioned by and between Sellers and Buyer as of 11:59 P.M. on the day preceding the ASA Effective Date (except as otherwise stated), and the net amount of such adjustments shall be paid by Seller or Buyer, as applicable, to the other during the Interim Period or, if not paid during such period, at the Closing by adjustment to the extent that either Party is obligated to pay:

3.3.1. Real estate taxes and assessments that have been paid to as well as additional rent, water, taxes and sewer rentals, which have the Sellers;

3.3.2. Prepayments or amounts due under Assumed Contracts;

3.3.3. Telephone, gas, water, electric and any other utility charges upon actual reading where practicable;

3.3.4. Prepaid insurance premiums;

3.3.5. Heating fuel;

3.3.6. Prepaid fees, fees payable in installments and fees due before the ASA Effective Date, covering assigned licenses and permits, including, but not limited to, dues and subscriptions;

3.3.7. Prepayments, charges and security deposits relating to any of the Acquired Assets, Assumed Contracts or the real property, including, but not limited to, service, maintenance and other similar agreements assigned to Buyer under this Agreement;

3.3.8. [Intentionally Omitted];

3.3.9. Accrued wages and payroll taxes for Transferred Employees if the ASA Effective Date takes place in the middle of a pay period or if the same has not been paid by Seller by the ASA Effective Date;

3.3.10. Except for Accrued PTO, monies due to employees of Sellers for any and all benefits due such employees for the period prior to the ASA Effective Date under the CBA, and monies due to non-union employees under employment contracts or other arrangements including but not limited to, contributions, under any plan, welfare & legal funds, including but not limited to health insurance premiums. This amount will be determined prior to the ASA Effective Date by Sellers' and Buyer's accountants so that it may be used as a Closing Adjustment;

3.3.11. If any retroactive adjustment in payments to the Facilities is made on or after the ASA Effective Date, as a result of an audit, rate appeal or otherwise, with respect to Medicaid or Medicare rate payments, cash receipts assessments or other Liabilities to

the State of New York or any other third party reimbursement paid or owing to or by Seller for services rendered by the Facilities prior to the ASA Effective Date, except for any overpayments which are Assumed Liabilities, Buyer shall receive an adjustment in the amount of such monies withheld or otherwise recovered from Seller attributable to such decrease;

3.4 <u>Closing Adjustments</u>. On or before the ASA Effective Date, Seller or Buyer, as applicable, shall compute the ASA Effective Date Adjustments in Section 3.3 and pay the net amount to Seller or Buyer, as applicable, on the ASA Effective Date or as soon as reasonably practicable thereafter.

3.5 <u>Correction or Updating of Adjustments</u>. The Parties agree that such information as may be pertinent to the ASA Effective Date Adjustments within sixty (60) days after the ASA Effective Date and the Closing Adjustments within thirty (30) days before the Closing Date  The ASA Effective Date Adjustments and the Closing Adjustments shall be subject to correction or updating one hundred twenty (120) days after the ASA Effective Date or the Closing Date, as applicable, to be agreed upon by the Parties. If Seller and Buyer cannot agree on any of the adjustments, their respective accountants shall choose a third accountant who is familiar with the operation and transfer of skilled nursing facilities in the State of New York and the decision of at least two of the three accountants shall be final. Any updated or corrected adjustments made within the preceding one hundred twenty (120) days shall be paid in cash by one Party to the other Party, as applicable, within ten (10) days after such final determination has been made.

3.6 [ERISA Section 4202 Exemption. Sellers are a party to one or more Collective Bargaining Agreement(s) (collectively referred to as the "<u>CBA</u>") and are party to, and  participate in, a "multiemployer plan" ("Multiemployer Pension Plan") as such term is defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("<u>ERISA</u>"). The Parties intend to comply with the requirements of Section 4204 of ERISA in order that the transactions contemplated by this Agreement shall not be deemed a complete or partial withdrawal from any Multiemployer Pension Plan to which the Sellers are obligated to contribute. Accordingly, Seller and Buyer agree:

3.6.1. After the Closing Date, Buyer shall contribute to the Multiemployer Pension Plan with respect to the operations of the facility for substantially the same number of "contribution base units" for which Sellers had an "obligation to contribute" to the Multiemployer Pension Plan under the CBA.

3.6.2. Buyer shall provide to the Multiemployer Pension Plan, for a period of five consecutive plan years commencing with the first plan year beginning after the Closing Date, either a bond issued by a surety company that is an acceptable surety for purposes of 29 U.S.C. § 1112, or an amount held in escrow by a bank or similar financial institution satisfactory to the Multiemployer Pension Plan. The amount of such bond or escrow deposit shall be equal to the greater of:

(a) the average annual contribution that Sellers were required to make to the Multiemployer Pension Plan with respect to the operations of the facility for the

three plan years immediately preceding the plan year in which the Closing Date occurs, or

(b)    the annual contribution that Sellers were required to make to the Multiemployer Pension Plan with respect to the operations of the facility for the last plan year immediately preceding the plan year in which the Closing Date occurs.

3.6.3.    Such bond or escrow shall be paid to the plan if the purchaser withdraws from the Multiemployer Pension Plan or fails to make a contribution t
Pension Plan when due, at any time during the first five plan years
Closing Date.

3.6.4.    If Buyer completely or partially withdraws from the Multiemployer Pension Plan prior to the end of the fifth plan year beginning after the Closing Date, and the resulting liability of Buyer with respect to the Multiemployer Pension Plan is not paid, then Sellers shall be secondarily liable to the Multiemployer Pension Plan in an amount not to exceed the amount of withdrawal liability Sellers would have had to pay to the Multiemployer Pension Plan as a result of the transactions contemplated by this Agreement but for Section 4204 of ERISA. Buyer shall indemnify Sellers against any liability incurred by Seller pursuant to this clause.

3.6.5.    Sellers shall cooperate with Buyer if Buyer wishes to prepare and submit to the Multiemployer Pension Plan a request for a variance of the exemption from the bond/escrow requirement of Section 4204(a)(1)(B) of ERISA (as described in Paragraph (B) above). Unless and until such a variance or exemption is granted, Buyer shall comply with the bond/escrow requirement.

3.7    The provisions of this Article 3 shall survive the Closing.]

4.    <u>ACCOUNTS RECEIVABLE AND PAYABLE</u>

4.1    For a period of up to twelve (12) months after the occurrence of the Closing, and until Buyer is able to secure provider agreements and provider numbers in its own name, Buyer may bill under Sellers' name and provider numbers to the extent permitted under applicable law.

4.2    Nothing herein shall be deemed to limit in any way any Party's respective rights and remedies to recover accounts receivable due and owing any of them under the terms of this Agreement as to any third party.

4.3    After the Closing, either Party, or its agents, shall, upon reasonable notice and during normal business hours, have the right to inspect all of the books and records of the other Party relating to accounts receivable collected by either Party on behalf of the other in order to confirm that such receivables were properly booked as Pre-ASA Effective Date or Post-ASA Effective Date. Notwithstanding the foregoing, if such information can be transmitted through electronic mail, then the Buyer and Sellers may satisfy the obligations under this subsection in that manner.

4.4     Power of Attorney. In connection with the collection of such cash receipts, Buyer is hereby authorized to endorse and deposit checks, money orders, or other negotiable instruments, made payable to Sellers but received by Buyer, and Seller does hereby constitute and appoint Buyer as its agent and attorney-in-fact for such purposes only.

4.5     Exchange of Documentation. All bills received after the ASA Effective Date by Buyer relating to Retained Liabilities shall be delivered to Seller within seven (7) business days of Buyer's receipt. All bills received after the ASA Effective Date by Seller relating to Assumed Liabilities shall be delivered to Buyer within seven (7) business days of Seller's receipt.

4.6     All of the provisions of this Section 4 shall survive the Closin

5.     OVERPAYMENTS, UNDERPAYMENT AND APPEALS

5.1     Right to Appeal. On and after the ASA Effective Date , each Party shall retain the sole and absolute right to protest, contest or appeal any Medicaid or Medicare rate determinations or any other third party reimbursement relating solely to services rendered by the Facilities as follows: (a) for the periods prior to the ASA Effective Date, Seller shall have such exclusive rights, and (b) for the periods on or after the ASA Effective Date, Buyer or ASA Servicer (as applicable) shall have such exclusive rights. Each Party shall be entitled to receive and retain any additional reimbursement resulting from that appeal limited, however, to the reimbursement for services rendered during such Party's period as set forth above.

5.2     Retroactive Payment Adjustments. If any retroactive adjustment in payments is made as a result of an audit, rate appeal or otherwise, with respect to Medicaid or Medicare rate payments, cash receipts assessments or other liabilities to the State of New York or any other third party reimbursement paid or owing to or by Seller for services howsoever provided by the Facilities prior to the ASA Effective Date and such adjustment is made by increasing or decreasing the Medicare, Medicaid or other third party payments made by such payor to Buyer for the Facilities on or after the ASA Effective Date, then:

5.2.1.   each Party shall promptly provide the other with written notice of such retroactive adjustment, with copies of all supporting documentation relating to it;

5.2.2.   in the case of an increase, the monies received by Buyer attributable to such increase relating to the rates in effect or the services rendered by the Nursing Home Business during any period of time before the ASA Effective Date shall be deemed trust funds belonging to Sellers and Buyer shall pay the same to Seller on or before the fifteenth (15th) day of the month after the receipt thereof by Buyer.

5.3     Claim Notice. After the Closing Date, if either Party receives a notice relating to any audit, rate appeal, retroactive rate adjustment, or other rate determination, or of the results of any protest, contest or appeal thereof, which is attributable in whole or in part to periods prior to the ASA Effective Date (the "Claim Notice") the receiving Party shall deliver to the other Party, within seven (7) business days of receipt, a true and correct copy of any such Claim Notice.

5.4     Rate Appeals.

5.4.1.   Participating Appeals.  If on or after the Closing Date, either Buyer or Seller (an "Initiating Party") intends to protest, contest or appeal any Medicaid or Medicare rate determinations or any third party reimbursement relating to any period that commenced prior to the ASA Effective Date and ends after the ASA Effective Date, then the Initiating Party shall notify the other Party (the "Receiving Party") of such intention in writing (a "Protest Notice") within twenty (20) days after receipt of the Claim Notice.  The Receiving Party shall have the right to participate in such protest, contest or appeal by giving the Initiating Party notice of such election within seven (7) business days after the receipt of the Protest Notice.

5.4.2.   Effect of Participation.  If the Receiving Party elects t protest, contest or appeal, then:

(a)     it shall pay its *pro rata* share of the Initiating Party's legal, accounting and other costs of pursuing such protest, contest or appeal.  The Receiving Party's *pro rata* share of such costs shall be equal to the product of (A) the amount of such costs and (B) a fraction in which the denominator is the total amount of reimbursement to be received and the numerator is the amount to be received by the Receiving Party. For purposes of this Section, (i) Seller is liable for such costs for periods before the ASA Effective Date and (ii) Buyer is liable for such costs for periods on and after the ASA Effective Date;

(b)     the Receiving Party shall participate in the protest, contest or appeal to the extent reasonably necessary to pursue such action and shall provide access to the Facilities' books and records;

(c)     so long as either Party is contesting any such claim in good faith, the other Party shall not pay or settle such claim;

(d)     Seller shall be entitled to receive all increased reimbursements resulting from such protest, contest or appeal that relate to services provided at the Facilities before the ASA Effective Date;

(e)     Buyer shall be entitled to receive all increased reimbursements resulting from such protest, contest or appeal that relate to services provided at the Facilities on or after the ASA Effective Date;

(f)     Notwithstanding the preceding, no appeal relating to (i) the Medicaid transfer price for the Facilities shall be settled or withdrawn without the prior written consent of Seller and Buyer and (ii) Hurricane Sandy relief or reimbursement shall be filed, settled or withdrawn without Seller's prior written consent.

5.4.3.   Failure to Elect.  If the Receiving Party does not elect in a timely manner to participate in any such protest, contest or appeal, then the Initiating Party shall bear the entire cost of such proceeding and, notwithstanding any other provision of this Agreement, shall be entitled to receive and retain all increased reimbursements resulting from such proceeding regardless of when the services were provided subject, however, to a maximum aggregate sum equal to the costs of such proceeding incurred by such Initiating Party. Upon recoupment of such costs by the Initiating Party all increased reimbursements resulting

from the proceeding shall be allocated between Buyer and Seller as outlined in Sections 5.4.2 (d) and (e) above.

5.5     Notwithstanding anything to the contrary contained in this Agreement, all post-Closing third party lump sum payments, increases in reimbursements and rates arising from services rendered by the Facilities before the ASA Effective Date shall be included in the Excluded Assets and shall belong to Seller and all third party lump sum payments, increases in reimbursements and rates relating to services rendered by the Facilities on or after the ASA Effective Date shall be included in the Acquired Assets and shall belong to Buyer.

6.     <u>CLOSING</u>

Subject to the provisions of Sections 12, 13 and 14 hereof, the closin provided for in this Agreement (the "<u>Closing</u>") shall take place at 10:00 a.m. either electronically or at the New York offices of Buyer's counsel, 800 Third Avenue, New York, New York 10022, or at such other location within the State of New York as may be agreed to by the Parties in writing, within thirty (30) days after receipt by Buyer, or its representative, of the written, non-contingent approval of the Department of Health of the Application (the "<u>DOH Approval</u>") and HUD.  The date upon which the Closing shall occur is the "<u>Closing Date</u>".

7.     <u>DOCUMENTS TO BE DELIVERED AT CLOSING</u>

7.1     <u>Seller's Deliveries</u>.  The following deliveries, duly executed as appropriate, shall be made by Seller to Buyer at or before the Closing (collectively, the "<u>Seller's Closing Documents</u>"):

7.1.1.   A general bill of sale and conveyance, substantially in the form annexed hereto as <u>Exhibit 7.1.1</u> (the "<u>Bill of Sale</u>"), conveying to Buyer good and marketable title to the Acquired Assets;

7.1.2.   An Assignment and Assumption of Contracts, substantially in the form annexed hereto as <u>Exhibit 7.1.2</u> (the "<u>Assignment and Assumption of Contracts</u>"), pursuant to which Seller shall assign to Buyer, and Buyer shall assume on and after the Closing Date, all of Seller's rights and obligations in, to and under the Assumed Contracts;

7.1.3.   A copy of the Sale Order of the Bankrupcy Court, duly authorizing and approving: (i) the transactions contemplated herein (the "<u>Transaction</u>"); and (ii) the execution, performance and delivery of this Agreement (the "<u>Sale Order</u>");

7.1.4.   A certificate of Seller, dated as of the Closing Date, certifying that: (i) each covenant and agreement to be performed on or after the Contract Date by Sellers pursuant to this Agreement has been performed in all material respects; and (ii) as of the Closing Date, and except as otherwise contemplated by this Agreement, each of the representations and warranties made by Sellers in Sections 8.1 and 8.2 of this Agreement is true and correct in all material respects;

7.1.5. A flow of funds, with respect to the Transaction including account information regarding payments, acquisition of debt and detailing all Closing Adjustments (the "Closing Statement"), which shall be attached hereto as Schedule 7.1.5;

7.1.6. Completed and executed documents necessary to transfer Seller's Medicare, Medicaid and third-party payor program provider numbers and provider agreements to Buyer, including, without limitation, at Buyer's request, Seller's signature on required portions of a CMS Form 855A accurately completed by Seller; and

7.1.7. Such other instruments and documents as Buyer and E reasonably request and as are customary to affect a closing of the Tra

7.2 Buyer's Closing Deliveries. The following deliveries, appropriate, shall be made by Buyer to Seller at or before Closing (collectively, the "Buyer's Closing Documents"):

7.2.1. The Assignment and Assumption of Contracts[1];

7.2.2. A copy of the resolution(s), certified as true and of full force and effect as of the Closing Date, duly executed by the members and managers or managing members of Buyer, duly authorizing and approving: (i) the Transaction; and (ii) the execution, performance and delivery of this Agreement, Buyer's Closing Documents and of all of the other documents to be executed and performed by Buyer in connection with the Transaction (collectively, the "Buyer's Transaction Documents");

7.2.3. A certificate executed by a manager or managing member of Buyer, certifying that: (i) each covenant and agreement of Buyer to be performed prior to or as of the Closing Date pursuant to this Agreement has been performed in all material respects; and (ii) as of the Closing Date, each of the representations and warranties contained in this Agreement made by Buyer contained in this Agreement is true and correct in all material respects;

7.2.4. A subsistence certificate for Buyer, issued by the Secretary of State of the State of New York, dated no earlier than thirty (30) calendar days before the Closing;

7.2.5. The Closing Statement;

7.2.6. Buyer's check or other acceptable funds payable to the appropriate Governmental Authority in the amount of the applicable sales taxes and any other transfer taxes associated with the sale of the Acquired Assets, if any, together with the completed sales tax return and any other applicable transfer tax returns;

7.2.7. Not less than three (3) days before the Closing Date, a list of all of Seller's books and records copies of which are requested by Buyer as Acquired Assets, to be delivered to Buyer at or before the Closing; and

---

[1] Buyer please provide form.

7.2.8.  Such other certificates, instruments and documents as Sellers and Sellers' counsel may reasonably request and as are customary to affect a closing of the Transaction.

8.  REPRESENTATIONS AND WARRANTIES OF SELLER

To induce Buyer to enter into this Agreement and close on the Transaction, each Seller severally represents and warrants to each applicable Buyer that the following representations are true, correct and complete in all material respects as of the date hereof, and shall be true, correct and complete in all material respects as of the ASA Effective Date and as of the Closing Date in each case, with respect to itself and its related Acquired Assets:

8.1  Organization and Ownership.  Each Seller is a limited liab organized and validly existing under the laws of the State of New York.  Sei authority to own and operate the Acquired Assets and carry on the business of the Facilities as the same is now being conducted.

8.2  Binding Agreement.  This Agreement has been duly authorized, executed and delivered by Seller and is a valid and binding agreement of Seller enforceable in accordance with its terms, except (a) as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights and (b) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.  Subject to the DOH Approval, Seller's execution, delivery and performance of this Agreement does not and shall not conflict with, violate or constitute a breach of or default under the provisions of any indenture, agreement or other instrument to which Seller is a party or by which it may be bound or the provisions of any federal, state or local law, rule or regulation or any order, writ, judgment, injunction, decree, determination or award of any court, Governmental Authority having applicability to Seller or by which Seller may be bound.  The transactions contemplated by this Agreement are not and shall not be in conflict with any of Seller's governance documents including, but not limited to, Seller's Operating Agreement, or any other agreement to which Seller is a party. Seller has not entered into any other agreement concerning the sale or transfer of the Acquired Assets.

8.3  Licenses and Governmental Permits.  Seller is established and licensed by the Department of Health, under the Public Health Law of the State of New York, to operate the Facilities as shown on Schedule A.  The Facilities each participate as a provider in the Medicare and Medicaid programs under Medicare and Medicaid provider agreements.  Seller has all Governmental Authorizations necessary for it to conduct the Nursing Home Business as currently operated.  Such Governmental Authorizations are valid, and Seller has not received any written notice that any Governmental Authority intends to cancel, terminate, or not renew any such Governmental Authorization.

8.4  Litigation, Etc.  Except as may be disclosed on Schedule 8.4 annexed hereto, there is no action, suit or other legal, administrative, arbitration, or other proceeding or governmental investigations pending or, to Seller's Knowledge, threatened with respect to Seller which would, individually or in the aggregate, have a material adverse effect on Seller, the Acquired Assets or the Nursing Home Business.

8.5     Title.  Subject to any security interests that will be discharged on the ASA Effective Date or related to the loans or financings of Buyer or any SPE used for the purpose of purchasing the Acquired Assets, Seller alone has good, valid and marketable title to the Acquired Assets owned by Seller.

8.6     Additional Consents.  Subject to entry of the Sale Order, and other than as set out elsewhere in this Agreement, no action, authorization, consent, order or action, including action by any federal, state, municipal or other Governmental Authority, is necessary to make this Agreement and the other agreements and instruments contemplated herein, valid instruments binding upon Seller in accordance with their terms.

8.7     Name.  Seller has been operating the Facilities under the na for Nursing and Rehabilitation."  To the Sellers' Knowledge, there have been no challenges to its use of the name "Absolut Center for Nursing and Rehabilitation Center."

8.8     No Other Sale Agreement.  There are no outstanding contracts or options to purchase any of the Acquired Assets or the Facilities, and no pending certificate of need application relating to the Nursing Home Business.

8.9     Financial Statements. Seller has furnished Buyer with audited financial statements for Seller for the years ended December 31, 2017 and December 31, 2018 (the "Audited Financial Statements") which, to the best of Seller's Knowledge, present fairly and accurately the financial condition of Seller and its respective assets, liabilities, revenues, expenses and ownership equity as of the date and fiscal period indicated, and the results of operations of Seller for the fiscal period indicated therein.

8.10    Cost Reports.  All Medicare and Medicaid cost reports filed by or on behalf of Seller applicable to the Facilities are, to Seller's Knowledge, accurate in all material respects.

8.11    Compliance with Laws.  The operation of the Facilities by Seller is in compliance in all material respects with all applicable legal requirements.  Seller has filed all forms, reports, statements and other documents required to be filed with any Governmental Authorities in connection with the operations of the Facilities by Seller where failure to file would be reasonably expected to have a material adverse effect on the Nursing Home Business.

8.12    Labor Unions and Plans.  Seller is a party to the CBA.  Seller has provided Buyer with a true, correct and complete copy of the CBA.  The CBA is being assumed by Buyer hereunder as provided herein.  The CBA is the only collective bargaining agreement to which Seller is a party and the Union is the sole collective bargaining representative of Seller's employees.  Except for the Plans identified on Schedule 8.12 annexed hereto, Seller does not maintain or contribute to, and it has no Liability or obligation concerning, any Plans. Seller is a party to, and  participates in, a "multiemployer plan" as such term is defined in the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("ERISA").

8.13    Compliance with Medicare and Medicaid Programs.  Seller has timely filed or will file all requisite claims and other reports required to be filed by Seller in connection with Medicare and Medicaid due on or before the Closing Date, all of which are complete and correct, except for

final cost reports which are due after the Closing Date. Seller has met and does meet, without exception, the conditions for participation in the Medicare and Medicaid programs.

8.14 <u>Surveys and Inspection Reports</u>. Seller has made available to Buyer true, complete and correct copies of the most recent surveys and inspection reports from, and plans of correction provided by, Seller to any governmental health care regulatory agency, intermediary or authority or any other licensing organization and any and all correspondence between or on behalf of any such regulatory agency, intermediary or authority or licensing organization concerning any and all deficiencies, inadequacies or non-compliance with regulations or standards applicable to the Facilities.

8.15 <u>Residents; Resident Funds; Resident Agreements</u>. Attached a true, complete and accurate accounting as of the ASA Effective Date of the following: (a) the Residents of the Facilities; and (b) all Resident Deposits and the Trust Funds held in custody by Seller which belong to the Residents. The Trust Funds represent all of the Residents' funds entrusted to Seller other than those which Seller has paid to or on behalf of Residents in accordance with all applicable laws and regulations

8.16 <u>Immigration and Nationality Act</u>. Seller is in compliance in all material respects with the terms and provisions of the Immigration and Nationality Act (the "<u>Immigration Act</u>") for each of Seller's employees for whom compliance with the Immigration Act is required. Sellers have obtained and have retained a complete and true copy of each of Sellers' employees' Form I-9 (Employment Eligibility Verification Form) and all other records or documents prepared, procured or retained by Seller pursuant to the Immigration Act. Seller has not been cited, fined, served with a Notice of Intent to Fire or with a Cease and Desist Order, nor has any action or administrative proceeding been initiated or, to the Seller's Knowledge, threatened against Seller by reason of any actual or alleged failure to comply with the Immigration Act.

9. <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

To induce Seller to enter into this Agreement and to close on the Transaction, Buyer at this moment represents and warrants to Seller as follows:

9.1 <u>Establishment and Licensure</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York and possesses all requisite power and authority to execute this Agreement and consummate the transactions contemplated herein.

9.2 <u>Binding Agreement</u>. This Agreement has been duly authorized, executed and delivered by Buyer and is a valid and binding agreement of Buyer enforceable in accordance with its terms, except (a) as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights and (b) that the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses. Subject to the DOH Approval, Buyer's execution, delivery and performance of this Agreement does not and shall not conflict with, violate or constitute a breach of or default under the provisions of any indenture, agreement or other instrument to which Buyer is a party or by which it may be bound or the provisions of any federal, state or local law, rule or regulation or

any order, writ, judgment, injunction, decree, determination or award of any court, Governmental Authority having applicability to Buyer or by which Buyer may be bound. The transaction contemplated by this Agreement is not and shall not be in conflict with any of Buyer's corporate governance documents including, but not limited to, Buyer's Articles of Organization or Operating Agreement, nor with any other agreement to which Buyer is a party.

9.3    Additional Consents.  Other than set out elsewhere in this Agreement, no action, authorization, consent, order or action, including action by any federal, state, municipal or other Governmental Authority, is necessary to make this Agreement and the other agreements and instruments contemplated herein, valid instruments binding upon Buyer by th

9.4    Regulatory Approvals.  Buyer knows of no circumstances or f
or any of Buyer's members or Affiliates that are reasonably likely to cause the Department of Health to refuse to issue the DOH Approval or otherwise consent to the Application and to issue a Certificate of Need or such other permits and approvals as may be necessary to authorize Buyer to consummate the Transaction, or to delay the processing of the Application. Buyer's members have satisfactory fitness, character and financials to meet the requirements of DOH for Buyer to become an operator of the Facilities.

9.5    Financial Statements.  Seller has made available to Buyer all of the financial statements and cost reports referred to Section 8.9 hereof, and Buyer has received all of the information it has requested to date.

9.6    Litigation.  There is no material action, order, writ, injunction, judgment or decree outstanding, or suit, litigation, proceeding, arbitration, investigation or reported claim, pending or, to Buyer's Knowledge, threatened, against Buyer before any court, Governmental Authority or arbitrator, which seeks to delay or prevent the consummation of the transactions contemplated by this Agreement.

9.7    No Other Representations.  In entering into this Agreement, Buyer has not been induced by, and has not relied on, any representations, warranties or statements, written or oral, express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other Person representing or purporting to represent Seller, which are not expressly set forth in this Agreement or the Purchasers Bid.

9.8    Ownership of Buyer.  Now and through the Closing Date, (a) the Members of Buyer shall include Edward Farbenblum; and (b) Edward Farbenblum shall be the manager or managing member of Buyer.

9.9    Disclaimer.  BUYER HEREBY ACKNOWLEDGES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT AND THE SCHEDULES REFERENCED IN THIS AGREEMENT WHICH ARE EACH INCORPORATED HEREIN IN FULL AND MADE A PART HEREOF BY WAY OF SUCH REFERENCE,  SELLER MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THE ACQUIRED ASSETS, THE ASSUMED LIABILITIES, THE REAL PROPERTY, THE FACILITIES OR ITS OPERATIONS OR OTHERWISE, OR WITH RESPECT TO ANY INFORMATION PROVIDED TO BUYER.

EXCEPT TO THE EXTENT SPECIFICALLY OUTLINED IN THIS AGREEMENT, SELLER IS SELLING, ASSIGNING AND TRANSFERRING THE ACQUIRED ASSETS TO BUYER ON AN "AS-IS, WHERE-IS" BASIS. BUYER FURTHER ACKNOWLEDGES THAT SELLER IS AFFORDING BUYER AND ITS REPRESENTATIVES REASONABLE ACCESS TO VISIT AND INSPECT AND TO COMPLETE A FULL INVESTIGATION AND EXAMINATION OF THE FACILITIES, THE ACQUIRED ASSETS, AND THE ASSUMED LIABILITIES.

10.     COVENANTS OF SELLER

Seller at this moment covenants and agrees with Buyer as follows, s obligations of ASA Servicer under ASA:

10.1     Conveyance.  At Closing, Seller shall convey the Acquired provided herein.

10.2     Commencing on the Contract Date and continuing through the Closing Date or the earlier termination of this Agreement (the "Contract Period"), without the prior written consent of Buyer, Seller shall:

10.2.1. be responsible at its sole cost and expense to file 2019 Medicare and Medicaid cost reports (i.e., Forms RHCF 4 and CMS-2540-96 and CMS-2540-10) and complete related financial audits.

10.2.2. not dissolve, merge or enter into a share exchange, sale or transfer with or into any other Person or make any change to its Articles of Organization;

10.2.3. not create or assume any new mortgage, security interest or other lien or encumbrance that is not prepayable without penalty or charge, of any nature upon any of the Acquired Assets, except in the ordinary course of business, provided that nothing herein shall prevent Sellers from making applications for refinancing, and further provided that any such mortgage, security interest or other lien or encumbrance on any of the Acquired Assets is satisfied at or prior to the ASA Effective Date at no expense to Buyer (unless related to the loans or financings of Buyer or Purchaser);

10.2.4. not cease, before the Closing Date, from using the Name;

10.2.5. not change from an accrual basis of accounting;

10.2.6. not enter into any agreement, other than this Agreement, for the sale of the Acquired Assets;

10.2.7. not undertake any action which could reasonably result in a material breach of any representation or warranty of Seller herein, or which is inconsistent with Seller's obligations under this Agreement, or would adversely affect Buyer's ability to perform its obligations under this Agreement or ASA Servicers' ability to perform their obligations under the ASA;

10.2.8. operate the Facilities in the ordinary course and use commercially reasonable efforts to maintain the goodwill of all payors, vendors, residents and others to whom Seller provides services or with whom Seller has a business relationship in connection with the Facilities;

10.2.9. pay all taxes and other liabilities relating to the Facilities or the Nursing Home Business as they become due;

10.2.10. reasonably participate with Buyer in obtaining all Government Authorizations required by Buyer for the purchase of the Acquired As and the transfer of the operations of the Facilities to Buyer;

10.2.11. on the ASA Effective Date or during the Inte required by the Buyer's lender, execute such loan documents reasonably requested by such lender in order to grant to such lender a first priority security interest in the Acquired Assets.

10.3 Seller's Indemnities. From and after the Closing Date, Seller shall indemnify, defend and hold Buyer, its members, managers, and their representatives, successors and permitted assigns harmless from and against any and all claims, actions, actual losses, damages, costs, liabilities or expenses, including without limitation, reasonable attorneys' fees; provided that such losses shall not include consequential or punitive damages to or asserted by the Buyer (the "Losses") of any kind or character, to the extent that such Losses arise from or relate to the Retained Liabilities or any matters itemized in Section 10.3.1 and are not the result of any action or inaction by the Buyer or ASA Servicers, including the Buyers' and ASA Servicers' obligation to ensure that Seller complies with all of its obligations pertaining to the operation of the Facilities following the ASA Effective Date, unless such action or inaction of the ASA Servicer or directly results from any affirmative action taken by Seller's board or members.

10.3.1. Notwithstanding the foregoing, Seller shall not be liable for any Losses suffered by Buyer as a result of any breach or default by Seller of a representation, warranty or covenant contained in this Agreement resulting from any action or inaction by the ASA Servicer, including the ASA Servicers obligation to ensure that Seller complies with all of its obligations pertaining to the operation of the Facilities following the ASA Effective Date, unless such action or inaction of the ASA Servicer directly results from any affirmative action taken by Seller's board or members.

Notwithstanding the preceding, except for Retained Liabilities, Seller shall have no liability concerning any Losses unless and until the aggregate amount of Losses shall exceed $25,000.

10.3.2. All Losses subject to the Seller's indemnification shall be capped at the cash Purchase Price for all of the Acquired Assets.

10.4 ASA Servicer cooperation with Buyer. Seller shall provide in a reasonable and timely manner all then existing documentation and information within its control as requested by Buyer in connection with Buyer's processing of the Application and securing the DOH approval, at no cost to Seller.

10.5 <u>Provider Numbers</u>.  Seller shall execute such documents as may be reasonably necessary to assign Seller's Medicaid and Medicare provider numbers and provider agreements to Buyer as of the Closing.  Seller shall file, on a timely basis, all Medicare and Medicaid reports for all periods before the Closing Date as required by applicable regulations. This provision shall survive the Closing.  All such reports relating to periods on or after the ASA Effective Date, including all 2020 reports, shall be prepared at Buyer's cost and expense. All such reports relating to periods before the ASA Effective Date, shall be prepared at Seller's cost and expense.  All reports shall be subject to each Party's review before filing, provided that any cost reports pertaining to the Interim Period shall be subject to each Party's review and approval prior to filing.

10.6 <u>Satisfaction of Conditions</u>.  Seller shall use its best efforts to o
of the conditions specified in Section 13 of this Agreement.

10.7 <u>Accounts Receivable</u>.

(a) Seller shall retain its right, title and interest in and to all unpaid Pre-ASA Effective Date Receivables.

(b) The Seller and Buyers shall comply with the anti-assignment provisions of the Medicare Act and regulations at, respectively, 42 USC 1395g(c) and 42 CFR 424.73(a). Specifically, any payments billed for services under the Sellers' provider numbers prior to the change of ownership will be deposited into the Sellers' respective accounts. Further, pursuant to 42 C.F.R. § 424.550 and 42 C.F.R. § 424.535(a)(7), the Buyers are prohibited from using the Sellers' Medicare Provider Numbers to bill for services except pursuant to a valid change of ownership.

10.8 <u>Disbursement of Cash Receipts</u>.  From and after the Closing Date, Cash Receipts shall be dispursed by the Parties in accordance with Article 4 of the ASA, provided that ASA Servicer shall be the Buyer post Closing.

11. <u>COVENANTS OF BUYER</u>

The buyer at this moment covenants and agrees with Seller as follows:

11.1 <u>Certificate of Need Approval</u>.  Subject to Seller's cooperation, no later than seventy-five (75) days after the Contract Date, Buyer, at its own cost and expense, shall submit to the Department of Health a certificate of need application (the "<u>Application</u>") seeking DOH Approval for its purchase of the Acquired Assets and its operation of the Facilities.  The principals of the applicant shall always be Edward Farbenblum, Michael Farbenblum and Menachem Tauber. Buyer's failure to timely file the Application shall be deemed a material breach by Buyer of its obligations hereunder, provided Buyer may extend the deadline for filing in exchange for an extension fee, payable to Sellers, of $25,000 per fifteen days.  The Buyer shall timely submit all information and materials required by DOH in connection with its review of the Application and shall diligently pursue obtaining the DOH Approval.  Buyer shall deliver to Seller's counsel, within ten (10) business days of its submission or receipt, a complete copy of the Application and all correspondence and submissions to or from the Department of Health relating to it.  Buyer shall not intentionally take any action before the Closing Date, which would or might disqualify Buyer as the established and licensed operator of the Facilities or delay the DOH Approval.  Once the

Application has been submitted to DOH, there shall be no change in the members of Buyer. If Buyer fails DOH's character and competence review, Buyer may substitute a Person for such member and Buyer may add to the persons listed in the Application with the consent of the Sellers, which shall not be unreasonably withheld. If Seller shall fail to respond to such request within thirty (30) days of such request, Seller shall be deemed to have approved such proposed replacement.

11.2     Buyer and each of its members shall jointly and severally indemnify, defend and hold Seller and its shareholders or members, and their representatives, successors and permitted assigns harmless from and against any Losses of any kind or character, wheth
are known or asserted before or after the ASA Effective Date, to the extent th
from or relate to the following:

11.2.1. The cooperation of the Facilities on and after the ASA Effective Date;

11.2.2. Any material breach or default by Buyer of a representation, warranty or covenant contained in this Agreement;

11.2.3. Liabilities under the Assumed Contracts accruing on or after the ASA Effective Date;

11.2.4. The Assumed Liabilities;

11.2.5. Any Losses arising from any action or inaction of transaction or activity of the ASA Servicer;

11.2.6. Any claim or action arising from employment of the Transferred Employees on and after the ASA Effective Date;

11.2.7. The tax liabilities of each member of Seller relating to the operation of the Facilities on and after the ASA Effective Date, computed at the members' actual applicable rates, in the event that any Governmental Authority does not recognize Buyer as the tax owner or payer of the operation of the Facilities for the Interim Period.

11.2.8. Any Liabilities incurred due to fines, fees and penalties levied for activities occurring on and after the ASA Effective Date in which case the Buyer shall be liable for all of the costs and expenses including Seller's legal fees and fines imposed by the Governmental Agency.

11.3     Satisfaction of Conditions.  Buyer shall use commercially reasonable efforts to obtain the satisfaction of the conditions specified in Section 12 of this Agreement.

11.4     WARN.  Buyer shall employ, or offer to employ, a sufficient number of Sellers' employees in the Facilities at the time of the Closing under the same or substantially similar terms and conditions (including aggregate pay and benefits that existed pre-closing) so as to ensure that neither a mass lay off nor a plant closing, as those terms apply in the federal and state Worker Adjustment and Retraining Notification Act, as amended ("WARN"), or other event giving rise to liability under WARN will occur.  Buyer shall indemnify, defend and hold Seller harmless from

any Liabilities under WARN should the ASA Servicer terminate any employees of Seller prior to Closing or should Buyer refuse to hire or offer employment to under the requisite terms to a sufficient number of Seller's employees so as to trigger a notice or other obligation or Liability pursuant to WARN.

11.5    Facilities Records.  On and after the Closing Date, upon the reasonable request of Seller, Buyer shall afford Seller and its representative access to, and copies of, at Seller's cost, books and records of the Facilities for purposes of responding to administrative inquiries, filing rate appeals, responding to audits, collecting retained accounts receivable, responding to and/or pursuing litigation, and verifying Buyer compliance with provisions of this A
other legitimate purpose.

11.6    Employee Matters.  Buyer shall take subject to the CBA.

(a)    Represented Employees.  Effective as of the Closing, Buyer will employ each "Represented Employee" (defined for this purpose as each Employee who is a member of the bargaining unit that is subject to the CBA) and will assume, adopt and accept the terms and conditions of the CBA or any extension and/or modification thereof including any successor agreement to the CBA.  The Buyer will be the successor under the successor provisions of the CBA from and after the Closing.  Buyer shall be solely responsible for, and agrees to, fully perform and discharge all obligations of the employer under the CBA from and after the ASA Effective Date.  On and after the Closing Date, the Buyer shall indemnify, defend and hold Seller and its partners harmless from any liabilities arising under or under the CBA and resulting from Buyers' failure or refusal to comply with the terms of the CBA.

(b)    Non-Represented Employees.  For purposes of this Agreement, effective as of the Closing, Buyer will, with respect to Non-Represented Employees: (i) assume responsibility for and all wages, benefits, new health care insurance and related taxes for periods commencing on and after the ASA Effective Date; (ii) Seller shall have no obligation or liability arising from the employment of the Non-Represented Employees on and after the ASA Effective Date; (iii) Buyer shall have no responsibility for any wages, benefits, health care insurance and related taxes for periods prior to the ASA Effective Date or any obligations to fund any deficits in Seller's healthcare plan and (iv) Buyer shall indemnify Seller for any claim or action arising from employment of the Transferred Employees on and after the Effective Date.

(c)    Nothing in this Agreement shall create any rights in favor of any person not a party hereto, including the employees of Seller or Buyer, or constitute an employment agreement or condition of employment for any employee of Seller or Buyer or any affiliate thereof, nor shall this Agreement be deemed the assignment to or assumption by Buyer of any collective bargaining agreement, employment agreement or terms or conditions of employment (except as expressly set forth herein)

11.7    Resident Records.  On the Closing Date, Seller shall provide to Buyer the Facilities' records that are Acquired Assets (including all resident/patient records and employment records) by delivering the same to Buyer or leaving all such Facilities records at the Facilities.  On and after

the Closing Date, the Buyer shall maintain all resident records included in the Acquired Assets by statutes, rules and regulations relating to resident records, including, without limitations, those relating to the privacy of resident health information, and periods required for the maintenance of such records. On and after the Closing Date, Seller or its representative(s) shall have access upon reasonable prior notice during normal business hours to inspect and make copies of any such resident records, all at Seller's cost and expense. The Buyer shall not destroy any such resident records without first giving Seller not less than ninety (90) days written notice of Buyer's intention to do so.

11.8    The provisions of this Section 11 shall survive Closing.

12.     CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

The obligations of Buyer to close on the Transaction are subject to the fulfillment at or before the Closing Date of all of the following conditions precedent unless such fulfillment is waived in writing by Buyer:

12.1    No Litigation. No injunction, temporary restraining order, judgment, or other order of any court or Governmental Authority shall have issued or have been entered which would be violated by the consummation of the transactions contemplated herein. Notwithstanding the preceding, Seller shall have the option to bond any loss or claim or settle any such suit, in which case the Closing shall proceed;

12.2    Seller's Closing Documents. Seller shall have executed and delivered to Buyer all of the Seller's Closing Documents;

12.3    Entry of Sale Order. The Bankruptcy Court shall have entered the Sale Order in form and substance satisfactory to the Buyers.

12.4    Regulatory Approval. Buyer shall have received the DOH Approval and HUD Approval;

12.5    Compliance with Covenants. Seller shall have performed and materially complied with all terms, agreements, covenants and conditions of this Agreement required of it at or before the ASA Effective Date, provided that this Section 12.4 shall not be a condition to Closing following the ASA Effective Date; and

12.6    Seller Representations and Warranties. All of Seller's representations and warranties outlined in this Agreement shall be true and correct in all material respects on the ASA Effective Date, provided that this Section 12.5 shall not be a condition to Closing following the ASA Effective Date.

13.     CONDITIONS PRECEDENT TO THE OBLIGATIONS OF SELLER TO CLOSE

The obligations of Seller to close on the Transaction are subject to the fulfillment at or before the Closing Date of all of the following conditions precedent unless such fulfillment is waived in writing by Seller:

13.1 _Buyer's Closing Documents_. Buyer shall have executed and delivered to Seller all of the Buyer's Closing Documents;

13.2 _Landlord Cure Obligations_. The Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Sellers, providing for payment of any cure obligations owed in respect of the Leases only in accordance with the terms of that certain Landlord Group Proposed Plan Term Sheet dated as of January 30, 2020 and incorporated by reference into the Sale Order or on such other terms as may be agreeable to the Sellers in their sole discretion;

13.3 _Entry of Sale Order_. The Bankruptcy Court shall have enter form and substance satisfactory to the Sellers;

13.4 _Regulatory Approval_. Buyer shall have received the DOH Approval;

13.5 _No Litigation_. No injunction, temporary restraining order, judgment or other order of any court or Governmental Authority shall have issued or have been entered which would be violated by the consummation of the transactions contemplated herein;

13.6 _Compliance with Covenants_. Buyer shall have performed and materially complied with all terms, agreements, covenants and conditions of this Agreement to be required of it at or before the ASA Effective Date, provided that this Section 13.6 shall not be a condition to Closing following the ASA Effective Date;

13.7 _Representations and Warranties_. All of Buyer's representations and warranties outlined in this Agreement shall be true and correct in all material respects on the ASA Effective Date and the Closing Date; and

13.8 _Purchase Price_. Seller shall have received the Purchase Price due at or prior to Closing in accordance with Section 3.1.

14. EVENTS OF DEFAULT; REMEDIES; TERMINATION

14.1 _Termination of Agreement_. This Agreement may be terminated:

14.1.1. Subject to Section 14.1.7, in the event of a Seller breach, default or failure to fulfill any material representation, warranty or covenant of this Agreement or the ASA Agreements prior to the Closing (in each instance, a "Seller Default") and the continuance of such Seller Default for twenty (20) days following the receipt by Seller of written notice from Buyer specifying the Seller Default. Notwithstanding the preceding, Buyer shall not have the right to terminate this Agreement if a Seller Default is due solely to an act or a failure to act by the ASA Servicer or Buyer without such default being caused in whole or in part by any action or failure to act by Seller, its board or its members. The waiver by Buyer of a breach hereunder shall not operate or be construed as a waiver of any subsequent breach.

14.1.2. In the event of a Buyer breach, default or failure to fulfill any material representation, warranty or covenant of this Agreement, or a ASA Servicer breach or

default, prior to the Closing (in each instance, a "Buyer Default") and the continuance of such Buyer Default for twenty (20) days following the receipt by Buyer of written notice from Seller specifying the Buyer Default.  The waiver by Seller of a breach hereunder shall not operate or be construed as a waiver of any subsequent breach.

14.1.3. The Parties may terminate this Agreement by mutual written consent at any time.

14.1.4. Seller may terminate this Agreement by written notice to Buyer if the Closing shall not have occurred within eighteen (18) months aft
Agreement (the "Outside Closing Date").  In the event the failure to
Closing Date is caused by the failure of the Department of He
Application due to a general moratorium on the processing of Certificate of Need applications for transfers of ownership of skilled nursing facilities, the Outside Closing Date shall be extended by the period of such moratorium.

14.1.5. Buyer or Seller may terminate this Agreement if any Governmental Authority shall have issued an order, no longer subject to appeal, restraining, enjoining or otherwise prohibiting the Transaction and such order is not vacated within six (6) months.

14.1.6. [Intentionally Deleted].

14.1.7. Notwithstanding anything to the contrary contained herein, following the ASA Effective Date, neither Party shall have the right to terminate this Agreement except pursuant to Sections 14.1.2, 14.1.3, 14.1.4, or 14.1.5.

14.2    Effect of Termination.  In the event of termination by Seller or Buyer under Section 14.1, written notice thereof shall forthwith be given to the other Party, and the transactions contemplated by this Agreement shall be terminated, without further action by any Party hereto. If the transactions contemplated by this Agreement are so terminated:

14.2.1. Return of Documents.  Buyer shall return Seller all documents and other material received from Seller relating to the Transaction, whether so obtained before or after the execution hereof; and

14.2.2. Filings and Submissions.  Upon any such termination, all filings, applications and other submissions made under this Agreement or in contemplation thereof shall, to the extent practicable, be withdrawn from the Governmental Authority or other Person.  All other rights and obligations of the Parties under this Agreement shall end as of the ASA Effective Date for the termination except as expressly outlined in this Agreement.

14.2.3. Statement and WC Loans.  In the event this Agreement is terminated pursuant to the terms hereof following the ASA Effective Date, upon such termination, the ASA Servicer shall prepare and deliver to Seller within sixty (60) days after the date of termination a profit and loss statement (the "Statement") on an accrual basis for the period from the ASA Effective Date through and including the termination date (the "Interim Period").

14.2.3.1    The Statement (a) shall not include (i) any revenue relating to services rendered prior to the ASA Effective Date, (ii) any expenses incurred prior to the ASA Effective Date (except for staffing and inventory costs relating to the care of residents on or after the ASA Effective Date), or (iii) any amounts recouped from Seller or the Facilities relating to services rendered prior to the ASA Effective Date.

14.2.3.2    [Intentionally Omitted].

14.2.3.3    Upon termination, the Buyer shall be en the Facilities including accrued during the Interim Period, inc of the Post-ASA Effective Date Accounts Receivable accrued termination, and the WC Loan shall be deemed satisfied.

14.2.3.4    Upon closing all of the WC Loans shall be assumed by the Buyer.

14.2.4. [Intentionally Omitted].

14.3    The provisions of this Article 14 shall survive any termination of this Agreement and the Closing.

14.4    Supplemental Disclosure. The Sellers shall have the right from time to time prior to the Closing to supplement any Disclosure Schedule with respect to any matter that arises or becomes known by the Sellers after the date hereof and that would have been required or permitted to be set forth or described in the disclosure schedules had such matter existed or been known to the Sellers as of the date of this Agreement. Any such supplemental disclosure will be deemed to have cured the breach of any representation or warranty made in this Agreement with respect to such disclosed matter only if such supplemental disclosure does not result in a material adverse effect on the Nursing Home Business (it being understood that the consummation of the Closing after the supplemental disclosure will be deemed to constitute a waiver of any such breach).

14.5    Prior Knowledge. If Buyer or the Seller had knowledge prior to the execution of this Agreement that any representation or warranty of the other Party contained in this Agreement was not true and correct as of the date hereof, Buyer or Sellers, as the case may be, may not assert such breach of a representation and warranty as a basis not to consummate the transactions contemplated by this Agreement. In the event the Closing occurs, Buyer and the Sellers hereby expressly waive, relinquish and release any right or remedy available to it at law, in equity or under this Agreement to make a claim against the other Party for damages that such Party may incur, or to rescind this Agreement and the transactions contemplated hereby, as the result of any of the other Party's representations or warranties being not true or correct, if such Party knew that such representation or warranty was not true or correct at the time of the Closing.

15.    GENERAL

15.1    Risk of Loss; Bed Reductions.  The Buyer shall bear all risk of loss of or damage to the Acquired Assets, the Facilities and the Real Property on and after the ASA Effective Date.

18657703.6
233620-10001

15.2     Severability.  If any provision of this Agreement or application to any Party or circumstances is determined by any court of competent jurisdiction to be invalid and unenforceable, the remainder of this Agreement or the application of such provision to such Person or circumstances other than those as to which it is so determined invalid or unenforceable shall not be affected, and each provision shall be valid and enforceable to the fullest extent permitted by law.

15.3     Resident/Patient Funds

   15.3.1. Delivery of Assets.  At the Closing, Seller shall del
Schedule of all Resident/Patient funds held by it, with all such fu
patient-by patient basis; (ii) a check drawn on the Residents'/
Account(s) maintained by the Facilities for the full amount of such account(s) which shall be deposited by Buyer in a new Residents'/Patients' Allowance Account to be maintained by it; (iii) a Schedule of all bank accounts maintained by the Facilities on behalf of its Residents/Patients; (iv) all bank books and other assets belonging to Residents/Patients of the Facilities maintained in the custody of the Facilities together with a Schedule listing such assets and the name of the Resident/Patient for whom they are being held; and (v) a Schedule of all Resident/Patient security deposits and prepayments designated on a patient-by-patient basis, together with a check in the amount of the security deposits and unexpended prepayments.

   15.3.2. Notices.   Seller and Buyer shall jointly and promptly give all notices required by law in connection with the transfer of the Residents'/Patients' assets.

15.4     Further Assurances.  From time to time at or after the Closing, upon the request of Seller or Buyer or any of their successors or assigns, each Party shall execute and deliver or cause to be executed and delivered to the other such assignments, powers of attorney and other instruments of conveyance and transfer and such other documents as may be reasonably necessary to more effectively transfer to Buyer or any of its successors or assigns all of the Acquired Assets sold and intended to be conveyed or transferred pursuant to this Agreement.

15.5     Survival.  The representations and warranties contained in this Agreement will survive for 12 months from the Closing, and the covenants and agreements shall survive for the applicable statute of limitations.

15.6     Amendment and Modification.  This Agreement may not be amended, modified, or supplemented except by a written instrument executed by all of the Parties.

15.7     Confidentiality.

   15.7.1. All information and documentary data furnished by Seller, including, but not limited to, information relating to its identity, its business, financial condition or business plan, shall be kept strictly confidential by Buyer.  Such information and documentary data, together with analyses, compilations, studies, or other documents or records prepared by each Party, their agents, representatives (including attorneys, accountants, and financial advisors), employees, or consultants that contain or otherwise reflect or are generated from such information are referred to in this Agreement as the

"Confidential Information."  No portion of the Confidential Information may be disclosed to others, except to those agents, representatives (including attorneys, accountants and financial advisors), employees, or consultants whose knowledge of the information is needed for evaluation purposes and who recognize the confidential nature of such information and agree to be legally bound to the same burdens of confidentiality, non-use and non-disclosure contained in this Agreement.  Confidential Information does not include any of the foregoing items which: (i) prior to or after the time of disclosure becomes publicly known and made generally available; and (ii) is required to be disclosed by applicable law or proper legal, governmental or other competent authority, provided that Seller shall be notified sufficiently in advance of such requirement so
an appropriate protective order with respect to such disclosure, wit
fully comply. Notwithstanding anything in this Agreement to the co
that Buyer may divulge Confidential Information to its lenders (provided Buyer shall be responsible for any disclosure of any Confidential Information by such lenders in violation of this Section) and in connection with the Application and in the process of seeking the DOH Approval.  Notwithstanding the foregoing, the Sellers may share the terms and conditions of the Transaction or the ASA or any other confidential information with their representatives or otherwise as Sellers determine may be reasonably necessary or appropriate to obtain approval of the Transaction.

15.7.2. Buyer agrees and acknowledges that Seller's Confidential Information is of a proprietary and confidential nature and that damage could result to Seller if the information is disclosed to any third party.  Buyer further agrees that the Confidential Information has been or shall be furnished subject to and in consideration of, the agreement that Buyer and its agents, representatives, employees, or consultants shall maintain its confidentiality, that the Confidential Information shall be used solely for the Transaction, and for no other purpose, and that the receiving party shall not disclose the Confidential Information, or any portion thereof, to any other party, except as authorized by this Agreement.

15.7.3. Except as permitted in this Section 15.7, without the prior written consent of the other Party, each Party and its respective members, directors, officers, agents, representatives, employees, or consultants shall keep the terms and conditions of this Agreement and the Transaction contemplated hereby confidential and not disclose the same to any third parties.  The term "third party" as used in this Agreement shall be broadly interpreted to include, without limitation, any Person that is not permitted to receive Confidential Information pursuant to this Section 15.7.

15.7.4. <u>Remedies</u>.  In the event of a breach of this Article, Seller shall be entitled to specific performance of the covenants contained in this Article, and Buyer shall indemnify and hold harmless Seller for all costs and reasonable attorneys' fees incurred by Seller if Seller is successful in obtaining such specific performance.

15.7.5. <u>Media Communications</u>.  Neither Party shall communicate with any news media relating to the Transaction without the prior written consent of the other Party.

15.8 <u>Merger</u>. This Agreement (including the Exhibits and Schedules hereto) and the documents to be delivered at Closing pursuant hereto, including the ASA, constitute the entire agreement and understanding between the Parties hereto as to the Transaction and supersede and revoke all prior agreements and understandings, oral and written, between the Parties hereto or thereto (including, without limitation, any memorandum of understanding or other preliminary agreements) or otherwise with respect to the subject matter hereof or thereof.

15.9 <u>Assignment</u>. Buyer may not assign this Agreement, or any rights or obligations hereunder, to any other Person without Seller's prior written consent. Any permitted assignee shall be required to execute and deliver to Seller an Assignment and Assump
form acceptable to counsel for Seller, which shall bind the assignee to a
provisions of this Agreement as if the assignee were the original signatory. T
be binding upon and shall inure to the benefit of the Parties and their respective representatives, successors and permitted assigns.

15.10 <u>Notices</u>. Any notices to be given may be sent by a Party's attorney, shall be in writing and, except as otherwise provided herein or specifically and in writing directed by the recipient, shall be delivered personally, against receipt, via nationally recognized overnight courier, or by registered mail, return receipt requested as set forth below:

If to Seller, to:

> Absolut Facilities Management, LLC
> Attn: Mr. Israel Sherman
> 300 Gleed Avenue
> East Aurora, NY 14052

With a copy to:

> Schuyler G. Carroll
> Loeb & Loeb
> 345 Park Avenue
> New York, NY 10154
> Direct Dial: 212.407.4820
> E-mail: scarroll@loeb.com

If to Buyer, to:

> RCA Healthcare Management, LLC
> 10 E. Merrick Road
> Suite 305
> Valley Stream, NY 11580

With a copy to:

> Michelman & Robinson, LLP
> 800 Third Avenue
> New York, New York 10022

18657703.6
233620-10001

15.11 <u>Counterparts</u>. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute the same instrument. A signed counterpart delivered by facsimile or other electronic means shall be binding as an original.

15.12 <u>Headings</u>. The section headings of this Agreement are f reference only and in no way define, limit or describe the scope or intent of t Agreement nor in any way affect this Agreement.

15.13 <u>Construction</u>. Within this Agreement, the singular shall include the plural and the plural shall include the singular, and any gender shall include all other genders, all as the meaning and the context of this Agreement shall require. The Parties hereto have been advised by counsel, and have participated jointly, in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. The words "shall" and "will" are to be interpreted as synonymous and mandatory, not permissive. The terms, and provisions of this Agreement shall be meant to apply to each separate Facility as if the Sellers have signed a separate contract with each SPE to be formed for the sale of the Acquired Assets used in each separate Facility. The terms Seller or Buyer can mean the singular or the plural as the context requires.

15.14 <u>Governing Law and Choice of Forum</u>. The construction, validity and interpretation of this Agreement and the obligations imposed by this Agreement shall be construed by and governed by the internal laws of the State of New York. The Parties hereby agree that the exclusive forum for resolving any disputes arising under this Agreement, including without limitation any proceedings to construe, interpret or enforce this Agreement, or to recover damages for a breach hereof, shall be the Eastern District Bankruptcy Court. To the extent that the provisions of this Agreement and that of the ASA are in conflict, any such conflict shall be interpreted or determined by referring solely to the terms and provisions of the ASA. To the extent the provisions of this Agreement and the ASA are in conflict with the terms of the Sale Order, any such conflict shall be interpreted or determined by referring solely to the terms and provisions of the Sale Order.

15.15 <u>No Third-Party Beneficiaries</u>. The provisions of this Agreement are for the sole benefit of the Parties and shall not create or be deemed to create any third-party beneficiary rights in any Person, not a party to this Agreement.

15.16 <u>No Setoffs</u>. Except as may be expressly permitted in this Agreement, no payment due from one Party to the other Party may be setoff or reduced by any other obligation or Liability whatsoever.

**[Remainder of Page Intentionally Left Blank – Signature Page to Follow]**

**IN WITNESS WHEREOF**, the Parties have duly executed this Agreement as of the date first written above.

SELLER:

**Absolut Facilities Management, LLC as Manager of the Debtor Facilities**

By: _____
    Name:
    Title:

BUYER:

**RCA Healthcare Management, LLC**

By: _____
    Name:  Edward Farbenblum
    Title:

|  | Facility Address | Landlord | Tenant | Lease |
|---|---|---|---|---|
| 1 | 292 Main Street East Aurora, NY 14052 ("East Aurora Facility") | 292 Main Street, LLC | Absolut Center for Nursing and Rehabilitation at Aurora Park, LLC | June 7, 2007 Operating Lease; February 26, 2009 First Amendment to Operating Lease; March 27, 2018 Second Amendment to Operating Lease (as amended, the "East Aurora Lease") |
| 2 | 6060 Armor Road Orchard Park, NY 14127 ("Orchard Brooke Facility") | 6060 Armor Road, LLC | Absolut at Orchard Brooke, LLC | June 7, 2007 Operating Lease; February 26, 2009 First Amendment to Operating Lease; June 1, 2011 HUD Addendum to Operating Lease March 27, 2018 Second Amendment to Operating Lease (the "Orchard Brooke Lease") |

| | Facility Address | Landlord | Tenant | Lease |
|---|---|---|---|---|
| 3 | 2178 N. Fifth Street Allegany, NY 14706 ("Allegany Facility") | 2178 N. Fifth Street, LLC | Absolut Center for Nursing and Rehabilitation at Allegany, LLC | June 7, 2007 Operating Lease; May 14, 2009 Restated and Amended First Second Amendment to Operating Lease (as amended, the "Allegany Lease") |
| 4 | 101 Creekside Drive Painted Post, NY 14870 ("Three Rivers Facility") | 101 Creekside Drive, LLC | Absolut Center for Nursing and Rehabilitation at Three Rivers, LLC | June 7, 2007 Operating Lease; June 1, 2009 Restated and Amended First Amendment to Operating Lease; September 1, 2013 HUD Addendum to Operating Lease March 27, 2018 Second Amendment to Operating Lease (as amended, the "Three Rivers Lease") |

18657703.6
233620-10001

|  | Facility Address | Landlord | Tenant | Lease |
|---|---|---|---|---|
| 5 | 4540 Lincoln Drive Gasport, NY 14067 ("Gasport Facility") | 4540 Lincoln Drive, LLC | Absolut Center for Nursing and Rehabilitation at Gasport, LLC | June 7, 2007 Operating Lease; May 14, 2009 Restated and Amended First  Second Amendment to Operating Lease (as amended, the "Gasport Lease") |

18657703.6
233620-10001

# EXHIBIT A

## WC PROMISSORY NOTE

## [TO BE NEGOTIATED]

18657703.6
233620-10001

<u>**EXHIBIT 7.1.1**</u>

**BILL OF SALE**

**[TO BE PROVIDED]**

18657703.6
233620-10001

# EXHIBIT 7.1.2

## ASSIGNMENT AND ASSUMPTION OF CONTRACTS

## [TO BE PROVIDED]

<u>**EXHIBIT 8.17**</u>

**REAL PROPERTY LEASE**

**TO BE PROVIDED BY LANDLORD AS AMENDED BY THE MOU**

18657703.6
233620-10001